IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAFEWAY INC.; WALGREEN CO.; THE KROGER CO.; NEW ALBERTSON'S, INC.; AMERICAN SALES COMPANY, INC.; and HEB GROCERY COMPANY, LP,<br><br>    Plaintiffs,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-05470 CW<br><br>ORDER DENYING DEFENDANT ABBOTT LABORATORIES' OMNIBUS MOTION TO DISMISS |
| MEIJER, INC. & MEIJER DISTRIBUTION, INC.; ROCHESTER DRUG CO-OPERATIVE, INC.; and LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-5985 CW |
| RITE AID CORPORATION; RITE AID HDQTRS CORP.; JCG (PJC) USA, LLC; MAXI DRUG, INC D/B/A BROOKS PHARMACY; ECKERD CORPORATION; CVS PHARMACY, INC.; and CAREMARK LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-6120 CW |

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, | No. C 07-5702 CW |
| Plaintiff, | |
| v. | |
| ABBOTT LABORATORIES, | |
| Defendant. | |

Defendant Abbott Laboratories moves to dismiss the second amended complaints of Plaintiffs Safeway, Inc., et al.; Meijer, Inc., et al.; and Rite Aid Corporation, et al. (collectively, Direct Purchasers) and Counts 1, 3 and 4 of Plaintiff SmithKline Beecham Corporation's (GSK) complaint. Abbott argues, among other things, that the Ninth Circuit's decision in John Doe 1 v. Abbott Laboratories, 571 F.3d 930 (9th Cir. 2009), forecloses the Direct Purchasers' and most of GSK's claims. Direct Purchasers and GSK oppose Abbott's motion. The motion was heard on October 15, 2009. Having considered oral argument and all of the papers submitted by the parties, the Court DENIES Abbott's Omnibus Motion to Dismiss.

BACKGROUND

Protease inhibitors (PIs) are considered the most potent class of drugs to combat the HIV virus. In 1996, Abbott introduced Norvir as a stand-alone PI with a daily recommended dose of 1,200 milligrams (twelve 100-mg capsules a day), priced at approximately eighteen dollars per day. Norvir is the brand name for a patented compound called ritonavir.

After Norvir's release, it was discovered that, when used in small quantities with another PI, Norvir would "boost" the anti-viral properties of that PI. Not only did a small dose of Norvir

2

-- about 100 to 400 milligrams per day -- make other PIs more effective and decrease the side effects associated with high doses, but it also slowed the rate at which HIV developed resistance to the effects of those PIs. The use of Norvir as a "booster" has enabled HIV patients to live longer. But the use of Norvir as a booster, and not a stand-alone PI, has also meant that the average daily price of Norvir has plummeted since Norvir was first introduced, because patients need a much smaller daily dose of Norvir when it is used as a booster compared to when it is used as a stand-alone PI. By 2003, the average price for a daily dose of Norvir was $1.71.

In 2000, Abbott introduced Kaletra, a single pill containing the PI lopinavir as well as ritonavir, which is used to boost the effects of lopinavir. Although effective and widely used, Kaletra causes some patients to experience significant side effects.

In 2003, two new PIs, Bristol-Myers Squibb's Reyataz and GSK's Lexiva, were about to be introduced to the market. Studies showed that, when boosted with Norvir, the new PIs were as effective as Kaletra, and were more convenient. In July, 2003, Reyataz was successfully introduced to the market. As a result, Kaletra's market share fell more than Abbott had anticipated. The average daily dose of Norvir also fell. Before Reyataz's release, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams a day. Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent while keeping the price of Kaletra constant. Abbott contends that it did this so that the price of Norvir would

3

be more in line with the drug's enormous clinical value. Plaintiffs contend that the Norvir price increase was an illegal attempt to achieve an anticompetitive purpose in the "boosted market," which Plaintiffs define as the market for those PIs, such as Reyataz, Lexiva and Kaletra, that are prescribed for use with Norvir as a booster.

