IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAFEWAY INC.; WALGREEN CO.; THE
KROGER CO.; NEW ALBERTSON'S, INC.;
AMERICAN SALES COMPANY, INC.; and HEB
GROCERY COMPANY, LP,

        Plaintiffs,

   v.

ABBOTT LABORATORIES,

        Defendant.

_____/

No. C 07-05470 CW

ORDER GRANTING IN
PART AND DENYING IN
PART DEFENDANT
ABBOTT LABORATORIES'
MOTIONS FOR SUMMARY
JUDGMENT ON DIRECT
PURCHASERS' CLAIMS
(Docket No. 232) AND
ON GSK'S CLAIMS
(Docket No. 227)

MEIJER, INC. & MEIJER DISTRIBUTION,
INC.; ROCHESTER DRUG CO-OPERATIVE,
INC.; and LOUISIANA WHOLESALE DRUG
COMPANY, INC., on behalf of
themselves and all others similarly
situated,

        Plaintiffs,

   v.

ABBOTT LABORATORIES,

        Defendant.

_____/

No. C 07-05985 CW

(Docket Nos. 332 and
328)

RITE AID CORPORATION; RITE AID HDQTRS
CORP.; JCG (PJC) USA, LLC; MAXI DRUG,
INC. D/B/A BROOKS PHARMACY; ECKERD
CORPORATION; CVS PHARMACY, INC.; and
CAREMARK LLC,

        Plaintiffs,

   v.

ABBOTT LABORATORIES,

        Defendant.

_____/

No. C 07-06120 CW

(Docket Nos. 213 and
209)

SMITHKLINE BEECHAM CORPORATION, d/b/a
GLAXOSMITHKLINE,                         No. C 07-05702 CW

                                         (Docket Nos. 287 and
          Plaintiff,                     283)

     v.

ABBOTT LABORATORIES,

          Defendant.
_____/

     Defendant Abbott Laboratories moves for summary judgment or,
alternatively, summary adjudication on the claims of Direct
Purchaser Plaintiffs Safeway, Inc., et al.; Meijer, Inc., et al.;
and Rite Aid Corporation, et al. (collectively, Direct Purchasers)
and for summary judgment on Plaintiff GlaxoSmithKline's (GSK)
claims.  Direct Purchasers and GSK oppose Abbott's motions.  The
motions were heard on October 28, 2010.  Having considered oral
argument and the papers submitted by the parties, the Court GRANTS
Abbott's motions in part and DENIES them in part.

                              BACKGROUND

I.   Abbott's Pricing of Norvir

     Protease inhibitors (PIs) are considered the most potent class
of drugs to combat the HIV virus.  In 1996, Abbott introduced
Norvir as a stand-alone PI with a daily recommended dose of 1,200
milligrams (twelve 100-mg capsules a day), priced at approximately
eighteen dollars per day.  Norvir is the brand name for a patented
compound called ritonavir.

     After Norvir's release, it was discovered that, when used in
small quantities with another PI, Norvir would "boost" the anti-
viral properties of that PI.  Not only did a small dose of Norvir
-- about 100 to 400 milligrams per day -- make other PIs more

                                 2

effective and decrease the side effects associated with high doses, but it also slowed the rate at which HIV developed resistance to the effects of those PIs. The use of Norvir as a "booster" has enabled HIV patients to live longer. But the use of Norvir as a booster, and not a stand-alone PI, has also meant that the price for an average daily dose of Norvir has plummeted since Norvir was first introduced, because patients need a much smaller daily dose of Norvir when it is used as a booster compared to when it is used as a stand-alone PI. By 2003, the average price for a daily dose of Norvir was $1.71.

In 2000, Abbott introduced Kaletra, a single "soft gel capsule" containing the PI lopinavir as well as ritonavir, used to boost the effects of lopinavir. Calamari Decl. ¶ 15. A single capsule contained 133 milligrams of lopinavir and 33 milligrams of ritanavir.

In 2003, two new PIs, Bristol-Myers Squibb's Reyataz and GSK's Lexiva, were introduced to the market. Although both drugs could be prescribed as stand-alone PIs, their daily doses were less if they were administered along with Norvir. A daily dose of Reyataz, unboosted by Norvir, was 400 milligrams; if boosted by 100 milligrams of Norvir, Reyataz's daily dose was 300 milligrams. A daily, unboosted dose of Lexiva was 2,800 milligrams; if taken with 100 or 200 milligrams of Norvir, Lexiva's daily dose was 1,400 milligrams. Abbott was aware of studies that showed Norvir-boosted doses of Reyataz and Lexiva had efficacy similar to Kaletra and, in several ways, were superior to Kaletra. See Stockinger Decl., Ex. 98, at NOR00096554-55. Without a boosting dose of Norvir, however, these drugs were inferior to Kaletra.

After the introduction of Reyataz, Kaletra's market share fell. The average daily dose of Norvir also fell. Before Reyataz's release, the most common boosting dose of Norvir ranged from 200 milligrams to 400 milligrams a day. Clinical trials, however, showed that a Norvir dose of only 100 milligrams a day effectively boosted Reyataz.

By September, 2003, Abbott was aware that Reyataz and Lexiva would threaten Kaletra's future market share and cause it to lose revenue. Abbott considered three options to preserve its "HIV leadership in the PI class": (1) continue to execute licensing agreements with competitors for the co-marketing of their PIs along with Norvir, similar to the one Abbott and GSK agreed to in December, 2002, see generally Calamari Decl., Ex. 23 at NOR0004414; (2) remove Norvir from the market; or (3) increase the price of Norvir. See Stockinger Decl., Ex. 17 at RIT0437434. Abbott concluded that the first would not be sufficient to stem projected revenue losses and that the second would cause "significant issues . . . on PR and regulatory fronts both domestically and internationally." Id. Abbott's staff ultimately decided to recommend an increase in the price of Norvir. See Stockinger Decl., Ex. 95, at NOR00091874. Abbott CEO Miles White approved the increase in late October, 2003.

On December 3, 2003, Abbott raised the price of 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-percent increase. In contrast, Abbott's four previous price increases averaged 3.45 percent, which was in line with the rate of inflation. Stockinger Decl., Ex. 71, at NOR00112052. The change applied only to consumers with private insurance; those purchasing

4

Norvir through public programs, such as Medicare, were not subject to it because of government pricing rules. Abbott maintained the cost of a daily regimen of Kaletra at $18.78. The Norvir price hike commensurately increased the price of boosted Reyataz and Lexiva therapies: a daily dose of Reyataz and Norvir rose from $23.79 to $30.65, and a daily dose of Lexiva and Norvir jumped from $19.42 to $33.14.[1] See Calamari Decl., Ex. 2, at NOR00302683; Dellinger Decl., Ex. 103 ¶ 10.

Since December, 2003, Norvir's price has remained at $8.57 per 100 milligrams, whereas the prices for boosted PIs have risen. In December, 2003, the price of a daily dose of Kaletra was $18.78. After slightly reducing Kaletra's price to $18.76 in 2004, through four price hikes between June, 2005 and December, 2007, Abbott increased Kaletra's price to $23.40, a rise of approximately twenty-five percent. Between June, 2005 and December, 2007, the cost of a daily dose of Reyataz, not including Norvir, increased approximately eleven percent, from $23.14 to $25.76. And the cost for a daily dose of Lexiva, not including Norvir, increased approximately twenty-two percent over the same period, from $16.78

---

[1] Abbott's comparison of the price of daily doses of Norvir and Kaletra and "average daily boosted doses" of other PIs, such as Reyataz, Lexiva and Prezista, is misleading. See Calamari Decl. ¶ 44 and tbl.1. What is relevant is the cost of therapies based on Reyataz, Lexiva and Prezista, not these drugs' individual prices. For instance, in December, 2003, Abbott compares the price of Reyataz, which was $22.08, to the price of Kaletra, which was $18.78. This comparison suggests that a Reyataz-based therapy cost eighteen percent more than one based on Kaletra. However, the price of Reyataz does not include the price of Norvir, which Abbott acknowledges is required to be taken if Reyataz serves as a boosted PI. With Norvir's price included, the cost of a Reyataz-based therapy, which required only 100 milligrams of Norvir, jumps to $30.65, or sixty-three percent above the cost to take Kaletra. The increase in the price of a Lexiva-based therapy, which required 200 milligrams of Norvir, was all the more substantial.

to $20.40.  See Calamari Decl. ¶¶ 45-46, tbl.1.

