IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE, | No. C 07-5702 CW |
| Plaintiff, | |
| and | |
| SAFEWAY INC.; WALGREEN CO.; THE KROGER CO.; NEW ALBERTSON'S, INC.; AMERICAN SALES COMPANY, INC.; and HEB GROCERY COMPANY, LP, | No. C 07-5470 CW |
| Plaintiffs, | |
| and | |
| MEIJER, INC. & MEIJER DISTRIBUTION, INC.; ROCHESTER DRUG CO-OPERATIVE, INC.; and LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of themselves and all others similarly situated, | No. C 07-5985 CW |
| Plaintiffs, | |
| and | |
| RITE AID CORPORATION; RITE AID HDQTRS CORP.; JCG (PJC) USA, LLC; MAXI DRUG, INC. D/B/A BROOKS PHARMACY; ECKERD CORPORATION; CVS PHARMACY, INC.; and CAREMARK LLC, | No. C 07-6120 CW |
| Plaintiffs, | |
| v. | PRELIMINARY JURY INSTRUCTIONS |
| ABBOTT LABORATORIES, | |
| Defendant. | |
| _____/ | |

## DUTY OF THE JURY

Ladies and gentlemen: You are now the jury in this case. It is my duty to instruct you on the law.

These instructions are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it. You will be given a copy of these instructions to keep throughout the trial. This set of instructions is not to be taken home and must remain in the jury room when you leave in the evenings. At the end of the trial, I will give you a final set of instructions. It is the final set of instructions which will govern your deliberations.

You must not infer from these instructions or from anything I may say or do that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

**PARTIES**

Abbott Laboratories is the Defendant in this case. It makes drugs called Norvir and Kaletra to treat human immunodeficiency virus (HIV) infection. This case is brought by various Plaintiffs.

First is GlaxoSmithKline, also known as GSK. GSK is a pharmaceutical company that makes Lexiva, a drug that competes with Abbott's drug Kaletra.

2

Second is a group of Plaintiffs comprised of Meijer, Inc.; Meijer Distribution, Inc.; Rochester Drug Co-Operative, Inc.; and Louisiana Wholesale Drug Company, Inc. These Plaintiffs are wholesalers and pharmacies that purchased the drugs Kaletra and Norvir directly from Abbott. They bring their lawsuit on behalf of a class of other wholesalers and pharmacies that purchased Kaletra and Norvir directly from Abbott. This group of Plaintiffs will be referred to as Customer Plaintiffs.

Third is a group of Plaintiffs consisting of individual pharmacies: Safeway; Walgreen; Kroger; New Albertson's; American Sales; HEB Grocery; Rite Aid Corporation; Rite Aid Headquarters; JCG (PJC) USA; Maxi Drug, which does business as Brooks Pharmacy; Eckerd; CVS; and Caremark. These pharmacies bought Kaletra and Norvir from wholesalers that bought the drugs directly from Abbott. This group of Plaintiffs will also be referred to as Customer Plaintiffs.

You must decide the case as to each Plaintiff separately. Unless otherwise stated, the instructions apply to all parties.

## CORPORATIONS

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

Under the law, a corporation is considered to be a person. It can only act through its employees, agents, directors, or officers. Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.

## SUMMARY OF DISPUTE AND THE PARTIES' CLAIMS AND DEFENSES

This case involves a dispute over brand-name prescription drugs, known as protease inhibitors, which are used to fight HIV. Protease inhibitors are also known as PIs. These drugs work by preventing HIV cells from reproducing.

In 1996, Abbott introduced Norvir, a PI used to treat HIV. Norvir's active ingredient is called ritonavir. Thereafter, it was discovered that, when taken in small quantities with another PI, Norvir would "boost" the effectiveness of the other PI. Because of this "boosting" property, Norvir is known as a booster. The other PI is known as the "boosted" PI.

In 2000, Abbott introduced Kaletra, which is a drug that contains two active ingredients: lopinavir and ritonavir, which is the active ingredient in Norvir. Ritonavir is used to boost the effects of lopinavir. Kaletra is known as a "boosted" PI.

