IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SMITHKLINE BEECHAM CORPORATION, d/b/a GLAXOSMITHKLINE,<br><br>    Plaintiff,<br><br>  v.<br><br>ABBOTT LABORATORIES,<br><br>    Defendant.<br>_____/ | No. C 07-5702 CW<br><br>ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 574) |

In January 2014, the Ninth Circuit issued its opinion in Plaintiff GlaxoSmithKline's (GSK's) cross-appeal of the jury verdict in this case. The court held that a Batson[1] violation had occurred during jury selection and that, as a result, a new trial must be held. On July 10, 2014, it issued its mandate with respect to that decision. Defendant Abbott Laboratories has now renewed its motion for judgment as a matter of law. GSK opposes the motion. Having considered the papers filed by the parties and oral argument, the Court DENIES the motion for judgment as a matter of law. Docket No. 574.

BACKGROUND

Because the parties are intimately familiar with the facts of this case, the Court provides only the background necessary to resolve their motions.

I. Factual Background

Abbott and GSK manufacture and sell protease inhibitors (PIs), which are drugs used to treat human immunodeficiency

---

[1] Batson v. Kentucky, 476 U.S. 79 (1986).

virus (HIV) infection.

In 1996, Abbott introduced Norvir, which contained the active ingredient ritonavir, as a stand-alone PI. After Norvir's release, it was discovered that, when used in small quantities with another PI, Norvir would "boost" the anti-viral properties of that PI.

GSK desired to obtain a license from Abbott, "to promote and market certain of GSK's HIV products with Ritonavir for the purpose of co-prescription/co-administration . . . ." GSK's Trial Ex. 5, License Agreement, at 0001. On December 13, 2002, Abbott and GSK executed a "Non-Exclusive License Agreement," under which Abbott granted GSK a license to "recommend, label, market, use, sell, have sold and offer to sell one or more of the GSK Products, but no other product, in co-prescription and/or co-administration with Ritonavir . . . ." Id. at 0001 and 0005.

In 2003, GSK introduced Lexiva to the market. Although the drug could be prescribed as a stand-alone PI, its daily dose was less if it was administered along with Norvir. Abbott was aware of studies that showed Norvir-boosted doses of Lexiva had efficacy similar to Kaletra, another Abbott PI.

On December 3, 2003, Abbott raised the price of 100 milligrams of Norvir from $1.71 to $8.57, which amounted to a 400-percent increase. This price hike commensurately increased the cost of a boosted Lexiva therapy to some consumers.

II. Procedural and Trial History

GSK brought a claim against Abbott for allegedly breaching the implied covenant of good faith and fair dealing associated with the parties' December 2002 agreement, as well as claims under

the Sherman Act and North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA). These claims were tried to a jury. At the close of evidence, Abbott moved under Rule 50(a) for judgment as a matter of law on all of GSK's claims. The Court did not grant Abbott's motion and submitted the case to the jury.

In accordance with the jury's verdict, judgment was entered in favor of GSK on its implied covenant claim and in favor of Abbott on GSK's other claims. GSK was awarded $4,549,590.96, which was the sum of $3,486,240.00 and interest provided under New York law. After judgment, Abbott filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b) on GSK's claim for breach of the implied covenant of good faith and fair dealing, the only claim on which the jury found for GSK. GSK opposed the motion and the Court denied it.

On October 3, 2011, Abbott filed a notice of appeal and, the next day, GSK filed its cross-appeal. On January 14, 2014, the Ninth Circuit issued an opinion, holding that Abbott's use of a peremptory strike against the only identifiable gay member of the venire violated Batson. Accordingly, the Ninth Circuit remanded the case for a new trial. SmithKline Beecham Corp. v. Abbott Labs, 740 F.3d 471 (9th Cir. 2014). In reaching this decision, the panel also held that this Court did not err in denying Abbott's Rule 50(b) motion for judgment as a matter of law on GSK's contract claim and that it "need not consider whether the district court erred in submitting the UDTPA and antitrust claims