Direct Purchasers allege that Abbott engaged in predatory pricing of a bundled product in the boosted market (Kaletra) and violated its duty to deal in the boosting market (Norvir), both in violation of Section 2 of the Sherman Act. In addition to antitrust and other claims brought under state law, GSK alleges that Abbott violated Section 2 of the Sherman Act by breaching its antitrust duty to deal. Plaintiffs in the Meijer action intend to move to certify this case as a class action and to prosecute their claims on behalf of a class of

> [a]ll persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

Meijer, et al., 2d Am. Compl. (SAC) ¶ 57.

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests.

4

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

DISCUSSION

"Section 2 of the Sherman Act makes it unlawful to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., ___ U.S. ___, 129 S. Ct. 1109, 1118 (2009).

The parties dispute the elements of predatory pricing and duty-to-deal claims under Section 2. Abbott argues that Doe controls the outcome of this case and that, as a result, Direct Purchasers must allege "below-cost pricing of Kaletra and a dangerous probability of recoupment in the 'boosted' market" successfully to plead predatory pricing. Abbott's Mot. at 10. With regard to their duty-to-deal claims, Abbott argues that Direct Purchasers and GSK must allege "a duty to deal and a refusal to deal in the Norvir 'booster' market." Abbott's Mot. at 10.

Plaintiffs assert that Doe did not change the law applicable to this case because Doe did not involve a predatory pricing claim

5

or a duty-to-deal claim. Direct Purchasers argue that if the Court were to adopt Abbott's definition of predatory pricing, the Court would have to find that Doe silently overruled Cascade Health Solutions v. Peacehealth, 515 F.3d 883 (9th Cir. 2008). In Cascade, the Ninth Circuit stated that a plaintiff need not prove dangerous probability of recoupment in predatory pricing cases involving bundled products. Id. at 910 n.21. With regard to their duty-to-deal claims, Direct Purchasers and GSK assert that Doe did not alter the requirements set forth in Aspen Skiing Company v. Aspen Highlands Skiing Corporation, 472 U.S. 585 (1985), which they maintain applies to their claims.

Although Doe involved the same conduct alleged here, the Doe plaintiffs proceeded on a different antitrust theory. They asserted that Abbott engaged in monopoly leveraging, which the Ninth Circuit held to state an antitrust claim in Image Technical Services, Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 2007). However, unlike the plaintiffs in Image Technical, the Doe plaintiffs did not allege a refusal to deal. See 125 F.3d 1195, 1209-11; see also Doe, 571 F.3d at 935 ("Image Technical involved a refusal to deal."). Nor did the Doe plaintiffs allege below-cost pricing.

In Doe, this Court certified for interlocutory appeal the question, among others, of whether the plaintiffs' monopoly leveraging theory constituted a cognizable antitrust injury.

Based on the Supreme Court's decision in Linkline, the Ninth Circuit held that the plaintiffs' theory did not state a Section 2 claim. Doe, 571 F.3d at 935. As plead, the plaintiffs' theory was the functional equivalent of the "price squeeze" theory that the

6

Supreme Court rejected in Linkline. Id.; see also Linkline, 129 S. Ct. at 1114. The court stated that the plaintiffs' claim failed because they alleged "no refusal to deal at the booster level, and no below cost pricing at the boosted level."[1] Id.

In numerous instances throughout the opinion, the Doe court made clear that its holding was limited to the plaintiffs' theory of monopoly leveraging. The first paragraph states that at issue was whether

> allegations of monopoly leveraging through pricing conduct in two markets state a claim under § 2 of the Sherman Act, 15 U.S.C. § 2, <u>absent an antitrust refusal to deal (or some other exclusionary practice)</u> in the monopoly market or below-cost pricing in the second market[.]