At the time of the Norvir price increase, Kaletra commanded a substantial share of the boosted PI market.  Since then, its share has declined.  In comparison, the market shares of Reyataz and Lexiva have increased, along with that of Prezista, a boosted PI introduced in June, 2006.

II.  Plaintiffs' Complaints and Procedural History

Direct Purchasers allege that, in violation of Section 2 of the Sherman Act, Abbott monopolized or attempted to monopolize the "boosted market," which Plaintiffs define to be the market in which Kaletra competes with Reyataz, Lexiva and other PIs boosted by Norvir.  Specifically, Direct Purchasers complain that Abbott set predatory prices for Kaletra, which they argue is a bundled product, and violated its antitrust duty to deal with respect to Norvir.  Direct Purchasers also allege that Abbott monopolized the "boosting market," which Plaintiffs define to be a market in which Norvir is the only product.  In the Meijer action, the Court has certified a class of:

> All persons or entities in the United States that purchased Norvir and/or Kaletra directly from Abbott or any of its divisions, subsidiaries, predecessors, or affiliates during the period from December 3, 2003 through such time as the effects of Abbott's illegal conduct have ceased, and excluding federal governmental entities, Abbott, and Abbott's divisions, subsidiaries, predecessors, and affiliates.

Order of August 27, 2008 at 21, Meijer v. Abbott Laboratories, Case No. 07-5985 CW.

GSK also alleges that Abbott monopolized or attempted to monopolize the boosted market, in violation of Section 2. Specifically, GSK claims that Abbott violated its antitrust duty to

deal with respect to Norvir and sabotaged its competitors.  In
addition, GSK brings claims under New York law for breach of the
implied covenant of good faith and fair dealing related to its co-
marketing licensing agreement with Abbott.  Finally, GSK pleads
claims for violations of North Carolina's Unfair and Deceptive
Trade Practices Act (UDTPA), N.C. Gen. Stat. §§ 75-1.1, et seq.
The UDTPA, among other things, prohibits monopolization and
attempted monopolization.  Id. § 75-2.1.

    The current cases are related to John Doe 1 v. Abbott
Laboratories, No. C 04-1511 CW.  Although that case also concerned
the December, 2003 increase in Norvir's price, the Doe plaintiffs
based their Section 2 claim on a theory of monopoly leveraging.
See John Doe 1 v. Abbott Laboratories, 571 F.3d 930, 933 (9th Cir.
2009).  The Ninth Circuit held that the plaintiffs' stand-alone
monopoly leveraging claim was foreclosed by Pacific Bell Telephone
Co. v. linkLine Communications, Inc., ___ U.S. ___, 129 S. Ct. 1109
(2009).  The Ninth Circuit noted that the Doe plaintiffs did not
allege predatory pricing or a refusal to deal.  Doe, 571 F.3d at
935.  Allegations of such conduct are plead here.

    In its motion to dismiss, Abbott argued that the Ninth
Circuit's decision in Doe controlled the outcome of this case and
foreclosed relief on Plaintiffs' claims.  The Court denied Abbott's
motion, concluding that Doe was distinguishable because Plaintiffs
here alleged predatory pricing and a refusal to deal.  Abbott then
filed a motion to certify issues for interlocutory appeal, which
the Court denied.  Thereafter, Abbott petitioned the Ninth Circuit
for a writ of mandamus, seeking enforcement of its mandate in Doe.
The Ninth Circuit denied Abbott's petition on September 28, 2010.

In a footnote in its opposition to Abbott's motion for summary judgment, GSK asserted that the motion did not address two theories of antitrust liability it had raised in opposition to Abbott's motion to dismiss: (1) under the circumstances of this case, it could still sue under Section 2 on a "monopoly leveraging plus" theory, notwithstanding linkLine and the Ninth Circuit's decision in Doe; and (2) Abbott's conduct was analogous to the tortious acts held to violate Section 2 in Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002). GSK also asserted in the footnote that, if Direct Purchasers survived summary judgment on their predatory pricing claim under Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008), it should also be entitled to go to trial on its "equally efficient competitor test." GSK Opp'n 18 n.18. At the October 28, 2010 hearing on Abbott's motions, the Court allowed further briefing from GSK and Abbott regarding the assertions in GSK's footnote.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815

F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to

produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

DISCUSSION

I.   Sherman Act Claims for Monopolization and Attempted
     Monopolization of the Boosted Market

Section 2 of the Sherman Act "makes it unlawful to monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." <u>linkLine</u>, 129 S. Ct. at 1118. To establish liability for a monopolization claim, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451, 480 (1992). To prove attempted monopolization, a plaintiff must show "'(1) that the defendant has engaged in predatory or anticompetitive conduct

10

with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" Cascade, 515 F.3d at 893 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)). The requirements of both claims are similar, "differing primarily in the requisite intent and the necessary level of monopoly power." Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1202 (9th Cir. 1997) (on remand). In addition to these elements, private party plaintiffs seeking damages for antitrust violations must also demonstrate antitrust injury. Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995). "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior." Id.

Abbott asserts that Plaintiffs' claims for monopolization and attempted monopolization fail because they have not demonstrated (1) its possession of monopoly power in the boosted market or (2) anticompetitive conduct. Abbott also maintains that Direct Purchasers did not suffer antitrust injury.

A.  Monopoly Power

Monopoly power is "'the power to control prices or exclude competition.'"[2]  Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th

---

[2] Courts have used the terms "monopoly power" and "market power" interchangeably. See, e.g., Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co., 99 F.3d 937, 950 n.15 (9th Cir. 1996). However, monopoly power is best understood to be the substantial degree of market power necessary to support liability under Section 2. See Eastman Kodak Co., 504 U.S. at 481 ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); Cal. ex rel. Brown v. Safeway, Inc., 615 F.3d 1171, 1187 n.6 (9th Cir. 2010); see also 3B P. Areeda, H. Hovenkamp & J. Solow, Antitrust Law ¶ 801, at 382 (3d ed. 2007) (hereinafter,
(continued...)

11

Cir. 1997) (quoting <u>United States v. Grinnell Corp.</u>, 384 U.S. 563, 571 (1966)). This may be shown through direct or circumstantial evidence. <u>Forsyth</u>, 114 F.3d at 1467.

## 1. Direct Evidence

With respect to direct evidence, Plaintiffs cite this Court's decision in <u>Doe</u>, in which the Court concluded that sufficient direct evidence created a triable issue with respect to Abbott's monopoly power. Like the <u>Doe</u> plaintiffs, Plaintiffs here point to evidence that the 400-percent increase in Norvir's price impacted the boosted market. Dr. Leffler, Plaintiffs' expert, opined that Abbott's control over Norvir, which was a necessary "input" for boosted PIs, gave it control over the boosted market. Stockinger Decl., Ex. 70 ¶ 32. Further, there is evidence that Abbott was aware that raising Norvir's price would affect the boosted market, and that GSK believed that Lexiva's sales performance was negatively impacted by the price hike. <u>See</u> Stockinger Decl., Ex. 95, at NOR00091874 and Ex. 118 ¶ 9. The Ninth Circuit has stated, "Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices**."** <u>Forsyth</u>, 114 F.3d at 1475. There is no rule, however, that this is the only way monopoly power can be proved. Monopoly power may be shown directly through evidence of "injury to competition which a competitor with market power may inflict," which in turn demonstrates "the actual exercise of market power." <u>Id.</u> (quoting <u>Rebel Oil</u>, 51 F.3d at 1434). Because Plaintiffs proffer such direct evidence, they

---

[2](...continued)
Areeda & Hovenkamp). In this Order, the Court uses the term "monopoly power" to refer to substantial market power.

**United States District Court**
For the Northern District of California

create a triable issue as to whether Abbott had monopoly power in the boosted market.

Plaintiffs contend that they have amassed additional direct evidence. They argue that Abbott's pricing of Kaletra above its average marginal cost demonstrated its monopoly power. However, Plaintiffs do not offer evidence that pricing above average marginal cost was necessarily supracompetitive, particularly in the pharmaceutical industry. Indeed, Dr. Leffler opined that Kaletra, Reyataz and Lexiva are all priced "substantially above" average marginal cost. Senator Decl., Ex. B at 191:1-21. That all boosted market participants priced above average marginal cost precludes any inference that such pricing reflected Abbott's monopoly power.