Late in 2003, Bristol-Myers Squibb and GSK introduced new PI drugs that were designed to be boosted by Norvir. As I mentioned earlier, GSK's drug is called Lexiva. These new boosted PI drugs competed with Abbott's Kaletra. Before launching Lexiva, GSK signed a contract with Abbott which allowed GSK to promote and market Lexiva with Abbott's Norvir.

On December 3, 2003, Abbott raised the wholesale price of Norvir by 400 percent, while keeping the price of Kaletra steady.

GSK and the Customer Plaintiffs claim that Abbott's conduct violated federal antitrust laws and damaged them. GSK and the Customer Plaintiffs claim that Abbott monopolized or attempted to monopolize the market in which Kaletra competes.

GSK also claims that Abbott breached the implied covenant of good faith and fair dealing in their contract and damaged GSK.

Plaintiffs have the burden of proving these claims. Abbott denies all of Plaintiffs' claims.  Abbott contends that it increased Norvir's price for legitimate business reasons, with neither the purpose nor the effect of harming competition or violating any duties to GSK.

## BURDEN OF PROOF

When a party has the burden of proof of any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

## WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

(1) the sworn testimony of any witness;

(2) the exhibits which have been received into evidence; and

(3) any facts to which the lawyers may agree.

## WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1) Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they will say in their opening

5

statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

(3) Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered.

(4) Anything you see or hear when the Court is not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

## EVIDENCE FOR LIMITED PURPOSE

Some evidence may be admitted for a limited purpose only. If I instruct you that an item of evidence is admitted for a limited purpose, you must consider it only for that limited purpose and for no other.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how

much weight to give to any evidence.

## RULING ON OBJECTIONS

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)    the opportunity and ability of the witness to see or hear or know the things testified to;

(2)    the witness's memory;

(3)    the witness's manner while testifying;

(4)    the witness's interest in the outcome of the case and any bias or prejudice;

(5)    whether other evidence contradicts the witness's testimony;

(6)    the reasonableness of the witness's testimony in light of

7

1       all the evidence; and

2   (7)  any other factors that bear on believability.

3       The weight of the evidence as to a fact does not necessarily

4   depend on the number of witnesses who testify about it.

5                          **EXPERT OPINION**

6       Some witnesses, because of education or experience, are

7   permitted to state opinions and the reasons for those opinions.

8   Opinion testimony should be judged just like any other testimony.

9       You may accept it or reject it, and give it as much weight as

10  you think it deserves, considering the witness's education and

11  experience, the reasons given for the opinion, and all the other

12  evidence in the case.

13                      **CHARTS AND SUMMARIES**

14      Certain charts and summaries may be received into evidence to

15  illustrate information brought out in the trial.  Charts and

16  summaries are only as good as the underlying evidence that supports

17  them.  You should, therefore, give them only such weight as you

18  think the underlying evidence deserves.

19      Certain graphics not received in evidence may be shown to you

20  in order to help explain the contents of books, records, documents

21  or other evidence in the case.  They are not themselves evidence or

22  proof of any facts.  If they do not correctly reflect the facts or

23  figures shown by the evidence in the case, you should disregard

24  these charts and summaries and determine the facts from the

25  underlying evidence.

26          **ANTITRUST CLAIMS - PURPOSE OF SHERMAN ACT**

27      I will now discuss the elements of Plaintiffs' claims.

28                                  8

Plaintiffs first allege that Abbott violated a United States law called the Sherman Act by willfully maintaining a monopoly or attempting to maintain a monopoly. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

**ANTITRUST CLAIMS – ELEMENTS OF CLAIM OF ACTUAL MONOPOLIZATION**

Plaintiffs allege that they were injured by Abbott's unlawful actual monopolization of the market in which Kaletra competes. To prevail on this claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

First, that the alleged market is a valid economic market;

Second, that Abbott possessed monopoly power in that market during the time period in which the violation allegedly occurred;

Third, that Abbott "willfully" maintained monopoly power in that market by engaging in anticompetitive conduct;

Fourth, that Plaintiffs were injured in their business or property because of Abbott's anticompetitive conduct; and

Fifth, that Abbott's conduct occurred in or affected interstate commerce. The parties agree that Abbott's conduct occurred in or affected interstate commerce.