3

to the jury." Id. at 488 n.8. Abbott has now renewed its Rule 50 motion with respect to the UDTPA and antitrust claims.[2]

LEGAL STANDARD

Rule 50(a)(1) of the Federal Rules of Civil Procedure provides,

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). The standard for judgment as a matter of law mirrors that for granting summary judgment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-50 (2000). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." Id. at 149. Rather, the court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006). "A district court can grant a Rule 50(a) motion for judgment as a matter of law only if there is no legally sufficient basis for a reasonable jury to find

---

[2] In its motion, Abbott states that it seeks to renew its Rule 50(b) motion. However, Rule 50(b) provides that, if a trial court does not rule on a party's Rule 50(a) motion for judgment as a matter of law and instead submits the action to the jury, the moving party may make a renewed motion for judgment as a matter of law to be filed within twenty-eight of entry of judgment. Here, the Ninth Circuit has vacated the jury's verdict and the subsequent judgment. Accordingly, the Court will interpret Abbott's motion as a renewal of its Rule 50(a) motion for judgment of law prior to submission of the action to the jury.

4

for that party on that issue." Krechman v. Cnty. of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal quotation marks omitted).

DISCUSSION

I. Propriety of Abbott's Rule 50 Motion

As an initial matter, GSK argues that Abbott's motion for judgment as a matter of law is procedurally improper. GSK first argues that a Rule 50(b) motion must be filed within twenty-eight days after the entry of judgment and Abbott's motion is therefore untimely. However, as discussed above, the Court construes Abbott's motion to be a Rule 50(a) motion.

Citing Ayala v. Wong, 756 F.3d 656 (9th Cir. 2014), GSK next argues that it is entitled to a new trial on all remaining claims because the previous trial was tainted by the structural error of the Batson violation. Abbott counters that other cases, such as Montiel v. Los Angeles, 2 F.3d 335 (9th Cir. 1993), permit it to renew its Rule 50 motion. The Court finds that none of the cases cited by the parties is controlling. Ayala considered whether structural error occurred in the context of a petition for a writ of habeas corpus where defense counsel was excluded from Batson proceedings. 756 F.3d at 673. Montiel did not address the question of whether a new motion for judgment as a matter of law can be made on remand when a Batson violation is found. Rather, it found a Batson violation and, in an unrelated discussion, reversed in part the district court's findings on a motion for judgment as a matter of law and remanded that motion to the district court for the consideration of other issues. 2 F.3d at 343. However, the Court need not decide whether this motion is

5

properly made at this time, because it denies Abbott's motion on all grounds.

II. Antitrust Claim

Abbott argues that GSK's antitrust claim fails as a matter of law. Section 2 of the Sherman Act "makes it unlawful to monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." Pac Bell Tel. Co. v. linkLine Commmuns., Inc., 555 U.S. 438, 448 (2009). To establish liability for a monopolization claim, GSK must prove "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 480 (1992). Abbott argues that GSK failed to present a legally sufficient evidentiary basis for a reasonable jury to find for GSK as to either element of a monopolization claim. Moreover, Abbott argues that GSK failed to rebut its evidence of a legitimate business justification for its decision to increase the price of Norvir.

A. Monopoly Power

Abbott first argues that GSK has failed to demonstrate that Abbott had monopoly power in the market in which Kaletra competes. Abbott contends that (1) GSK failed to prove that it properly defined the relevant market; (2) GSK failed to prove that Abbott maintained a dominant market share; and (3) GSK failed to prove sufficient barriers to entry or expansion in the market.

6

1. Relevant Market

Abbott argues that GSK's antitrust claim fails because it relies upon an unduly narrowly defined market. "A relevant market, for antitrust purposes, can be broadly characterized in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products or services." Coal. for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d 495, 507 (9th Cir. 2010) (citations and internal quotation marks omitted). Courts "consider whether the product and its substitutes are reasonably interchangeable by consumers for the same purpose, as well as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. (citations omitted). The Ninth Circuit has held that "what constitutes a relevant market is a factual determination for the jury." Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1203 (1997).