Doe, 571 F.3d at 931 (emphasis added). Further, the Doe court acknowledged that this Court had certified other issues for appeal, including "whether the below-cost pricing test for bundled discounts . . . adopted in Cascade Health Solutions v. Peacehealth applies to this monopoly leveraging case." Id. at 932 (citation omitted). However, because it decided that the plaintiffs' theory failed to state a Section 2 claim, the court did not reach "Cascade's impact on this case or others pending in the district court." Id. at 935. In particular, the court did not consider whether a dangerous probability of recoupment was required to state a "price-based claim" under Section 2 because the plaintiffs did not allege below-cost pricing. Id. (stating that "given Does' failure to allege the first prong of the test for a § 2 price-based

---

[1] Indeed, Doe suggests that had the plaintiffs been able to amend their complaint to include allegations of a refusal to deal and below-cost pricing, the outcome may have been different. See Doe, 571 F.3d at 935 n.4.

7

claim (below-cost pricing), we have no need to reach the second (dangerous probability) prong"). Indeed, the Doe court suggested that "a free-standing monopoly leveraging claim" may be viable, notwithstanding Linkline, if accompanied by an allegation of a refusal to deal.[2]

Given Doe's narrow focus on the viability of a monopoly leveraging claim absent allegations of a refusal to deal, Doe does not foreclose Direct Purchasers' and GSK's antitrust theories. Direct Purchasers assert antitrust violations based on Abbott's alleged predatory pricing of a bundled product, and both Direct Purchasers and GSK allege a breach of the duty to deal. Contrary to Abbott's argument, the court had no occasion to consider the elements of these theories because the Doe plaintiffs did not plead them. The Court therefore rejects Abbott's effort to expand Doe to encompass antitrust theories that the Ninth Circuit did not address. Doe does not control the outcome of this case.

I. Direct Purchasers' Predatory Pricing Claims

As noted above, Direct Purchasers allege that Abbott engaged in predatory pricing with regard to Kaletra and the boosted market. They maintain that Kaletra, which contains lopinavir as well as

---

[2] The court stated:

> Does nevertheless submit that they should be allowed to proceed because we previously embraced the principle of a free-standing monopoly leveraging claim in Image Technical Services, Inc. v. Eastman Kodak Co. However, Image Technical involved a refusal to deal. Read in that context and in light of Linkline, Image Technical does not save Does' claim.

571 F.3d at 935 (citation omitted). Thus, although the court rejected the plaintiffs' monopoly leveraging theory, it did not overrule Image Technical. It distinguished Image Technical because that case involved allegations of a refusal to deal.

8

ritonavir, constitutes a bundled product. Thus, they argue, their pleadings should be scrutinized under the "discount attribution" standard in Cascade. In its previous omnibus motion to dismiss, Abbott agreed that Cascade controls in such cases. January 31, 2008 Notice of Mot. and Omnibus Mot. of Abbott to Dismiss Pls.' Sherman Act Claims Pursuant to Rule 12(b)(6) at 7.

In Cascade, the Ninth Circuit held that the test developed by the Supreme Court in Brooke Group Ltd. v. Brown & Williamson Tobacco Corporation, 509 U.S. 209 (1993), for predatory pricing in the sale of a single product does not directly apply in cases that involve bundled-product discounting. As an alternative, Cascade set forth the "discount attribution" standard, which courts use to determine whether bundled-product pricing is anticompetitive. Under the standard,

> the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2. This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product.

Cascade, 515 F.3d at 906. As noted above, Cascade does not require that a plaintiff plead dangerous possibility of recoupment, which is required in single-product pricing cases. Id. at 910 n.21.

Abbott maintains that, in Linkline, the Supreme Court "rejected the use of the sort of attribution or imputed price test set forth in Cascade." Reply at 4. In Linkline, the Supreme Court opined that a test that presumes that an unlawful price squeeze exists when an "upstream monopolist could not have made a profit by

9

selling at its retail rates if it purchased inputs at its own wholesale rates" lacked "any ground in our antitrust jurisprudence." 129 S. Ct. 1121-22. This is because, the Supreme Court explained, an "upstream monopolist with no duty to deal is free to charge whatever wholesale price it would like . . . ." Id. at 1122. This dicta does not reject Cascade's discount attribution test. The Cascade court developed the test to address predatory pricing, not price squeezes. Indeed, Doe distinguishes below-cost pricing from price squeezing. See Doe, 571 F.3d at 935. Unlike the present case, Linkline did not involve alleged predatory pricing of a bundled product where a defendant had an antitrust duty to deal.[3] This Court will not disregard controlling Ninth Circuit precedent based on inapplicable Supreme Court dicta.