Further, supracompetitive pricing, on its own, is not direct evidence of monopoly power. See Forsyth, 114 F.3d at 1476; see also Harrison Aire, Inc v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005); Geneva Pharmas. Tech. Corp. v. Barr Laboratories Inc., 386 F.3d 485, 500 (2d Cir. 2004); Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995). To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output. Rebel Oil, 51 F.3d at 1434. Both are required to prove monopoly power directly.[3] Id.

---

[3] Plaintiffs nevertheless continue to argue that evidence of restricted output is not required because raising prices necessarily depresses sales. This is incorrect. Take for example a market in which demand outstrips supply. In such a hypothetical market, a firm could raise prices -- up to a certain point -- without necessarily causing a commensurate reduction in sales. In re ATM Fee Antitrust Litigation, 2010 WL 2557519 (N.D. Cal.), is both factually and procedurally distinguishable. There, the plaintiffs alleged that several banks and an ATM network exercised monopoly power in the "ATM Networks" market by charging

(continued...)

Plaintiffs argue that they offer evidence of restricted output, albeit indirectly. They do not claim that output in the boosted market decreased following the December, 2003 Norvir price increase; indeed, undisputed evidence shows the contrary. Instead, Plaintiffs maintain that, but for the price hike, output would have been greater. They point to Dr. Leffler's opinion that, had Abbott not increased Norvir's price, its sales of Norvir "would have been substantially higher." Stockinger Decl., Ex. 103 ¶ 58. From this, Plaintiffs argue that sales in the boosted market also would have necessarily been higher, in that a sale of Norvir would ordinarily entail a sale of a boosted PI because Norvir is no longer prescribed as a stand-alone PI. However, Dr. Leffler did not address this point and the discussion to which Plaintiffs refer did not concern the boosted market.

Accordingly, Plaintiffs provide direct evidence of Abbott's monopoly power through their proffer of expert opinion and documents regarding the impact of the Norvir price increase on the boosted market.

### 2. Circumstantial Evidence

To prove monopoly power circumstantially, "a plaintiff must:

---

[3](...continued)
supracompetitive ATM fees over two decades. Id. at *9-*10. They did not expressly plead restricted output. Id. at *10. The court stated that this did not warrant dismissal of their complaint, finding that "because price and output are inversely correlated, the fact that Star, the market leader, has charged supracompetitive interchange fees for two decades implies that marketwide output . . . has been lower than it would have been had Star charged a competitive interchange fee." Id. Plaintiffs do not allege that Abbott priced Kaletra above a competitive level for an extended period of time, a factor the ATM Fee court emphasized in its ruling. Furthermore, to oppose a summary judgment motion, Plaintiffs are required to proffer evidence supporting a reasonable inference of restricted output.

(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." Rebel Oil, 51 F.3d at 1434. In addition to providing direct evidence, Plaintiffs offer circumstantial evidence of Abbott's monopoly power.

### a. Relevant Market

"A relevant market, for antitrust purposes, can be broadly characterized in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products or services." Coal. for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 507 (9th Cir. 2010) (citations and internal quotation marks omitted). Courts "consider whether the product and its substitutes are reasonably interchangeable by consumers for the same purpose, as well as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. (citations omitted).

As noted above, Plaintiffs maintain that the relevant market is the boosted market, and that this includes Reyataz, Lexiva and Kaletra and other PIs that require Norvir as a booster. Plaintiffs present evidence of Abbott's internal documents, which, according to Plaintiffs' expert Dr. Singer, indicate that it believed that Reyataz, Lexiva and Kaletra were all in the same market and impacted each other's prices. Further, Abbott's economics expert, Dr. Lagenfeld, acknowledged at his deposition that Kaletra's price

would impact its market share relative to its "boosted PI rivals."
Stockinger Decl., Ex. 114, at 32:8-23. This is sufficient to
create a question of fact on the definition of a boosted market.

Abbott challenges Plaintiffs' definition as overly narrow,
pointing to Plaintiffs' medical experts' testimony that non-
nucleoside reverse transcriptase inhibitors (NNRTIs) are
functionally comparable to boosted PIs. <u>See, e.g.</u>, Calamari Decl.,
Ex. 2, at 145:1-148:11. However, this similarity does not preclude
Plaintiffs' definition of the boosted market for antitrust
purposes. These experts' testimony suggests that there are several
HIV therapies, including NNRTIs and boosted PIs. The testimony is
not inconsistent with Plaintiffs' definition of a boosted PI
submarket that exists within a broader HIV therapy market. "A
submarket exists if it is sufficiently insulated from the larger
market so that supply and demand are inelastic with the larger
market." <u>Forsyth</u>, 114 F.3d at 1476 (citation and internal
quotation marks omitted). Indeed, Plaintiffs offer evidence that
the Norvir-driven price increases of boosted PI therapies did not
cause a cognizable flight to NNRTIs or other alternative therapies.

Abbott also argues that Plaintiffs do not offer any
econometric analyses of cross-elasticity. However, Dr. Singer
testified at his deposition that he conducted a cross-elasticity
analysis, stating that he "looked at changes in market shares
around the time of the . . . Norvir price increase, which is a way
to get at price cross-elasticity." Stockinger Decl., Ex. 106, at
262:7-11. Abbott points to no requirement that such an analysis
must be statistical in nature.

Accordingly, there is a genuine dispute for trial concerning

16

the definition of a boosted market.

                b.    Abbott's Market Share in the Boosted Market

"A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme." Rebel Oil, 51 F.3d at 1439. Conversely, a "declining market share may reflect an absence of market power, but it does not foreclose a finding of such power." Oahu Gas Serv., Inc. v. Pac. Resources, Inc., 838 F.2d 360, 366 (9th Cir. 1988) (citation omitted).

Abbott does not dispute that it commanded an overwhelming share of the boosted market in December, 2003, the time of the Norvir price increase. Nor does it dispute that Plaintiffs' experts show that, through the third quarter of 2007, it held a substantial share of the market. Instead, Abbott challenges the method by which Plaintiffs' experts measure its market share. This does not warrant summary judgment. Whether ritanovir, either sold through Norvir or in co-formulation with lopinavir in Kaletra, should be included in calculating Abbott's market share in the boosted market is a matter to be decided by a jury.

Accordingly, there is a genuine dispute for trial concerning whether Abbott owns a sufficiently dominant share of the boosted market.

                c.    Barriers to Entry and Expansion

"A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." Oahu Gas, 838 F.2d at 366 (citing Grinnell, 384 U.S. at 571). Barriers to entry include

"(1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale."  Rebel Oil, 51 F.3d at 1439 (footnote omitted).  The existence of entry barriers, however, is not sufficient to support an inference of market power.  "The ability to control output and prices -- the essence of market power -- depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant."  Id. at 1441.  Control over one market may be considered in determining whether a firm has control of another.  See Pac. Coast. Agric. Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir. 1975).

Plaintiffs' experts opined that Abbott had monopoly power based on its high market share in a differentiated product market with high barriers to entry.  Dr. Noll, Plaintiffs' expert, stated that this power existed from "2002 through at least the end of 2006."  Stockinger Decl., Ex. 50, at 8.  As Abbott acknowledges, bringing a new drug to market entails high research and development costs and obtaining regulatory approval, both of which constitute barriers to entry.  See Barr Labs. Inc., 386 F.3d at 499 (concluding that "regulatory requirements to sell" generic drugs were a barrier to entry).  Further, Abbott does not dispute that it controls the supply of Norvir, which can be understood to be "an essential . . . resource" for the boosted market.  Rebel Oil, 51 F.3d at 1439.  Its power over a necessary input posed barriers to entry and expansion: to limit either, Abbott could have increased the cost of Norvir, as it did, which could have rendered Kaletra's

United States District Court

For the Northern District of California

potential or existing competitors unattractive to consumers. Thus, there is a triable issue as to whether there were barriers to entry and expansion.

Abbott contends that the erosion of its market share between December, 2003 and the third quarter of 2007 precludes, as a matter of law, a finding that it had monopoly power. Plaintiffs do not dispute that Kaletra's market share declined from between nineteen and forty-five percent in that period.[4] Direct Purchasers' Opp'n 14.