If you find that Plaintiffs have failed to prove any of these elements, then you must find for Abbott and against Plaintiffs on this claim. If you find that Plaintiffs have proved each of these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Abbott on this claim.

## ACTUAL MONOPOLIZATION CLAIM – RELEVANT MARKET

The first element Plaintiffs must prove by a preponderance of the evidence is a relevant market. Defining the relevant market is essential because you are required to make a judgment about whether Abbott had monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrained Abbott's freedom to set prices for or restrict the output of Kaletra. The most likely and most important restraining force is actual and potential competition from other firms and their products. This includes all firms and products that acted as restraints on Abbott's power to set prices as it pleased. All the firms and products that exerted this restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Plaintiffs have met their burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market; the second is the relevant geographic market. The parties agree that, for the purposes of this case, the relevant geographic market is the United States.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that consumers believe are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely

interchangeable as long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material -- such as aluminum foil, cellophane, or even plastic containers -- to be reasonable alternatives, then all those products would be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another.  Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price not due to external cost factors, but you may conclude in this case that some other percentage is more applicable to the product at issue.  If you find that such switching would occur, then you may conclude that the products are in the same product market.

In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you may also consider: (1) consumers' views on whether the products are interchangeable; (2) the relationship between the price of one product and sales of another; (3) the perceptions of either industry or the public as to whether the products are in separate markets; (4) the views of the producers in the market about who their respective competitors are; and (5) the existence or absence of different customer groups or distribution channels.

As noted above, Plaintiffs contend that the relevant product market is the market in which Kaletra competes, which they define

11

to be the market for all protease inhibitors (PIs) boosted with Abbott's drug Norvir or for a subset of those drugs. By contrast, Abbott asserts that Plaintiffs have failed to allege the proper relevant product market and that Plaintiffs' reasons for defining the market as they have are invalid.

If you find that Plaintiffs have proved a relevant product market comprised of products that are reasonably interchangeable, then you should continue to evaluate the remainder of Plaintiffs' claim. However, if you find that Plaintiffs have failed to prove such a market, then you must find in Abbott's favor on this claim.

**ACTUAL MONOPOLIZATION CLAIM – MONOPOLY POWER – DEFINITION**

The second element Plaintiffs must prove by a preponderance of the evidence is monopoly power. Monopoly power is the power to control prices and exclude or handicap competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, monopoly power, in and of itself, is not unlawful.

There are two ways to show that a firm has monopoly power: through direct evidence and through circumstantial evidence.

**ACTUAL MONOPOLIZATION CLAIM – DIRECT EVIDENCE OF MONOPOLY POWER**

Plaintiffs may prove directly that Abbott had monopoly power by demonstrating that Abbott had sufficient power to inflict injury to competition and that it actually exercised that power. A firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.

12

Plaintiffs have the burden of proving that Abbott had the ability to raise or maintain the prices that it charged for drugs in the relevant market above competitive levels.  Plaintiffs must prove that Abbott had the power to do so by itself -- that is, without the assistance of, and despite competition from, any existing or potential competitors.

Plaintiffs must also prove that Abbott had the power to maintain prices above a competitive level for a significant period of time.

Similarly, Plaintiffs must prove that Abbott had the ability to exclude or handicap competition.

**ACTUAL MONOPOLIZATION CLAIM - INDIRECT EVIDENCE OF MONOPOLY POWER**

Evidence of the structure of the market can show indirectly that Abbott had monopoly power.  Factors you may consider are: (A) Abbott's market share, (B) market share trends, (C) barriers to entry or expansion and (D) the number and size of Abbott's competitors.  If this evidence establishes that Abbott had the power to control prices and exclude or handicap competition in the relevant antitrust market, then you may conclude that Abbott had monopoly power in the market.

**INDIRECT EVIDENCE OF MONOPOLY POWER - (A) MARKET SHARE**

The first factor that you may consider as indirect evidence of monopoly power is Abbott's market share.  You will hear evidence about Abbott's market share, and you should determine Abbott's market share as a percentage of total industry sales by prescription.