At trial, GSK's theory relied upon a "highly effective PI market," which it defined as Kaletra and two other drugs, Lexiva and Reyataz, when boosted by Norvir. GSK's expert, Dr. Roger Noll, testified that these drugs constitute the relevant market because they are "close therapeutic substitutes" and "economic substitutes." Tr. Tran. 1553:12-1554:12. Abbott criticizes Dr. Noll's testimony on several grounds and simply states that "no reasonable jury could have accepted this contrived definition--let alone based on the testimony of GSK's Dr. Noll, who admitted that he has no medical or pharmacological expertise, has no experience

in drug pricing or drug competition, and did not consult with independent physicians to inform his analysis." Docket No. 574 at 10 (citations omitted). However, when considering a JMOL, the Court may not make credibility determinations and must view the evidence in the light most favorable to the non-moving party.

Abbott also criticizes GSK's definition of the relevant market because it contends other drugs are interchangeable with Kaletra. However, GSK's medical expert, Dr. Javeed Siddiqui, testified as to the lack of interchangeability between the other drugs and Kaletra.

Because the Court finds that GSK presented sufficient evidence for a reasonable jury to find that there was adequate interchangeability between the products included in its definition of the relevant market, it need not reach Abbott's arguments with respect to cross-elasticity. The Court denies Abbott's motion for judgment as a matter of law on this ground.

2. Dominant Market Share and Barriers to Entry

Relying on United States v. Syufy Enterprises, 903 F.2d 659 (9th Cir. 1990), Abbott argues that evidence of its market share decline from eighty-one percent to below fifty percent over a three-year period establishes, as a matter of law, that it did not possess monopoly power over the market. In Syufy, the Ninth Circuit concluded that, even though a firm had a large market share, its inability to maintain that share demonstrated a lack of monopoly power. Id. at 666. As this Court noted in its order on the summary judgment motions, Syufy is, at least in part, distinguishable from the instant case because there were no substantial barriers to entry in that case. Id. at 666-67. In

this case, GSK presented evidence of significant barriers to entry including obtaining patents, investing in research and development, obtaining FDA approval and depending on Abbott's control over Norvir. Tr. Tran. 1583:15-1585:7. Abbott further argues that the Ninth Circuit has "expressed doubt that 50% share of the market is sufficient to establish monopoly power per se." Greyhound Computer Corp., Inc. v. IBM Corp., 559 F.2d 488, 496 n.18 (9th Cir. 1977). However, as discussed above, GSK presented other evidence of monopoly power, so there is no need for a per se finding.

Finally, Abbott cites Rebel Oil Co., Inc. v. Atlantic Richfield Co. for the proposition that, where rivals "can quickly respond to any predator's attempt to raise prices above competitive levels, the predator will suffer an immediate loss of market share," indicating that "the predator does not have market power." 51 F.3d 1421, 1441 (9th Cir. 1995). However, Rebel Oil is factually distinguishable from the instant case. In Rebel Oil, the Ninth Circuit addressed a claim of predatory pricing among gas stations. Predatory pricing occurs when a defendant engages in a "price war" by "set[ting] prices below its marginal cost hoping to eliminate rivals and increase its share of the market" then charges "supracompetitive prices--prices above competitive levels." Id. at 1433-34. In such situations, competitors' ability quickly to expand their output will undercut the defendant's ability to "recoup the losses suffered during the price war" and undermines a finding of predatory pricing. Id. at 1434. In contrast to the gas stations in Rebel Oil, where other companies could expand their operations to build new stations to

9

draw business away from the defendant, GSK and Abbott's other competitors had to buy Norvir to boost their products. Therefore, GSK and Abbott's other competitors could not simply increase their production to draw business away from Abbott when Abbott increased the price of Norvir.