Applying Cascade's discount attribution test, the Court concludes that Direct Purchasers sufficiently state a Section 2 violation. Direct Purchasers aver that, when consumers purchase Kaletra, Abbott offers a substantial discount on ritonavir as a result of its bundling with lopinavir. Direct Purchasers maintain that, when the full amount of this discount is attributed to lopinavir, a competitive product in the boosted market, the resulting price is below Abbott's average variable cost to produce lopinavir. These allegations support Direct Purchasers' claim that Abbott engaged in unlawful predatory pricing through bundled

---

[3] Abbott maintains that DSL service, which was at issue in Linkline, was presented as a bundled product. Although the Court disagrees with Abbott's characterization, it need not decide this point. Even if a bundled product was involved, Linkline is nonetheless distinguishable because the defendant did not have a duty to deal. 129 S. Ct. at 1119. Here, Plaintiffs have alleged such a duty.

10

discounting.

## II. Direct Purchasers' and GSK's Claims Based on an Antitrust Duty to Deal

Albeit in different terms, each Plaintiff avers that Abbott engaged in exclusionary conduct by increasing Norvir's price because the change disrupted a longstanding course of dealing. Plaintiffs maintain that this change was intended to impede competition, and, accordingly, constitutes a violation of Abbott's antitrust duty to deal. Abbott argues that, because they do not allege that it explicitly refused to deal with them, Plaintiffs do not plead cognizable exclusionary conduct.

In <u>Aspen Skiing</u>, the Supreme Court upheld a jury verdict of Section 2 liability when a "monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." 472 U.S. at 603. There, the defendant owned three of the four ski resorts in Aspen, Colorado. <u>Id.</u> at 587-89. For several years, the defendant, along with the plaintiff who owned the fourth ski resort, had offered a ski lift pass that could be used at any Aspen ski resort. <u>Id.</u> at 589-90. Proceeds from the sale of the all-Aspen pass were divided between the defendant and the plaintiff, based on a survey of which resorts consumers actually frequented. <u>Id.</u> at 590-91. The plaintiff's share of revenue fluctuated year-to-year, depending on its attendance attributable to the ski pass.

Believing, among other things, that the survey upon which revenues were allocated was inaccurate and that the ski pass "was siphoning off revenues that could be recaptured," the defendant sought to discontinue the joint program. <u>Id.</u> at 592. It extended

11

the plaintiff "an offer that it could not accept;" the defendant would only agree to continue the program if the plaintiff agreed to a fixed percentage of revenue, far below what the plaintiff had received in the past. Id. After the plaintiff rejected this offer, the defendant took actions "that made it extremely difficult" for the plaintiff to compete. Id. at 593. Eventually, the plaintiff's market share plummeted. Id. at 594-95.

On appeal, the defendant asserted that it had no duty to deal with the plaintiff. The Supreme Court agreed that, generally, a business has a right to select customers and associates, but stated that this right is not unqualified. Id. at 601. Quoting Lorain Journal Co. v. United States, 342 U.S. 143, 155 (1951), the Supreme Court stated,

> The right . . . is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act. . . . '<u>In the absence of any purpose to create or maintain a monopoly</u>, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'

Aspen Skiing, 472 U.S. at 602 (emphasis supplied by Aspen Skiing court). Because it found sufficient evidence to show that anticompetitive intent motivated the defendant's unreasonable offer, the Court upheld the jury's verdict in favor of the plaintiff. As the Court explained later, the Aspen Skiing Court

> found significance in the defendant's decision to cease participation in a cooperative venture. The unilateral termination of a voluntary <u>(and thus presumably profitable)</u> course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end. Similarly, the defendant's unwillingness to renew the ticket <u>even if compensated at retail price</u> revealed a distinctly anticompetitive bent.

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 409 (2004) (emphasis in original).