Abbott relies primarily on <u>United States v. Syufy Enterprises</u>, 903 F.2d 659 (9th Cir. 1990). There, the court concluded that, although a firm had a large market share, its inability to maintain it demonstrated a lack of monopoly power. <u>Id.</u> at 666. The market in <u>Syufy</u>, however, had no substantial barriers to entry. 903 F.2d at 666-67 (contrasting circumstances there to cases involving industries that required "onerous front-end investments that might deter competition from all but the hardiest and most financially secure investors"). Abbott correctly notes that <u>Syufy</u> did not expressly limit its teachings to circumstances in which entry barriers are absent. However, as <u>Oahu Gas</u> indicates, declining market share is not necessarily sufficient to warrant summary judgment. <u>See</u> 838 F.2d at 366; <u>see also</u> Areeda and Hovenkamp, <u>Antitrust Law</u>, ¶ 801a2, at 385 ("[A] steadily declining share

---

[4] The variation arises from whether ritonavir, as provided in Norvir or as a component of Kaletra, should be considered as part of Abbott's share of the boosted market. Direct Purchasers' expert, Dr. Singer, includes ritanovir in his calculation, whereas GSK's expert, Dr. Noll, does not. If ritanovir is included, Abbott's market share was seventy-five percent in Q3 2007; if it is excluded, Abbott's share is below fifty percent.

suggests that substantial power is transitory . . . . However, it is not in itself enough."). Although it may be that Abbott lacked monopoly power, this is for a jury to decide.

Accordingly, through both direct and circumstantial evidence, Plaintiffs create a triable issue of fact as to whether Abbott had monopoly power. Summary judgment is not warranted on the ground that Abbott lacked monopoly power.

B. Anticompetitive Conduct

As noted above, in addition to demonstrating monopoly power, Plaintiffs must provide evidence of anticompetitive conduct.

Four theories of anticompetitive conduct have been raised in this action: (1) predatory pricing through bundled-product discounting, which GSK terms the "equally efficient competitor test"; (2) a violation of Abbott's antitrust duty to deal; (3) a "monopoly leveraging plus" theory based on government-pricing rules in the boosting market; and (4) a business tort theory under Conwood. At the hearing on Abbott's motions, Direct Purchasers and GSK clarified that they seek Section 2 liability based on each of the four theories, even though they may not have raised them in their respective opposition briefs to Abbott's current motions and motions to dismiss. They maintain that their complaints offer sufficient allegations to put Abbott on notice of these theories.

Abbott argues that, to assert a predatory pricing theory of liability, GSK must amend its complaint.[5] Although GSK must plead every claim for which it seeks relief, it need not plead the legal

---

[5] Abbott does not contend that, to seek liability under the "monopoly leveraging plus" and Conwood theories, Direct Purchasers must amend their complaints.

theories that support liability. <u>See, e.g.</u>, <u>Alvarez v. Hill</u>, 518

F.3d 1152, 1154 (9th Cir. 2008) ("[F]ederal complaints plead

claims, not . . . legal theories."); <u>Am. Timber & Trading Co. v.

First Nat'l Bank of Or.</u>, 690 F.2d 781, 786 (9th Cir. 1982) ("A

party need not plead specific legal theories in the complaint, so

long as the other side receives notice as to what is at issue in

the case."). GSK pleads a claim for a violation of Section 2 of

the Sherman Act and alleges that Abbott's pricing excluded "equally

efficient producers of PIs." GSK's 1st Am. Compl. ¶ 52. Abbott is

well aware of what is at issue in this case. Accordingly, GSK may

proceed on a legal theory based on predatory pricing without

amending its complaint.

> 1. Predatory Pricing through Bundled-Product
> Discounting

First, Plaintiffs assert that Abbott acted anticompetitively

by engaging in predatory pricing with respect to Kaletra, which

they maintain is a bundled product containing lopinavir and

ritanovir. In particular, Direct Purchasers maintain that, under

<u>Cascade</u>'s discount attribution rule, the imputed price of

lopinavir, the competitive component of Kaletra, is below its

average variable cost to produce and, therefore, predatory. Abbott

maintains that Kaletra is not a bundled product and <u>Cascade</u> does

not apply. Abbott does not challenge Dr. Singer's conclusion that,

under the <u>Cascade</u> discount attribution rule, lopinavir's imputed

price is below its average variable cost.

Direct Purchasers argue that Abbott should be held to its

prior litigation position that Kaletra is a bundled product, either

because its earlier statements constitute admissions of fact or

because it should be estopped from asserting otherwise. This argument is unavailing. Abbott's earlier statements were not admissions of fact, but rather legal arguments. See In re Teleglobe Commc'ns Corp., 493 F.3d 345, 377 (3d Cir. 2007) ("To be binding, admissions . . . must be statements of fact that require evidentiary proof, not statements of legal theories."); Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 227 (9th Cir. 1988) (stating that trial courts have discretion to accept statements of fact as judicial admissions). Nor does judicial estoppel apply here. Although the "doctrine of judicial estoppel bars a party from taking inconsistent positions in the same litigation," it does not apply if "no court ever adopted the original . . . position." Masayesva ex rel. Hopi Indian Tribe v. Hale, 118 F.3d 1371, 1382 (9th Cir. 1997); see also Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) (in determining whether judicial estoppel should apply, "courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position"). Because no court accepted Abbott's earlier legal arguments that Kaletra was a bundled product under Cascade, they do not judicially estop Abbott from taking a different legal position in light of linkLine and the Ninth Circuit's opinion in Doe. Here, Abbott maintains that Kaletra is a single, integrated product, "no more a bundle of its APIs [active pharmaceutical ingredients] than bread is a bundle of flour, milk, and salt." Mot. for Summ. J. on Direct Purchasers' Claims 19. It maintains that the Cascade court intended the discount attribution rule to be applied only to bundles comprised of "separate, independent products being packaged or sold together for a single price." Id.

Direct Purchasers respond that their "economists have concluded that Kaletra is a bundle . . . because consumers would, could, and did assemble the bundle (boosted PI plus ritonavir) on their own." Direct Purchasers' Opp'n 20.  In other words, Direct Purchasers maintain that bundles are comprised of products that consumers naturally would purchase together.

Abbott's arguments are not persuasive.  Retail drugs and their APIs present special challenges with regard to bundling.  Abbott explains in detail that APIs must be combined with "excipients, principally solvents and stabilizers, in a formulation designed to optimize factors including chemical stability, provision of appropriate blood levels of the API, manufacturability, and pill burden."  Mot. for Summ. J. on Direct Purchasers' Claims 4.  Thus, bundling ritonavir and lopinavir in Kaletra entails more than bundling shampoo and conditioner in a shrink-wrapped package. Nonetheless, Kaletra presents a bundle of two products, a boosting PI and boosted PI, sold together for a single price.  Consumers do not purchase Kaletra for its excipients, which by definition are its inert ingredients; the excipients serve only to make the API "bioavailable," as Abbott explains.  Abbott's Reply in Support of Summ. J. on Direct Purchasers' Claims 13.  Instead, consumers purchase Kaletra to obtain the APIs.  Thus, for the purposes of Cascade, the bundled "products" here are ritonavir and lopinavir.

Abbott's bread analogy is therefore inapt.  Consumers do not purchase bread in order to obtain flour, milk and salt.  Further, unlike the combination of flour, milk, salt and other ingredients to make bread, the combination of lopinavir and ritonavir does not create a product functionally different from its components.

23

Bundled or separate, these two APIs remain PIs.

Accordingly, Kaletra can be regarded as a bundled product for the purposes of <u>Cascade</u>'s discount attribution rule. As noted above, this was the only challenge Abbott raised with respect to Plaintiffs' predatory pricing theory of liability. Thus, Plaintiffs' monopolization and attempted monopolization claims are viable to the extent that they are based on this theory.

2.    Violation of an Antitrust Duty to Deal

Plaintiffs' second theory is that Abbott acted anticompetitively by violating its antitrust duty to deal. Their theory rests on allegations that

> Abbott engaged in a long-standing pattern to induce its rivals to develop and promote their PIs for use with Norvir, including use of licensing agreements, and then radically altered its conduct -- through its massive and sudden price hike that made rivals' boosted PIs much more expensive than Kaletra virtually overnight -- to impair rivals' ability to compete in the boosted market.

Direct Purchasers' Opp'n 23. Abbott contends that there is no evidence that Norvir was priced at a level that its rivals or consumers "could not accept" or evidence that it unilaterally terminated a voluntary course of dealing with its rivals to set Norvir's price.

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." <u>linkLine</u>, 129 S. Ct. at 1118. However, there are "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." <u>Id.</u> (citing <u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585 (1985)).