A market share above fifty percent may be sufficient to

13

support an inference that Abbott had monopoly power.  The likelihood that a company has monopoly power is stronger the higher that company's share is above fifty percent.

A market share below fifty percent is ordinarily not sufficient to support a conclusion that a company has monopoly power.  However, if you find that the other evidence demonstrates that Abbott, in fact, had monopoly power despite having a market share below fifty percent, you may conclude that Abbott had monopoly power.

**INDIRECT EVIDENCE OF MONOPOLY POWER - (B) MARKET SHARE TRENDS**

The trend in Abbott's market share is something you may consider as indirect evidence of monopoly power.  An increasing market share may strengthen an inference that Abbott had monopoly power, particularly if Abbott had a high market share, while a decreasing share might show that Abbott did not have monopoly power.

**INDIRECT EVIDENCE OF MONOPOLY POWER - (C) BARRIERS TO ENTRY OF EXPANSION**

You may also consider as indirect evidence of monopoly power the extent to which there were barriers to entry or barriers to expansion in the relevant market.

Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way.  Barriers to entry might include intellectual property rights (such as patents), specialized marketing practices, and the reputation of the companies already participating in the market or the brand name recognition of their products.

14

Barriers to expansion prevent other companies who are already in the market from increasing their output and selling more of their product.

Evidence of low or no barriers to entry or expansion during the relevant period would be evidence that Abbott did not have monopoly power, regardless of Abbott's market share, because new competitors could enter the market or existing competitors could expand their sales if Abbott attempted to raise the price of its drug Kaletra substantially above competitive levels for a substantial period of time. By contrast, evidence of high barriers to entry and high barriers to expansion along with high market share, during the relevant period, may support an inference that Abbott had monopoly power.

The history of entry and exit of competitors in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Abbott lacked monopoly power. On the other hand, departures of competitors from the market, or the failure of competitors to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Abbott had monopoly power.

**INDIRECT EVIDENCE OF MONOPOLY POWER - (D) NUMBER AND SIZE OF COMPETITORS**

You may consider whether Abbott's competitors were capable of effectively competing. In other words, you should consider whether the financial strength, market shares and number of competitors acted as a check on Abbott's ability to price its products. If

15

Abbott's competitors were vigorous or had large or increasing market shares, this may be evidence that Abbott lacked monopoly power.  On the other hand, if you determine that Abbott's competitors were weak or had small or declining market shares, this may support an inference that Abbott had monopoly power.

**MONOPOLY POWER - CONCLUSION**

If you find, by direct or indirect evidence, that Abbott had monopoly power in the relevant market, then you must consider the remaining elements of this claim.  If you find that Abbott did not have monopoly power, then you must find for Abbott and against Plaintiffs on this claim.

**ACTUAL MONOPOLIZATION CLAIM - ANTICOMPETITIVE CONDUCT - GENERALLY**

As I mentioned, the third element of an actual monopolization claim, that Plaintiffs must prove by a preponderance of the evidence, is that Abbott willfully maintained its monopoly power by engaging in anticompetitive conduct.

In considering whether Abbott's conduct was anticompetitive, you must draw a distinction between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other.  Put another way, anticompetitive conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way.  Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or

exercising natural competitive advantages.

Here, in support of their claim that Abbott unlawfully monopolized the market in which they allege Kaletra competes, Plaintiffs argue that Abbott engaged in two types of anticompetitive conduct: (A) unlawful bundled discounting; and (B) refusing to cooperate with its competitors. Abbott contends that it increased Norvir's price for legitimate business reasons, including obtaining a fair value for its patented invention, with neither the purpose nor the effect of harming competition.

**ANTICOMPETITIVE CONDUCT - BUNDLED DISCOUNTING - INTRODUCTION**

Sometimes a company will offer a lower price if a buyer purchases two different products together for a single price, in a bundle, rather than buying them separately. Bundling is generally not anticompetitive because bundled discounts can benefit buyers.