Accordingly, the Court denies Abbott's motion for judgment as a matter of law on this ground.

B. Anticompetitive Conduct

As stated above, in addition to demonstrating monopoly power, GSK must establish anticompetitive conduct. Abbott argues that GSK failed to present sufficient evidence to permit a reasonable jury to find anticompetitive conduct on either of its theories, (1) a violation of a duty to deal, or (2) predatory pricing through bundled-product discounting.

1. Duty to Deal

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." linkLine, 555 U.S. at 448. However, there are "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability." Id. (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985)). A refusal to deal might take the form of (1) "the unilateral termination of a voluntary and profitable course of dealing;" (2) "an offer to deal with a competitor only on unreasonable terms and conditions," which could "amount to a practical refusal to deal;" and (3) a refusal to provide competitors with "products that were already sold in a retail market to other customers." MetroNet Services Corp. v.

10

Qwest Corp., 383 F.3d 1124, 1132-34 (9th Cir. 2004). "[A] willingness to forsake short-term profits to achieve an anticompetitive end" is evidence of an anticompetitive refusal to deal. Id. at 1131 (quoting Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 409 (2004)). Accordingly, a decision to alter a course of dealing together with evidence of "anticompetitive malice" is evidence of a refusal to deal. Id. at 1132.

At trial, GSK presented evidence that, prior to the 2003 price increase, Abbott had a pattern of licensing Norvir and increasing the price only at the rate of inflation. In contrast, the December 2003 400-percent price increase caused the cost of GSK's boosted Lexiva-based therapy to increase by seventy-one percent. In addition, GSK presented evidence of "anticompetitive malice" including a presentation recommending delaying the announcement of the price increase to be "simultaneous with" the launch of Lexiva and calling the plan a "clever creative way to make [GSK] look bad." P-0081. GSK also presented an email sent shortly after the price increase, from the President of Abbott's United States Pharmaceutical Products Division to a group of individuals responsible for the price increase, stating, "Congratulations to the A Team. You folks are fantastic. It's too bad you're giving a lump of coal to BMS and GSK for the holidays, but such is life." P-0245-0002. GSK introduced another email from the same individual discussing a "RTV supply constraint program." P-0157-0003. This evidence, combined with the sudden price increase, was sufficient to allow a reasonable jury to find

11

in GSK's favor on its duty to deal claim.³ Accordingly, the Court denies Abbott's motion for judgment as a matter of law on this ground.

2. Bundled Discounting

Abbott next argues that it is entitled to judgment as a matter of law on GSK's bundled discounting claim. "Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately. A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually." Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008). "[B]undled discounts, while potentially procompetitive by offering bargains to consumers, can also pose the threat of anticompetitive impact by excluding less diversified but more efficient producers." Id. at 897. Under Cascade, a bundled product can be found to cause an antitrust violation if the competitive component of the bundled product is deemed, under the "discount attribution standard," to be sold below cost, even though the bundle as a whole is priced above cost. 515 F.3d at 906.

At trial, GSK's economic expert, Dr. Keith Leffler, opined that Kaletra is a bundled product of lopinavir and Norvir. He

---

³ Abbott asserts that, in order to prevail on its duty to deal claim, GSK must also establish that Abbott made a short-term profit sacrifice as a result of the price increase. However, as GSK points out, the Court has previously found that "short-term sacrifice is not an element of a Section 2 claim, but rather a means to show anticompetitive motives." Docket No. 195 at 16. Here, there is other evidence of anticompetitive malice.