In Verizon, the Court found that the defendant's conduct did not fall under the Aspen Skiing exception to the rule that businesses do not have a duty to aid competitors. In that case, the Telecommunications Act of 1996 imposed an obligation on Verizon to share its telephone network with competitors. Id. at 401-02. As part of that duty, Verizon had to process competitors' orders for access to its network. Id. at 404-05. The plaintiff accused Verizon of processing Verizon's rivals' access requests in an untimely fashion, if at all, which the plaintiff alleged was "part of an anticompetitive scheme to discourage customers from becoming or remaining customers of [Verizon's competitors]." Id. at 404-05. This conduct did not violate Section 2 of the Sherman Act. Distinguishing the case from Aspen Skiing, the Court stated,

> The complaint does not allege that Verizon voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion. Here, therefore, the defendant's prior conduct sheds no light upon the motivation of its refusal to deal--upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice.

Id. at 409.

Taken together, Aspen Skiing and Verizon demonstrate that liability under Section 2 can arise when a defendant voluntarily alters a course of dealing and "anticompetitive malice" motivates the defendant's conduct. See MetroNet Svcs. Corp. v. Qwest Corp., 383 F.3d 1124, 1131-32 (9th Cir. 2004). When a firm declines to cooperate with a competitor, that decision may have "evidentiary significance" as to the defendant's anticompetitive intent and may give rise to liability under Section 2. See Aspen Skiing, 475 U.S.

13

at 601 ("The absence of an unqualified duty to cooperate does not mean that every time a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances.")

Plaintiffs' allegations sufficiently support a duty-to-deal claim under Section 2. Plaintiffs maintain that, before raising Norvir's price in December, 2003, Abbott had voluntarily engaged in licensing agreements with its competitors and, unlike in Verizon, this cooperation was not compelled by statute. These agreements allowed Abbott's competitors to market their PIs along with Norvir. Plaintiffs maintain that these agreements, which were entered into with many of Abbott's rivals, induced Abbott's competitors to rely on Norvir's availability on the market, subject to normal, inflation-level price increases.

Once Abbott recognized that Kaletra would face new competitors in the boosted PI market, Abbott changed its voluntary course of dealing by imposing a 400 percent increase in the price of Norvir. Plaintiffs allege sufficient facts to show that this pricing conduct could have been motivated by anticompetitive malice. Direct Purchasers aver that Abbott hiked the price to impede its "competitors' ability to compete with Kaletra." Safeway, et al. SAC ¶ 42; Meijer, et al. SAC ¶ 38; Rite Aid, et al. SAC ¶ 40. They point to the fact that the price of Norvir increased without a commensurate rise in the price of Kaletra, which contains Norvir. Further, both Direct Purchasers and GSK quote documents and emails to corroborate their claims of anticompetitive motive. Thus, Plaintiffs' complaints not only plead a radical change in a

14

voluntary course of dealing, but also allege facts that suggest anticompetitive malice motivated Abbott's conduct.

Abbott argues that Plaintiffs' allegations do not amount to an actionable refusal to deal because it never refused outright to sell Norvir. However, precedent does not require an outright refusal. Although the Supreme Court and the Ninth Circuit refer to this conduct as a "refusal to deal," it encompasses circumstances, as in Aspen Skiing, when a monopolist sets exorbitant terms that a competitor would not accept. See Aspen Skiing, 472 U.S. at 592. "An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal." MetroNet, 383 F.3d at 1132. Here, the 400 percent price increase on Norvir placed GSK and Abbott's other competitors in the untenable position of selling their boosted PIs at a price that could not compete with Kaletra. By setting such unattractive terms, Abbott essentially refused to deal with its competitors.