In <u>Aspen Skiing</u>, the Supreme Court upheld a jury verdict of

24

United States District Court
For the Northern District of California

Section 2 liability when a "monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." 472 U.S. at 603. The defendant owned three of the four ski resorts in Aspen, Colorado. Id. at 587-89. For several years, the defendant, along with the plaintiff who owned the fourth ski resort, had offered a ski lift pass that could be used at any Aspen ski resort. Id. at 589-90. Proceeds from the sale of the all-Aspen pass were divided between the defendant and the plaintiff, based on a survey of which resorts consumers actually frequented. Id. at 590-91. The plaintiff's share of revenue fluctuated year-to-year, depending on its attendance attributable to the ski pass. Believing, among other things, that the survey upon which revenues were allocated was inaccurate and that the ski pass "was siphoning off revenues that could be recaptured," the defendant sought to discontinue the joint program. Id. at 592. It extended the plaintiff "an offer that it could not accept;" the defendant would agree to continue the program only if the plaintiff agreed to a fixed percentage of revenue, far below what the plaintiff had received in the past. Id. After the plaintiff rejected this offer, the defendant took actions "that made it extremely difficult" for the plaintiff to compete. Id. at 593. In particular, the defendant refused to sell the plaintiff any lift tickets, even at the retail price. Id. Eventually, the plaintiff's market share plummeted. Id. at 594-95.

On appeal, the defendant asserted that it had no duty to deal with the plaintiff. The Supreme Court agreed that, generally, a business has a right to select customers and associates, but stated that this right is not unqualified. Id. at 601. Quoting Lorain

25

Journal Co. v. United States, 342 U.S. 143, 155 (1951), the Supreme

Court stated,

> The right . . . is neither absolute nor exempt from
> regulation.  Its exercise as a purposeful means of
> monopolizing interstate commerce is prohibited by the
> Sherman Act. . . .  "In the absence of any purpose to
> create or maintain a monopoly, the act does not restrict
> the long recognized right of trader or manufacturer
> engaged in an entirely private business, freely to
> exercise his own independent discretion as to parties
> with whom he will deal."

Aspen Skiing, 472 U.S. at 602 (emphasis supplied by Aspen Skiing

court).  Because it found sufficient evidence that anticompetitive

intent motivated the defendant's unreasonable offer, the Court

upheld the jury's verdict in favor of the plaintiff.

In Verizon Communications Inc. v. Law Offices of Curtis V.

Trinko, LLP, 540 U.S. 398 (2004), the Supreme Court revisited Aspen

Skiing.  There, the plaintiff brought Section 2 claims, alleging

that, under Aspen Skiing, Verizon violated an antitrust duty to

deal when it failed to provide its rivals with timely access to its

telecommunications network, for which Verizon had already been

sanctioned by government agencies under the Telecommunications Act

of 1996.  Id. at 403-05.  The Court rejected the plaintiff's claim.

Although the Court reaffirmed the potential for liability under

Aspen Skiing, it distinguished that case and reasoned that the

Aspen Skiing Court "found significance" in two of the defendant's

acts, both of which suggested anticompetitive motives: (1) the

"unilateral termination of a voluntary (and thus presumably

profitable) course of dealing" and (2) "the defendant's

unwillingness to renew the ticket even if compensated at retail

price."  Trinko, 540 U.S. at 409 (emphasis in original).  Unlike

the Aspen Skiing plaintiff, Trinko did not allege that Verizon

United States District Court
For the Northern District of California

"voluntarily engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." Id. Thus, the Court reasoned, Verizon's "prior conduct sheds no light upon the motivation of its refusal to deal -- upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice." Id. The Court also noted that the Telecommunications Act of 1996 required Verizon to provide services not available to the public, which made the case "different from Aspen Skiing in a more fundamental way." Id. The Court explained,

> In Aspen Skiing, what the defendant refused to provide to
> its competitor was a product that it already sold at
> retail -- to oversimplify slightly, lift tickets
> representing a bundle of services to skiers. Similarly,
> in Otter Tail Power Co. v. United States, another case
> relied upon by respondent, the defendant was already in
> the business of providing a service to certain customers
> (power transmission over its network), and refused to
> provide the same service to certain other customers. In
> the present case, by contrast, the services allegedly
> withheld are not otherwise marketed or available to the
> public. The sharing obligation imposed by the 1996 Act
> created "something brand new" -- "the wholesale market
> for leasing network elements." The unbundled elements
> offered pursuant to § 251(c)(3) exist only deep within
> the bowels of Verizon; they are brought out on compulsion
> of the 1996 Act and offered not to consumers but to
> rivals, and at considerable expense and effort.

Id. at 410 (citations omitted).

In MetroNet Services Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004), the Ninth Circuit reconsidered, in light of Trinko, its prior reversal of a district court's grant of summary judgment in favor of an antitrust defendant. The court noted that Trinko identified three circumstances that were "significant for creating antitrust liability": (1) "the unilateral termination of a voluntary and profitable course of dealing;" (2) a refusal to deal or an "offer to deal with a competitor only on unreasonable terms

and conditions," which could "amount to a practical refusal to deal;" and (3) a refusal to provide competitors with "products that were already sold in a retail market to other customers." MetroNet, 383 F.3d at 1132-34. Concluding that the plaintiffs' evidence did not contain these hallmarks, the court noted that their theory of liability did "not fit comfortably in the Aspen Skiing mold" and affirmed summary judgment in favor the defendant. Id. at 1132.

Here, in its motion to dismiss, Abbott argued, based on Trinko and MetroNet, that Plaintiffs' antitrust duty-to-deal claims did not fall within the scope of Aspen Skiing. The Court denied the motion, holding that liability under Section 2 could arise if a defendant unilaterally alters a voluntary course of dealing and "anticompetitive malice" motivates the defendant's conduct. See MetroNet, 383 F.3d at 1131-32. The Court noted MetroNet's observation that Aspen Skiing could apply in cases involving a practical refusal to deal, in which a defendant offered its competitors only on unreasonable terms and conditions. In opposition to Abbott's motions for summary judgment, Plaintiffs provide evidence that creates a genuine issue of fact with respect to the three factors of significance identified in MetroNet and the elements outlined by the Court in its order on Abbott's motions to dismiss.

Plaintiffs offer evidence that Abbott unilaterally terminated a voluntary course of dealing by increasing the price of Norvir approximately four hundred percent and did so at some expense. Plaintiffs offer undisputed evidence that, before December, 2003, Abbott's previous price increases were in line with the rate of

28

inflation.  Further, Dr. Noll opines that Norvir's 400-percent

price increase in December, 2003 came at some cost, including a

diminished rate of profit and a drop in Abbott's stock price.

Abbott responds that Trinko found anticompetitive significance only

in unilateral changes in "cooperative ventures" between

competitors.  But Trinko did not so hold.  The Trinko Court noted

that Aspen Skiing involved such a venture, but it was the

unilateral termination of a voluntary and profitable course of

dealing that controlled.[6]  540 U.S. at 409.  Indeed, in MetroNet,

the defendant had engaged in a general course of dealing with

respect to all of its customers, not just the plaintiff reseller.

383 F.3d at 1132.  Nevertheless, the Ninth Circuit did not find

this dispositive; instead, its ruling was based on the lack of

evidence that the defendant forsook short-term profits.  Id.  Here,

Plaintiffs have offered such evidence.

Plaintiffs have likewise tendered evidence of a practical

refusal to deal.  For instance, Abbott does not dispute that the

Norvir price hike made Kaletra's rival boosted PI therapies

significantly more expensive.  To illustrate, the Norvir price

increase caused the cost of a therapy based on GSK's Lexiva to jump

from $19.42 to $33.14.  A jury could view this as an offer to deal

only on unreasonable terms and conditions.  Abbott argues that

consumers' continued purchases of Norvir precludes, as a matter of

---

[6] Even if a unilateral change in a cooperative venture is
required, Plaintiffs provide evidence of such a change.  Abbott
does not dispute that, prior to the Norvir price hike, it
participated in co-marketing agreements with its competitors and
followed a practice of increasing Norvir's price based on the rate
of inflation.  Thus, a jury could view Abbott as having
unilaterally changed the nature of its cooperative ventures with
its competitors.

law, a finding that its price was unreasonable.  This argument is unavailing.  Doctors might have continued to prescribe an unreasonably priced drug if it were necessary to the health or life of their patients.

Finally, a jury could infer that Abbott refused to provide its competitors with Norvir on the same terms that it provided the drug to its retail customers.  As noted above, Norvir is the trade name for the API ritanovir.  To avail themselves of the benefits of ritanovir, patients taking Abbott's competitors' boosted PI therapies are required to purchase Norvir.  Abbott, however, provides ritanovir to patients taking Kaletra at a significantly cheaper price.