However, bundling may be anticompetitive if a business that has monopoly power over part of the bundle charges a substantial penalty to buyers who purchase the products separately. Penalizing buyers purchasing from competitors can have the effect of causing buyers to purchase the entire bundle from the monopolist even if those buyers would rather buy one product from the bundler and one product from the competitor. In this way, monopoly bundling can harm or exclude competitors that sell only one of the bundled products. This could reduce competition and lead to higher prices.

Abbott engaged in unlawful monopoly bundling in this case if: (1) Abbott had monopoly power in the Norvir market; (2) Kaletra is a bundle; and (3) Abbott's Norvir price increase constituted an improper penalty on buyers who wanted to purchase a boosted PI

17

other than lopinavir, the active ingredient in Kaletra.  In the final jury instructions at the end of the case, I will explain how to determine whether Abbott imposed an improper penalty price on Norvir.

### ANTICOMPETITIVE CONDUCT - REFUSAL TO DEAL - INTRODUCTION

A corporation's refusal to deal with its business rivals may constitute anticompetitive conduct under certain circumstances.  A company that possesses monopoly power is generally not under a duty to deal with its business rivals if valid business reasons exist for that refusal to deal.  In other words, if there were legitimate business reasons for the refusal to deal, then the defendant, even if it is found to possess monopoly power in a relevant market, has not violated the law.

However, an important change in a pattern of distribution in a competitive market that had persisted for several years can constitute a refusal to deal.  Such a refusal to deal may constitute anticompetitive conduct if the refusal is contrary to the short-run best interest of a defendant, but makes sense for the defendant because it harms competitors and helps the defendant maintain monopoly power in the long run.

### ATTEMPTED MONOPOLIZATION CLAIM - ELEMENTS

Plaintiffs also allege that they were injured by Abbott's unlawful attempt to monopolize.  To prevail on their claim of attempted monopolization, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

First, that Abbott engaged in anticompetitive conduct.

Second, that Abbott had a specific intent to achieve monopoly

18

power in a relevant market;

Third, that there was a dangerous probability that Abbott would achieve its goal of monopoly power in the relevant market;

Fourth, that Plaintiffs were injured in their business or property by Abbott's anticompetitive conduct; and

Fifth, that Abbott's conduct occurred in or affected interstate commerce. The parties agree that Abbott's conduct occurred in or affected interstate commerce.

Plaintiffs allege that the relevant market for this claim is the same market as the market relevant to their claim of actual monopolization. As I have said earlier, they define this to be the market for all protease inhibitors (PIs) boosted with Abbott's drug Norvir or for a subset of those drugs.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Abbott and against Plaintiffs on their claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Abbott, then you must find for Plaintiffs and against Abbott on Plaintiffs' claim of attempted monopolization.

**ATTEMPTED MONOPOLIZATION CLAIM - ANTICOMPETITIVE CONDUCT**

The first element Plaintiffs must prove by a preponderance of the evidence to prove its attempted monopolization claim is that Abbott engaged in anticompetitive conduct. Plaintiffs allege that, to attempt to monopolize the market in which Kaletra competes, Abbott (A) engaged in unlawful bundled discounting and (B) unlawfully refused to deal with its competitors. This is the same conduct that Plaintiffs allege with respect to their actual

19

monopolization claim.

## ATTEMPTED MONOPOLIZATION CLAIM – SPECIFIC INTENT

The second element that Plaintiffs must prove to prove their attempted monopolization claim is that Abbott had a specific intent to monopolize the market in which they allege that Kaletra competes.  In other words, you must decide if the evidence shows that Abbott acted with the conscious aim of maintaining the power to control prices and to exclude or handicap competition in the relevant market.

There are several ways in which Plaintiffs may prove that Abbott had the specific intent to monopolize.  They may present evidence of direct statements of Abbott's intent to obtain a monopoly in the relevant market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of Abbott at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Abbott.  You must be careful, however, to distinguish between Abbott's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Abbott actually intended to obtain a monopoly, specific intent may be inferred from what Abbott did.  For example, if the evidence shows that the natural and probable consequence of Abbott's conduct in the relevant market was to give Abbott control over prices and to exclude or handicap competition, and that this was plainly

foreseeable by Abbott, then you may (but are not required to) infer that Abbott specifically intended to maintain monopoly power.