12

further opined that Abbott sold the lopinavir component of Kaletra below its average variable cost.  Abbott criticizes Dr. Leffler's methodology on two grounds.  First, it asserts that Dr. Leffler improperly excluded Abbott's sales of lopinavir to public entities when calculating the imputed price of the drug.[4]  Second, it asserts that Dr. Leffler improperly included fixed costs in his calculations to increase the average variable cost.  However, as GSK points out, Dr. Leffler explained his reasons for limiting his analysis to private sector pricing and for the inclusion of certain costs in his average variable cost analysis.  See, e.g., Tr. Tran. 1290:19-1291:14.  Moreover, Dr. Leffler's testimony was subject to cross-examination and Abbott had the opportunity to present the testimony of its own expert, Dr. Richard Gilbert.  As discussed above, when considering a JMOL, the Court may not make credibility determinations and must view the evidence in the light most favorable to the non-moving party.  Accordingly, the Court denies Abbott's motion for judgment as a matter of law on this ground.

C.  Legitimate Business Justification

Abbott argues that GSK failed to present evidence to rebut Abbott's legitimate business justification of profiting from its intellectual property rights in Norvir.  "When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act."

---

[4] Abbott's price increase on Norvir applied only to consumers with private insurance; those purchasing Norvir through public programs, such as Medicare, were not subject to the increase because of government pricing rules.

13

Image Tech. Servs., 125 F.3d at 1212.  In the Ninth Circuit, a defendant's "desire to profit from its intellectual property rights justifies its conduct, and the jury should presume that this justification is legitimately procompetitive."  Id. at 1219.  However, the presumption is rebuttable.  Whether valid business reasons motivated a monopolist's conduct is a question of fact.  High Tech. Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir. 1993) (citing Eastman Kodak Co., 504 U.S. at 483-84; Aspen Skiing Co., 472 U.S. at 604-05).

As discussed above, GSK presented evidence that the price increase was timed to disrupt the launch of Lexiva.  In addition, GSK presented other evidence that, in response to concerns that competitors were taking market share from Kaletra, Abbott was considering either pulling Norvir from the market or implementing the price increase at issue in this case.  Based on this evidence, a reasonable jury could find that Abbott's purported legitimate business justification was pretextual.  Accordingly, the Court denies Abbott's motion for judgment as a matter of law on this ground.

III. UDTPA Claim

Abbott argues that it is entitled to judgment as a matter of law on GSK's UDTPA claim to the extent it is based on a breach of

contract.[5] Abbott's argument is based on <u>Bumpers v. Community Bank of Northern Virginia</u>, a recent case in which the North Carolina Supreme Court held that the UDTPA "has long encompassed conduct tantamount to fraud, which requires reliance." 367 N.C. 81, 82 (2013). Abbott argues that GSK's UDTPA claim must fail because GSK failed to present evidence of reliance on a misrepresentation. However, as GSK pointed out at the hearing, "in assessing whether particular conduct violates the UDTPA, either unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." <u>South Atlantic Ltd. P'Ship of Tenn. v. Riese</u>, 284 F.3d 518, 535 (4th Cir. 2002) (internal quotation marks omitted); <u>see also</u> <u>Rucker v. Huffman</u>, 99 N.C. App. 137, 141 (1990). As Abbott concedes, <u>Bumpers</u> is applicable to cases in which "the allegations address misrepresentations." Docket No. 574 at 24. To the extent GSK's UDTPA claim is based on a breach of contract, it is based, at least in part, on unfair conduct rather than misrepresentations or deceptive conduct. Accordingly, the Court denies Abbott's motion for judgment as a matter of law on GSK's UDTPA claim.

---

[5] GSK notes and Abbott does not dispute that, if the Court denies Abbott's motion for judgment as a matter of law on GSK's antitrust claims, Abbott's motion for judgment as a matter of law on its UDTPA claim must likewise be denied because antitrust liability is sufficient to establish UDTPA liability. <u>See</u> Docket No. 325 at 44 n.10. Nonetheless, Abbott seeks judgment as a matter of law on GSK's UDTPA claim to the extent it is based on a breach of contract.

15

CONCLUSION

For the foregoing reasons, the Court DENIES Abbott's motion for judgment as a matter of law.

IT IS SO ORDERED.

Dated: November 24, 2014

CLAUDIA WILKEN
United States District Judge