Abbott also maintains that a duty to deal violation requires Plaintiffs to show it had a "willingness to forsake short-term profits." Mot. to Dismiss at 20-21 (citing Trinko, 540 U.S. at 409; MetroNet, 383 F.3d at 1132). However, in Trinko and MetroNet, the Supreme Court and the Ninth Circuit inquired into the effect on the defendants' short-term profitability to determine whether the defendants were motivated by anticompetitive intent. As the Trinko Court explained, a defendant's decision to forgo benefits in the short run provides evidence of a defendant's interest in reducing competition. See 540 U.S. at 409 ("The unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggested a willingness to forsake short-term profits to achieve an

15

anticompetitive end. . . .  Here, . . . the defendant's prior conduct sheds no light upon the motivation of its refusal to deal-- upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice."); see also MetroNet, 383 F.3d at 1132 (stating that, because the defendant did not forsake short-term profits, its termination of a prior course of dealing neither proved nor disproved whether it was motivated by anticompetitive malice).  Proof of a short-term sacrifice is not an element of a Section 2 claim, but rather a means to show anticompetitive motives.  Because a defendant is unlikely to admit that it engaged in exclusionary conduct, a court must look for indicia of a defendant's desire to injure competition, as the Ninth Circuit demonstrated in MetroNet.  See 383 F.3d at 1132-33 (analyzing facts to determine whether they were significant in showing anticompetitive intent).  Here, as noted above, Plaintiffs adequately plead facts to suggest that Abbott's price increase arose from improper motives.

While Abbott is correct that antitrust law imposes no generalized duty to deal, its deviation from its prior course of conduct with its competitors can constitute evidence of anticompetitive conduct in violation of Section 2.  MetroNet, 383 F.3d at 1131 (stating that under "'certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2'") (quoting Trinko, 540 U.S. at 408).  Plaintiffs' allegations suggest that Abbott's conduct qualifies, under Aspen Skiing, as an exception to the general rule.

16

III. Direct Purchasers' Claims of Monopolization of the Boosting Market

Direct Purchasers allege that Abbott monopolized the boosting market by keeping the price of Norvir at a reasonable level for several years, thereby inducing its competitors to rely on the availability of Norvir on these terms and to forgo development of their own PI boosters. Direct Purchasers maintain that this conduct enabled Abbott to suppress competition in the boosting market.

Abbott makes several arguments, none of which is persuasive. First, Abbott maintains that these allegations are not plausible and run counter to Linkline and Doe. However, the Court reads these allegations to assert an antitrust theory based on deceptive conduct that induced reliance, a theory that was not at issue in either Linkline or Doe. Thus, those cases do not apply to this claim. And the Court finds no reason to deem Direct Purchasers' allegations implausible.

Abbott also appears to argue that, because its purported patent rights enable it to license its product as it pleases, Direct Purchasers' claims fail. To the extent that Abbott has such rights, they do not defeat Direct Purchasers' claims; Direct Purchasers do not allege unlawful conduct arising from Abbott's licensing activity. Instead, as noted above, Direct Purchasers maintain that Abbott unlawfully deceived its competitors.

Finally, Abbott argues that Direct Purchasers have not satisfied the requirements of Broadcom Corporation v. Qualcomm, Inc., which involved "deceptive conduct before a private standards-determining organization." 501 F.3d 297, 303 (3d Cir. 2007).

17

Without deciding whether <u>Broadcom</u> comports with Ninth Circuit precedent, the Court does not find it applicable to this case: Direct Purchasers' allegations do not implicate deceptive conduct before a private standards-determining organization.

Accordingly, the Court finds that Direct Purchasers sufficiently state their claims for Abbott's monopolization of the boosting market.

IV. GSK's State Law Claims

Abbott maintains that GSK's claims under North Carolina law must fail because GSK has not plead cognizable claims under the Sherman Act. However, because the Court finds that GSK has adequately plead a violation of the Sherman Act, GSK adequately states claims under North Carolina's anti-monopolization and unfair and deceptive practices laws. <u>See</u> N.C. Gen. Stat. §§ 75-1.1 and 75-2.1.

## CONCLUSION

For the foregoing reasons, the Court DENIES Abbott's Omnibus Motion to Dismiss. The parties shall file dispositive motions by June 17, 2010. These motions shall be noticed for hearing on August 5, 2010.

IT IS SO ORDERED.

Dated: January 12, 2010

_____
CLAUDIA WILKEN
United States District Judge