Furthermore, as noted in the Court's prior ruling, Plaintiffs offer evidence -- comments by Abbott's executives -- that suggests Abbott engaged in this conduct with anticompetitive malice. Plaintiffs' experts show that Kaletra sales benefitted from the increase in Norvir's price.  Finally, GSK points to damages it suffered based on Abbott's conduct.

Accordingly, Plaintiffs offer sufficient evidence to create a genuine issue of fact with respect to whether Abbott's conduct constituted a violation of its antitrust duty to deal, as defined by Aspen Skiing.  Thus, Plaintiffs' monopolization and attempted monopolization claims are viable to the extent that they are based on this theory, as well as on the predatory pricing theory explained above.

        3.    Monopoly Leveraging in a Market with Government
             Pricing Rules

Plaintiffs' third theory is that Abbott leveraged its monopoly

30

in the boosting market, which is regulated by government pricing rules, to maintain or obtain a monopoly in the boosted market. At the hearing on Abbott's motions to dismiss Plaintiffs' amended complaints, the Court called this a "monopoly leveraging plus" theory because, although it rests on allegations of monopoly leveraging, it includes the additional factor of government pricing rules in the boosting market. Although Direct Purchasers adopted this theory at the hearing on Abbott's summary judgment motions, only GSK provided briefing on it.

As explained above, the Ninth Circuit in <u>Doe</u> held that, based on <u>linkLine</u>, monopoly leveraging, on its own, is not proscribed under Section 2. GSK asserts that the Supreme Court's and Ninth Circuit's rejection of liability based solely on monopoly leveraging rested on a "single monopoly profit (SMP) theory," which reflects a precept that "in most monopoly leveraging cases a monopolist can only take its monopoly profit once." GSK Opp'n to Abbott's Supp. Brief 2. It argues that this theory does not apply in a government-regulated market and, thus, antitrust liability may nevertheless lie for monopoly leveraging on its own.

The Court is not persuaded. The Ninth Circuit in <u>Doe</u> addressed a free-standing monopoly leveraging theory in the context of the circumstances in this case and held it to be insufficient to sustain a Section 2 claim. Indeed, GSK acknowledges that, in its amicus brief submitted in the <u>Doe</u> appeal, it raised its arguments concerning the government pricing rules.

Further, in <u>linkLine</u>, the defendant's prices in the upstream, wholesale market were likewise subject to regulation. <u>See</u> 129 S. Ct. at 1115. This did not change the outcome in that case. <u>See</u>

31

129 S. Ct. at 1124 (Breyer, J., concurring in judgment).  GSK cites several cases in which courts opined that regulation in a monopolized market, but not in an adjacent market, could alter the analysis as to whether monopoly leveraging, on its own, is actionable.  See, e.g., Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 549 (9th Cir. 1991); Town of Concord, Mass. v. Boston Edison Co., 915 F.2d 17, 29 (1st Cir. 1990).  However, these cases were decided before linkLine and Doe.

After linkLine and Doe, a free-standing monopoly leveraging theory of liability is not cognizable in this case.  Accordingly, the Court summarily adjudicates that Plaintiffs may not base their monopolization and attempted monopolization claims on a "monopoly leveraging plus" theory.

> 4.  Tortious Conduct

Plaintiffs' final theory of anticompetitive conduct rests on the Sixth Circuit's decision in Conwood.  Although Direct Purchasers adopted this theory at the hearing on Abbott's motions, only GSK provided briefing on it.

In Conwood, the defendant destroyed the plaintiff's store racks and offered false information to retailers about competitors' products.  290 F.3d at 775-79, 783.  The Sixth Circuit upheld a jury's finding that the defendant's "pervasive practice of destroying [the plaintiff's advertisements] and reducing the number of [the plaintiff's displays] through exclusive agreements with and misrepresentations to retailers was exclusionary conduct without a sufficient justification . . . ."  Id. at 788.  GSK asserts that Conwood applies here because Abbott's price hike interfered with

its ability to promote Lexiva.[7]

Abbott's challenged acts are not analogous to those of the Conwood defendant. The Conwood court stated, "Business torts will be violative of § 2 only in 'rare gross cases.'" 290 F.3d at 784. GSK focuses primarily on Abbott's acts of "announcing and timing a massive price hike to hamper a key competitive product upon its introduction." GSK's Opp'n to Abbott's Supp. Brief 6. GSK does not argue that these acts constituted business torts, nor does it contend that Abbott committed the type of widespread tortious conduct at issue in Conwood.

Accordingly, the Court summarily adjudicates that Abbott cannot suffer Section 2 liability based on Conwood. Thus, Plaintiffs' Section 2 claims concerning the boosted market may only be based on the predatory pricing and duty-to-deal theories discussed above.

C.    Direct Purchasers' Antitrust Injury

As noted above, private plaintiffs seeking damages for federal antitrust violations must demonstrate antitrust injury. Abbott challenges Direct Purchasers', although not GSK's, showing with respect to antitrust injury.

First, Abbott relies on Brooke Group v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993), to argue that predatory pricing always benefits consumers because, "until the elimination of competition, purchasers . . . can purchase the goods or services at

---

[7] In its original opposition, GSK claimed that Abbott's publication of misleading price comparisons is analogous to the false information in Conwood. However, in its supplemental opposition, GSK clarified that its Conwood theory is based solely on the announcement and timing of the Norvir price increase.

33

issue for less than if the defendant were not engaged in predatory pricing." Mot. for Summ. J. on Direct Purchasers' Claims 24. However, Brooke Group concerns single-product predatory pricing, where a defendant's products are sold below cost. Under Cascade's bundled discounting exception to Brooke Group, a bundled product can be found to be predatorily priced if the competitive component of the bundled product is deemed, under the "discount attribution standard," to be sold below cost, even though the bundle as a whole is priced above cost. 515 F.3d at 906. Thus, predatory pricing does not always benefit consumers. Here, there is evidence that Direct Purchasers paid supracompetitive prices for Kaletra, a bundled product. This creates a genuine issue of material fact as to whether Direct Purchasers suffered antitrust injury.

Second, Abbott argues that Direct Purchasers' theory of liability is contradictory. On the one hand, Abbott argues, Direct Purchasers claim that it engaged in predatory pricing. Abbott notes that Direct Purchasers maintain that a Kaletra-based therapy costs less than its rivals' therapies because it predatorily priced a bundle of lopinavir and ritonavir. On the other hand, Abbott asserts, Direct Purchasers claim that it charged monopoly prices for Kaletra. These allegations are not necessarily inconsistent. Although Kaletra costs less than other boosted PI therapies, which are more expensive due to Norvir's allegedly inflated price, a jury could agree with Plaintiffs' experts that Abbott's conduct caused all prices in the boosted market to be higher than they would have been, but for Abbott's pricing conduct. Further, Direct Purchasers posit that Abbott's scheme was intended to operate in two stages: (1) the Norvir price increase functioned to raise the cost of

United States District Court

For the Northern District of California

Kaletra's rival therapies, making them unattractive to consumers and (2) once this was achieved, Abbott raised the price of Kaletra to a price higher than what Abbott could have commanded but for the Norvir price increase. Direct Purchasers contend that they were injured by Abbott's subsequent inflation of the price of Kaletra, and their experts corroborate this.

Accordingly, summary judgment is not warranted on Direct Purchasers' claims based on Abbott's argument that they fail to show antitrust injury. Because Plaintiffs create triable issues with respect to every element of their Section 2 claims pertaining to the boosted market, Abbott's motion for summary judgment with respect to these claims must be denied.

II.   Sherman Act Claims for Monopolization of the Boosting Market

Direct Purchasers, but not GSK, bring Section 2 claims for Abbott's alleged unlawful monopolization of the boosting market. They assert that Abbott monopolized this market by stifling innovation through inducing its competitors to "standardize around the use of Norvir for boosting purposes." Direct Purchasers' Opp'n 24. Abbott argues that this monopolization claim fails because there is no evidence of (1) below-cost pricing or (2) competitors refraining from developing or introducing PI boosters.