**ATTEMPTED MONOPOLIZATION CLAIM - DANGEROUS PROBABILITY OF SUCCESS**

The next element that Plaintiffs must prove to prove their attempted monopolization claim is that there was a dangerous probability that Abbott would succeed in achieving monopoly power in the market in which Kaletra competes if it continued to engage in the same or similar allegedly anticompetitive conduct. As I instructed you earlier, monopoly power is the power to control prices and exclude competition in a relevant antitrust market.

In determining whether there was a dangerous probability that Abbott would acquire the ability to control prices in the relevant market, you should consider the factors included in the **"ACTUAL MONOPOLIZATION CLAIM - DIRECT EVIDENCE OF MONOPOLY POWER"** and the **"ACTUAL MONOPOLIZATION CLAIM - INDIRECT EVIDENCE OF MONOPOLY POWER"** instructions, which I gave earlier. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Abbott would ultimately acquire monopoly power.

**MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS -
REQUIREMENT OF INJURY**

If you find that Abbott committed monopolization or attempted monopolization in violation of the Sherman Act, then you must decide if Plaintiffs are entitled to recover damages from Abbott.

Plaintiffs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

21

First, that Plaintiffs were in fact injured as a result of Abbott's alleged violation of the Sherman Act;

Second, that Abbott's alleged illegal conduct was a material cause of Plaintiffs' injury; and

Third, that Plaintiffs' injury is an injury of the type that the Sherman Act was intended to prevent.

Customer Plaintiffs allege that they were injured in their "property" because they paid higher prices for Norvir and Kaletra as a result of Abbott's alleged violations of the Sherman Act. Such overcharges, resulting from higher prices caused by anticompetitive conduct, may be found to be the type of injury the Sherman Act was intended to prevent. You are not to consider whether any Customer Plaintiff passed on any alleged overcharge to its own customers in determining whether and to what degree a Customer Plaintiff was injured.

### GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – INTRODUCTION

Implied in every contract is a covenant, or agreement, of good faith and fair dealing. The implied covenant of good faith and fair dealing between parties to a contract is a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of the contract. A breach of the covenant is a breach of the contract itself, the covenant being part and parcel of the contract. The covenant encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding were included. However, the covenant cannot be construed so broadly as

to create independent contractual rights.

**GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - ELEMENTS**

GSK alleges that Abbott breached the implied covenant of good faith and fair dealing with respect to a licensing agreement that they executed on December 13, 2002. In order to demonstrate that Abbott breached the implied covenant of good faith and fair dealing, GSK has the burden to show by the preponderance of the evidence that:

First, the parties had a valid contract. The parties agree that they entered into a contract -- a license agreement -- on December 13, 2002.

Second, a reasonable party in GSK's position would have understood the contract to have included a right to receive the benefits that GSK alleges that it was owed.

Third, Abbott's conduct directly destroyed or injured GSK's alleged right to receive these benefits under the license agreement, causing GSK harm.

**GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - CONDUCT**

The following acts are those that GSK claims Abbott committed which showed a lack of good faith and fair dealing, injuring GSK's right to receive the benefits GSK alleges it was owed under its license agreement with Abbott. First, you will be asked to determine whether Abbott committed these acts.

1.    During the negotiation of the Norvir Boosting License, Abbott was considering how to use its control over Norvir to limit competition with its drug Kaletra from

23

competitors' drugs, including possibly removing Norvir from the market or increasing Norvir's price, and deliberately withheld its plans from GSK.

2. Abbott inequitably asserted its power over Norvir by increasing Norvir's price by 400 percent to undermine and disrupt GSK's launch of its drug, Lexiva, and future sales of that drug.

3. Abbott timed the 400 percent Norvir price increase in order to disrupt Lexiva's launch and undermine Lexiva's future sales.

4. Abbott maintained or attempted to maintain a monopoly in the market in which Kaletra competes through anticompetitive conduct.