Direct Purchasers offer no evidence to support their claim. They cite Dr. Noll's report, even though he focused solely on how "Abbott's pricing behavior has created an artificial financial barrier to innovation in boosted PIs." Stockinger Decl., Ex. 50, at 132. Indeed, Dr. Noll stated at his deposition that the price hike increased the "incentive to innovate" in the boosting market. Senator Decl., Ex. A, at 61:7-10. Dr. Singer also offers no

35

United States District Court

For the Northern District of California

support. Like Dr. Noll, he addressed reduced innovation in the boosted market and, to the extent that he discussed the boosting market, he merely assumed that "Plaintiffs can show that Abbott's competitors delayed or deferred developing alternatives to Norvir." Stockinger Decl., Ex. 69, at 39-40. Dr. Singer did not identify any evidence that the price hike actually had this effect.

Direct Purchasers did not respond to Abbott's argument that Norvir was not priced below cost, which is a necessary predicate for predatory pricing with respect to single products. See Brooke Group, 509 U.S. at 223. Further, that Abbott had monopoly power in the boosting market and charged monopoly prices does not violate Section 2. Doe, 571 F.3d at 934.

Accordingly, summary judgment is granted on the Direct Purchasers' claims for monopolization of the boosting market.

III. GSK's State Law Claims

A.  Breach of the Implied Covenant of Good Faith and Fair Dealing under New York Law

GSK asserts that Abbott breached the implied covenant of good faith and fair dealing with respect to their licensing agreement for the co-marketing of Norvir and GSK's PIs, including Lexiva.[8] Abbott responds that it did not breach the implied covenant and that, even if it did, New York law and the contract preclude recovery for lost profits and restitution, as sought by GSK.

1.  Breach

"The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall

_____

[8] The parties' agreement, which has been filed under seal, contains a choice-of-law provision that designates New York law as controlling. Calamari Decl., Ex. 23 ¶ 11.4.

36

do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Moran v. Erk, 11 N.Y.3d 452, 456 (2008) (quoting 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002)).  The implied covenant encompasses "'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" Jennifer Realty, 98 N.Y.2d at 153 (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69 (1978)); accord M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (stating that the implied covenant doctrine is used to "effectuate the intentions of the parties, or to protect their reasonable expectations") (citation omitted).

GSK maintains that Abbott violated the implied covenant by injuring GSK's "right to enhance its profits from Lexiva sales by promoting Lexiva for boosted use with Norvir." GSK Opp'n 7.  It maintains that "the purpose of the contract was to allow GSK to increase sales of Lexiva by promoting it with Norvir." Id.  In support of its claim, it tenders expert opinion that GSK lost sales as a result of the Norvir price hike and that, but for the increase, Lexiva would have had a larger share of the boosted market.  GSK also provides evidence that Abbott knew that co-marketing was one benefit GSK sought when it entered into the contract.  James Tyree, who was then Abbott's head of business development, agreed with GSK's counsel that a benefit of the license was that it permitted GSK to market its PIs in tandem with Norvir, which would "hopefully" result in increased sales. Stockinger Decl., Ex. 1, Tyree Depo. 39:7-40:6.  And John Poulos, who negotiated with GSK on behalf of Abbott, agreed with GSK's

counsel's assertion that the license gave Abbott's competitors the opportunity to promote Norvir with their boosted PIs.

Abbott's arguments are unavailing. Although Abbott disputes the nature of the implied promises arising from its agreement with GSK, this is not sufficient to justify summary judgment. The evidence supports a finding that, after executing a co-marketing agreement with Abbott, GSK justifiably understood that Abbott would not drastically increase the price of Norvir at a time designed to interfere with the launch of GSK's co-marketed product. Abbott also argues that there is no evidence that it "'directly destroyed'" GSK's right to co-promote its products with Norvir. Reply at 11 (quoting MA/COM, 904 F.2d at 136). However, GSK's theory is that Abbott injured, not destroyed, its right.

Abbott also cites Moran, in which New York's high court rejected the plaintiffs' claim for a breach of the implied covenant. There, the plaintiffs claimed that they were deprived of "the fruits" of a contract when the defendants, after having "qualms about purchasing the Morans' house," instructed their attorney not to approve the purchase contract. 11 N.Y.3d at 454-55. The court, however, noted that the contract contained a clause that explicitly stated that the contract was "contingent upon approval by attorneys for Seller and Purchaser." Id. at 456 (emphasis omitted). Based on this clause, the court concluded that "the plain language of the contract in this case makes clear that any 'fruits' of the contract were contingent on attorney approval, as any reasonable person in the Morans' position should have understood." Id. at 457. Here, there were no contingencies placed on GSK's right to co-market its PIs with Norvir. Indeed, Tyree

38

testified that, at the time of their negotiations, Abbott did not inform GSK that it was then considering changes in either the supply or price of Norvir.

Abbott does not establish that, as a matter of law, it was unreasonable for GSK to expect that Abbott would not injure its right to market its PIs along with Norvir.

### 2. Damages

GSK seeks damages for the breach of the implied covenant in the form of its alleged lost profits, and restitution for the consideration it offered for the co-marketing license.

### a. Lost Profits

Abbott maintains that, under New York law, lost profits are consequential damages that are not recoverable for a breach of the implied covenant. Abbott also argues that, because lost profits are consequential damages, a liability-limiting clause in the contract bars GSK from recovering them.

In <u>Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.</u>, the Second Circuit, applying New York law, explained the difference between lost profits as consequential damages and as general damages:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. . . . In New York, a party is entitled to recover this form of lost profits only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties.

> By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages.

487 F.3d 89, 109-10 (2d Cir. 2007) (footnotes, citations and internal quotation marks omitted); see also Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 43 (1989).

Here, GSK maintains that it would have received additional revenue from third parties had Abbott not raised the price of Norvir. See GSK Opp'n 11. GSK does not contend that any of its lost profits are monies owed by Abbott under the contract. Thus, the lost profits GSK seeks are best characterized as consequential, not general, damages.

Abbott cites Travellers International A.G. v. TWA, 41 F.3d 1570 (2d Cir. 1994), for the proposition that New York law precludes recovery of consequential damages for breach of the implied covenant. There, the Second Circuit stated that "a damage award for lost profits cannot rest upon the breach of the implied duty of good faith and fair dealing." Id. at 1576. However, the court did not cite any authority for this proposition, and Abbott did not identify, nor did the Court find, any supporting New York case law. The Travellers court affirmed the award of lost profits as damages, although based on the theory that the defendant breached a provision of the contract. 41 F.3d at 1577-81. Further, contrary to the Second Circuit's statement, a New York state appellate court found cognizable a request for consequential damages based on a breach of the implied covenant, concluding that the request was sufficiently plead. Panasia Estates, Inc. v. Hudson Ins. Co., 889 N.Y.S.2d 452, 453 (2009). Because there is no authority that bars recovery for lost profits based on a breach of the implied covenant, summary judgment is not warranted on this ground.

United States District Court
For the Northern District of California

Abbott next argues that the parties' contract prohibits recovery for consequential damages. The relevant provision states, "EXCEPT AS OTHERWISE PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL LOSSES ARISING OUT OF OR RELATING TO THIS AGREEMENT . . . ." Calamari Decl., Ex. 23 at NOR00004428 (upper case in original). Abbott's conduct, however, could render the relevant provision inoperable.

In <u>Sommer v. Federal Signal Corporation</u>, New York's high court stated that it "is the public policy of this State . . . that a party may not insulate itself from damages caused by grossly negligent conduct," a principle that "applies equally to contract clauses purporting to exonerate a party from liability and clauses limiting damages to a nominal sum." 79 N.Y.2d 540, 554 (1992). The court explained that, to render such a clause inoperative, conduct must evince "a reckless indifference to the rights of others" and "smack of intentional wrongdoing." <u>Id.</u> (citations and editing and quotation marks omitted).

In a subsequent case, <u>Metropolitan Life Insurance Company v. Noble Lowndes International, Inc.</u>, the high court considered a limiting clause that restricted consequential damages to those resulting from "intentional misrepresentations, . . . willful acts or gross negligence." 84 N.Y.2d 430, 433 (1994). The court interpreted the clause to mean that "the parties intended to narrowly exclude from protection truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." <u>Id.</u> at 438. The court then explained,

> As thus defined, limiting defendant's liability for
> consequential damages to injuries to plaintiff caused by
> intentional misrepresentations, willful acts and gross

negligence does not offend public policy.  As we said in
<u>Sommer v. Federal Signal Corp.</u>, the conduct necessary "to
pierce an agreed-upon limitation of liability in a commercial
contract, must smack[] of intentional wrongdoing." . . . <u>see
also</u>, 5 Corbin, Contracts § 1068, at 389 [contractual
exemption from liability for tortious conduct may be held
against the public interest and illegal]; Restatement [Second]
of Contracts § 195[1] ["A term exempting a party from tort
liability for harm caused intentionally or recklessly is
unenforceable on grounds of public policy"]).