**GSK'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING - INJURY AND CAUSATION**

If you determine that GSK proved by a preponderance of the evidence that Abbott committed at least one of these acts, you will then be required to determine:

First, whether GSK's business was injured, and

Second, whether Abbott's conduct was a proximate cause of the injury to GSK's business.

Proximate cause is a cause which in a natural and continuous sequence produces the injury, and is a cause which a reasonable and prudent person could have foreseen would probably produce such injury or some similar injurious result.

There may be more than one proximate cause of an injury. Therefore, GSK need not prove that Abbott's conduct was the sole

proximate cause of the injury to GSK's business. GSK must prove by

a preponderance of the evidence that Abbott's conduct was a

proximate cause.

## CONDUCT OF THE JURY

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not

decide what the verdict should be until you and your fellow jurors

have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the

evidence received in the case and on my instructions as to the law

that applies, you must not be exposed to any other information

about the case or the issues it involves during the course of your

jury duty. Thus, until the end of the case or unless I tell you

otherwise do not communicate with anyone in any way and do not let

anyone else communicate with you in any way about the merits of the

case or anything to do with it. This includes discussing the case

in person, in writing, by phone or electronic means, via e-mail,

text messaging, or any Internet chat room, blog, Web site or other

feature. This applies to communicating with your fellow jurors

until I give you the case for deliberation, and it applies to

communicating with everyone else including your family members,

your employer, and the people involved in the trial, although you

may notify your family and your employer that you have been seated

as a juror in the case. But, if you are asked or approached in any

way about your jury service or about this case, you must respond

that you have been ordered not to discuss the matter and to report

the contact to the court. Because you will receive all the

25

evidence and legal instruction you properly may consider to return a verdict: do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

### NO TRANSCRIPT AVAILABLE TO JURY

During deliberations, you will have to make your decision based on what you recall of the evidence. You will not have a transcript of the trial. I urge you to pay close attention to the testimony as it is given.

If at any time you cannot hear or see the testimony, evidence, questions or arguments, let me know so that I can correct the problem.

### TAKING NOTES

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note-taking distract you. When you leave, your notes

should be left in the jury room.  No one will read your notes.
They will be destroyed at the conclusion of the case.

Whether or not you take notes, you should rely on your own
memory of the evidence.  Notes are only to assist your memory.  You
should not be overly influenced by your notes or those of your
fellow jurors.

### QUESTIONS TO WITNESSES BY JURORS

You will be allowed to propose written questions to witnesses.
You may propose questions in order to clarify the testimony, but
you are not to express any opinion about the testimony or argue
with a witness.  If you propose any questions, remember that your
role is that of a neutral fact finder, not an advocate.  You may
write out your questions.  Do not sign the questions.  I will
review the question with the attorneys to determine if it is
legally proper.

There are some proposed questions that I will not permit, or
will not ask in the wording submitted by the juror.  This might
happen either due to the rules of evidence or other legal reasons,
or because the question is expected to be answered later in the
case.  If I do not ask a proposed question, or if I rephrase it, do
not speculate as to the reasons.  Do not give undue weight to
questions you or other jurors propose.  You should evaluate the
answers to those questions in the same manner you evaluate all of
the other evidence.

By giving you the opportunity to propose questions, I am not
requesting or suggesting that you do so.  It will often be the case
that a lawyer has not asked a question because it is legally

1  objectionable or because a later witness may be addressing that

2  subject.

3  **OUTLINE OF TRIAL**

4      The trial will now begin.  First, each party may make an

5  opening statement.  An opening statement is not evidence.  It is

6  simply an outline to help you understand what that party expects

7  the evidence will show.

8      After opening statements, GSK and the Customer Plaintiffs will

9  present evidence, and counsel for Abbott may cross-examine.  Then

10  Abbott may present evidence, and counsel for GSK and the Customer

11  Plaintiffs may cross-examine.

12      After the evidence has been presented, I will instruct you on

13  the law that applies to the case and the attorneys will make

14  closing arguments.  After that, you will go to the jury room to

15  deliberate on your verdict.

16      After you have reached your verdict, you will be excused.

18  Dated: February 24, 2011

_____
CLAUDIA WILKEN
United States District Judge