<u>Id.</u> at 438.

Here, there is sufficient evidence to support an inference
that Abbott's action smacked of intentional wrongdoing.  Internal
documents suggest that Abbott intended to injure GSK's right to co-
market Lexiva with Norvir.  Further, several documents suggest that
Abbott intended to recapture and maintain Kaletra's market share,
at the expense of Lexiva and other boosted PIs.  GSK presents
evidence that, while Abbott was negotiating with it regarding the
terms of the license, it was concurrently investigating methods by
which it could diminish the license's value.  Abbott never informed
GSK that it was considering withdrawing or raising dramatically the
price of Norvir, two material facts that Abbott knew would have
altered the nature of the negotiations.  <u>See</u> Stockinger Decl., Ex.
1 at 134:22-24 (Tyree stated that it is "inconsistent to think
about withdrawing a product that we're actually issuing licenses
on").  Abbott announced the price hike on December 3, 2003,
apparently adopting a staff recommendation to implement the
increase at the same time as GSK's late-November launch of Lexiva.
Abbott adopted this timing as a "clever creative way to make them
look bad."  Stockinger Decl., Ex. 21 at RIT0437394.  Finally, the
price hike caused the cost of GSK's Lexiva-based therapy to jump
approximately seventy-one percent.  This evidence, and the

1  reasonable inferences that can be drawn from it, create a triable

2  issue as to whether Abbott meets the standard set in <u>Sommer</u>.

3  Accordingly, GSK may recover lost profit damages based on

4  Abbott's conduct, if it proves that Abbott acted with reckless

5  indifference to its right to co-market its products with Norvir.

6  b.  Restitutionary Damages

7  Abbott contends that one form of consideration for which GSK

8  seeks restitution on its breach of the implied covenant claim was

9  the subject of a separate contract and, as a result, cannot be

10  recovered for a breach of the covenant with respect to the Norvir

11  license.[9]

12  In relevant part, the parties' Norvir license provides that

13  "the terms and conditions of this Agreement and [the parties' other

14  contract] shall remain independent of one another, including the

15  termination provisions." Calamari Decl., Ex. 23 ¶ 7.1. GSK's

16  theory of recovery, however, does not implicate the terms and

17  conditions of this other contract. Accordingly, Abbott's motion on

18  this point is denied.

19  B.  Violation of North Carolina's Unfair and Deceptive Trade
        Practices Act

20

21  Abbott seeks summary judgment on GSK's claim for violation of

    North Carolina's UDTPA to the extent that it is based on GSK's

22
    allegations that Abbott breached the implied covenant of good faith

23
    and fair dealing and deceived consumers through statements it made

24
    regarding the Norvir price increase. Abbott does not seek summary

25

26

27  [9] Abbott does not appear to contest that GSK could recover
    monies it paid under the terms of the Norvir license. Abbott
    appears to seek only summary adjudication that GSK cannot recover

28  the other, more substantial, form of consideration.

43

judgment on GSK's claim for monopolization or attempted monopolization of "any part of trade or commerce in the State of North Carolina," in violation of the UDTPA. N.C. Gen. Stat. § 75-2.1.[10]

To prove a violation of the UDTPA, a plaintiff must show: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." Miller v. Nationwide Mut. Ins. Co., 112 N.C. App. 295, 301 (1993).

"The question of what constitutes an unfair or deceptive trade practice is an issue of law." Nelson v. Hartford Underwriters Ins. Co., 177 N.C. App. 595, 609 (2006). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 302 N.C. 539, 548 (1981). "Stated another way, a party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position." Carcano v. JBSS, LLC, 684 S.E.2d 41, 50 (N.C. App. 2009) (citation and internal quotation marks omitted). When determining whether an act violates the UDTPA, courts must consider "the effect of the actor's conduct on the consuming public." Marshall, 302 N.C. at 548.

"A simple breach of contract, even if intentional, does not amount to a violation of the Act; a plaintiff must show substantial

---

[10] The parties do not dispute that Abbott would face liability under the UDTPA for monopolization and attempted monopolization if and only if GSK prevailed on its Section 2 claim. See generally S.B. 843, 1996 Gen. Assemb., Reg. Sess. (N.C. 1996) (indicating that § 75-2.1 was intended to ensure UDTPA is consistent with federal antitrust laws).

**United States District Court**
For the Northern District of California

aggravating circumstances attending the breach to recover under the Act, which allows for treble damages." <u>Bartolomeo v. S.B. Thomas, Inc.</u>, 889 F.2d 530, 535 (4th Cir. 1989); <u>accord</u> <u>Bob Timberlake Collection, Inc. v. Edwards</u>, 176 N.C. App. 33, 42 (2006).

The evidence supporting an award of consequential damages for GSK's breach of the implied covenant claim under New York law could also support liability under the UDTPA based on Abbott's alleged breach. As noted above, the price hike caused the cost of a Lexiva-based therapy to increase seventy-one percent overnight. There is evidence to suggest that this increase was specifically intended to interfere with GSK's launch of Lexiva. Further, the price hike resulted in a sudden and substantial increase in the cost to HIV patients in need of treatment.

There are few guides regarding what constitutes sufficiently egregious conduct under the UDTPA. On the one hand, allegations of "deceptions, lies, and misrepresentations" with respect to marketing "membership in a fictional LLC," even if proved, "do not constitute unfair and deceptive practices" under the UDTPA. <u>See</u> <u>Carcano</u>, 684 S.E.2d at 50. On the other hand, a party that never had an intent to fulfill an agreement may be liable under the UDTPA. <u>Unifour Constr. Servs., Inc. v. Bellsouth Telecommc'ns, Inc.</u>, 163 N.C. App. 657, 667 (2004).

Here, although there is no indication that Abbott did not intend to fulfill the explicit terms of the license, there is evidence that Abbott knew that it was taking steps that would undermine the license's value. If the evidence is construed as described above, Abbott's conduct could be found "unethical, oppressive, unscrupulous" and "substantially injurious to

45

consumers." Thus, summary judgment is not warranted on GSK's UDTPA claim to the extent it is based on Abbott's alleged breach of the implied covenant of good faith and fair dealing.

Summary judgment, however, is warranted on GSK's UDPTA claim to the extent it is based on Abbott's allegedly deceptive representations to the public about the Norvir price increase. Although Abbott's statements to the public may have been deceptive, GSK does not offer any evidence that it suffered proximate injury from them.

Accordingly, the Court summarily adjudicates that GSK cannot base its UDTPA claim on Abbott's alleged deception of consumers. In all other respects, Abbott's motion concerning GSK's UDTPA claim is denied.

CONCLUSION

For the foregoing reasons, Abbott's motions for summary judgment on the Direct Purchasers' claims (C 07-5470 CW, Docket No. 232; C 07-5985 CW, Docket No. 332; C 07-6120 CW, Docket No. 213; C 07-5702 CW, Docket No. 287) and GSK's claims (C 07-5470 CW, Docket No. 227; C 07-5985, Docket No. 328; C 07-6120 CW, Docket No. 209; C 07-5702 CW, Docket No. 283) are GRANTED in part and DENIED in part. The Court makes the following rulings:

    1.    Plaintiffs' Section 2 claims for the monopolization and attempted monopolization of the boosted market may go forward on the theories that Abbott engaged in predatory pricing under <u>Cascade</u> and violated its antitrust duty to deal. These claims, however, may not be based on a "monopoly leveraging plus" theory or on a theory that Abbott committed a <u>Conwood</u>-type business tort.

2.   Summary judgment is granted in favor of Abbott on Direct
     Purchasers' Section 2 claim for monopolization of the
     boosting market.

3.   Summary judgment is denied with respect to GSK's claim
     under New York law for the breach of the implied covenant
     of good faith and fair dealing.  GSK may seek
     consequential damages and restitution based on this
     claim.

4.   Summary judgment is denied with respect to GSK's UDTPA
     claim.  However, the Court summarily adjudicates that the
     claim may not be based on a theory that Abbott deceived
     consumers through its statements regarding the Norvir
     price increase.

A final pretrial conference is scheduled for February 8, 2011
at 2:00 p.m.  A fifteen-day jury trial is set to begin on February
28, 2011 at 8:30 a.m.

IT IS SO ORDERED.

Dated: January 14, 2011

_____
CLAUDIA WILKEN
United States District Judge

47