IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
C.A. No. 1:15-cv-00360

SMITHKLINE BEECHAM
CORPORATION d/b/a
GLAXOSMITHKLINE,

          Plaintiff,

v.

ABBOTT LABORATORIES,

          Defendant.

**PLAINTIFF GSK'S STATUS REPORT**

GSK files this Status Report, pursuant to the Court's instructions at the May 20, 2015 status conference, in response to Abbott's report filed May 28, 2015.

## I. BACKGROUND

### A. Factual History

To correct misstatements in Abbott's status report, GSK sets forth here a brief statement of the history of this litigation.

GSK's claims arise out of Abbott's unfair, deceptive, and illegal actions with respect to a treatment method for HIV known as a boosted protease inhibitor ("PI"). In March 1996, Abbott introduced ritonavir as a stand-alone PI named Norvir. There were several drawbacks for patients taking full-strength Norvir that quickly became apparent, which led doctors to begin prescribing Norvir as a low-dose booster for other PIs. This repositioning of Norvir from a stand-alone drug to a booster with a sub-therapeutic dose was done with Abbott's encouragement, as the company profited both from the increased Norvir prescriptions and from selling marketing licenses to its competitors, including GSK, for the right to market their PIs to be co-administered with Norvir. That is, Norvir became a "booster" PI, and the PIs of other companies, like GSK, were "boosted" PIs, wherein the boosted PI would be prescribed and administered with Norvir (the booster PI).

In September 2000, Abbott introduced its own boosted PI, brand named Kaletra, which combined into a single pill a dose of the PI lopinavir and a boosting dose of ritonavir/Norvir. As the only coformulated boosted PI, Kaletra became the dominant boosted PI for HIV patients. Notwithstanding Kaletra's success, Abbott continued to exploit Norvir by selling marketing licenses so competitors could promote their own boosted PIs with Norvir. In late 2002, GSK and Abbott negotiated such a license agreement whereby GSK purchased the right to promote its then existing PIs, as well as PIs in development such as Lexiva, for use with Norvir. These negotiations included

1

face-to-face meetings between the parties' head negotiators at GSK's HIV headquarters in Research Triangle Park, North Carolina. Tr. 989-90 (GSK's Keller) (Dkt. No. 542), 1120 (Abbott's Poulos) (Dkt. No. 543).

On December 13, 2002, Abbott and GSK executed a license agreement. The license agreement provided, in material part, that GSK would have the right to promote its HIV drugs including Lexiva with Norvir (Abbott's drug), and, in exchange, GSK would make an upfront payment, royalty payments and other concessions to Abbott that Abbott internally valued as worth at least $59 million. All told, Abbott has collected over $325 million from licensing Norvir. There is no dispute that the purpose of this license agreement was to allow GSK to market Lexiva for use with Norvir.

Yet, at the same time Abbott negotiated and executed the Norvir license with GSK (and other competitors), Abbott was also plotting ways to prevent GSK from enjoying the benefits of the license. Abbott was intent on preventing GSK's boosted PI, Lexiva, (and those of other competitors) from threatening the market dominance of Abbott's boosted PI, Kaletra. Specifically, Abbott feared that two new highly-effective boosted PIs that were planned for launch in 2003--Bristol Meyers Squibb's Reyataz and GSK's Lexiva--would undermine Kaletra's position as the market leader. Abbott was particularly concerned about GSK's Lexiva, as that drug when boosted by Norvir had been shown to be more advantageous than Kaletra in ways that made meaningful differences in patients' lives: without sacrificing efficacy, Lexiva required fewer pills per day and had fewer unpleasant side effects than Kaletra. In the face of this encroaching competition, Abbott senior executives instructed their subordinates to "think about ways to constrain the supply of Norvir" to stifle competition from other drugs. Tr. 2107 (Dkt. No. 548). GSK introduced evidence at the prior trial showing that Abbott considered pulling Norvir from the market as a stand-alone booster product (so as to leave Kaletra as the only HIV treatment containing the active ingredient in Norvir, ritonavir), selling Norvir only in

2

liquid form (which the evidence showed tasted like "vomit," creating problems for patients' adherence to the regimen), or raising the price of Norvir so dramatically that it would effectively price Lexiva out of the market. Tr. 675-76 (Dkt. No. 561); Trial Exs. 153, 306. Abbott never disclosed these possibilities to GSK during the negotiation of the Norvir license. To the contrary, Abbott made assurances that Abbott would not do anything to undermine the treatment of patients. *See* Tr. 1130-31 (Poulos) (Dkt. No. 543).

Ultimately, Abbott opted to breach the implied covenant of good faith and fair dealing in the parties' contract and thwart competition from Lexiva by implementing an unprecedented 400 percent "mega price increase" on the price of stand-alone Norvir. Although GSK had priced Lexiva to compete with Kaletra, Abbott's massive price increase of Norvir (while maintaining Kaletra's price) meant that the cost of a daily dose of boosted Lexiva increased by over 70%--suddenly costing $14.39 more than the daily dose of Kaletra. Furthermore, Abbott's internal documents revealed that this price hike was intentionally timed by company executives so as to coincide with GSK's launch of Lexiva as a way to prevent the new competitor to Kaletra from gaining traction in the market. See Tr. Ex. 81 at 10 (hike timed as a "clever creative way to make [GSK] look bad"). Abbott's scheme worked: Lexiva's sales performance fell far below both GSK's and Abbott's predictions, costing GSK hundreds of millions of dollars in lost profits.

B. **Procedural History**

After seven and a half years of litigation that included extensive discovery, numerous dispositive motions, a three-week trial resulting in a split verdict, GSK's successful appeal and remand, and further pretrial briefing, this case was once again trial-ready in the Northern District of California and was set for retrial beginning May 6, 2015.

It is true that in February 2015, GSK sought leave to file a Second Amended Complaint, which was filed on March 10, 2015, dropping the federal and state antitrust

3

causes of action in order to streamline the case for retrial. But Abbott drastically overstates the effect of this amended pleading. GSK's Second Amended Complaint maintains and realleges all of the factual allegations contained in previous pleadings and outlined above. GSK's Second Amended Complaint simply decided, as was GSK's right, to proceed on two claims for recovery rather than four claims for recovery. As Judge Wilken repeatedly decided in denying Abbott's numerous dispositive motions, GSK's allegations are sufficient to state independently triable claims that Abbott's conduct breached the implied covenant of good faith and fair dealing, and violated North Carolina's UDTPA. GSK's contract and UDTPA claims remain ready to be retried.

Indeed, following the April 8, 2015 final pretrial conference before Judge Wilken, the Court entered a minute order retaining that trial date and an additional order resolving pending motions *in limine*, notwithstanding Abbott's claims that GSK has no basis to proceed on the claims in its Second Amended Complaint. The parties subsequently entered into a stipulation, adopted by the Court, transferring this case to the Middle District of North Carolina pursuant to 28 U.S.C. § 1631. GSK believes this case remains trial-ready and requests that the Court set the case for trial forthwith. In its status report, Abbott contends several pending or newly proposed motions stand in the way of this case being ready for trial, but each of those motions has already been decided against Abbott, lacks merit, or is more suitable for resolution during or after trial. Prior to transfer to this Court, this litigation was set to go to retrial in less than a month. Nothing about the recent transfer to this Court provides justification for delaying trial six months or more, or for reopening settled issues or previous decisions that Abbott does not like.

GSK stands ready to begin retrial in July as suggested by the Court at the May 20, 2015 hearing. Based on the availability of GSK's lead trial counsel, GSK requests the trial commence any day between July 6 and July 13, 2015.

4

## II. GSK'S RESPONSES TO ABBOTT'S PROPOSED MOTIONS

### A. Abbott's Rule 12(c) Motion Regarding Choice of Law

Taking yet another bite at the apple, Abbott proposes to move for judgment on the pleadings based on its allegation that under controlling choice of law principles, GSK's North Carolina UDTPA claim cannot go forward. GSK will fully respond to that motion at the appropriate time if and when directed to do so by the Court,[1] but, for the Court's benefit, GSK briefly explains why Abbott's proposed motion is without merit. In any event, GSK submits that Abbott's contentions can be resolved during trial (if necessary), after GSK has presented its case.

Abbott essentially makes two arguments in support of its proposed Rule 12(c) motion. First, Abbott argues that the *lex loci* rule applies to GSK's UDTPA claim and that the claim must therefore be governed by Pennsylvania law. Second, Abbott argues that the contractual choice-of-law clause precludes GSK's UDTPA claim.[2] Neither argument supports Abbott's request to rid the complaint of GSK's long-pending UDTPA claim.

Abbott is incorrect that the *lex loci* rule must necessarily apply to GSK's UDTPA claim or that the *lex loci* rule compels this Court to apply Pennsylvania law. There is a split in North Carolina as to the application of choice-of-law principles to UDTPA

---

[1] At the May 20, 2015 status conference, the Court stated that it would review Abbott's motion and then determine whether to order further briefing on the choice-of-law motion or to hold the motion in abeyance for trial. Hr'g Tr. at 35. GSK contends that, in addition to being flawed as a matter of law, Abbott's Motion is rife with factual disputes more appropriately suited for resolution at trial, and requests that the Court set the motion to be briefed and heard in the ordinary course of trial.

[2] Abbott of course ignores that for nearly seven-and-a-half years it has relied on North Carolina law to fight GSK's UDTPA claims.

5

claims. *See Stetser v. TAP Pharm. Products, Inc.*, 165 N.C. App. 1, 15 (2004). Some North Carolina courts conclude that the *lex loci* rule applies to UDTPA claims, *United Virginia Bank v. Air-Lift Assocs., Inc.*, 79 N.C. App. 315 (1986), while other North Carolina courts conclude that the most significant relationship test applies to these claims, *Andrew Jackson Sales v. Bi-Lo Stores, Inc.*, 68 N.C. App. 222 (1984). Under either test, GSK's UDTPA claim should proceed as it has proceeded for over seven years.

<u>Lex Loci</u>: Under the *lex loci* rule, this Court primarily considers where the plaintiff suffered injury. *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 387 F. Supp. 2d 521 (M.D.N.C. 2005). Here there can be no doubt that GSK suffered injury in North Carolina, a state where GSK is headquartered, the state where its HIV business is based, the state where it conducts research and development in HIV, and the state housing various marketing, administrative and corporate functions. GSK Second Amended Complaint, ¶ 5; *Rhone–Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 554, 555 (M.D.N.C. 1999) ("the state where the injury occurred in a fraud claim is the state in which the plaintiff suffered the economic impact ... [plaintiff] suffered injury from the alleged fraudulent misrepresentations in both North Carolina, where its North America headquarters are located, and in France, where its worldwide headquarters are located."); *see also Williams v. Frontier Spinning Mills, Inc.*, 368 F. Supp. 2d 491, 492-93 (M.D.N.C. 2005) (in deciding defendant's Rule 12(c) motion, "the Court must assume that the allegations in the complaint are true and construe them in the light most favorable to plaintiff"). Thus, under the *lex loci* test, North Carolina law would apply to GSK's UDTPA claim.

Ignoring these facts and law, Abbott contends that only the law of Pennsylvania applies because, Abbott claims, Pennsylvania is GSK's "principal place of business" (a concept Abbott asks this Court to import from the jurisdictional context). But several North Carolina courts have explicitly rejected Abbott's proposed bright-line rule. *See*

6

Case 1:15-cv-00360-WO-JLW   Document 714   Filed 06/03/15   Page 7 of 20

*United Dominion Indus. v. Overhead Door Corp.*, 762 F. Supp. 126, 130 (W.D.N.C. 1991) (rejecting "a bright line rule that in all cases an injury is sustained where corporate headquarters are located"); *Harco Nat. Ins. Co. v. Grant Thornton LLP*, 206 N.C. App. 687, 697 (2010) (joining *Union Dominion* in "rejecting defendant's proposed bright line rule"). Rather than a bright-line rule, where the defendant engaged in misconduct having nationwide effect, many Courts have instead engaged in more fact-specific inquiries as to the place of injury for purposes of the *lex loci* analysis. And in any event, GSK has headquarters in North Carolina.

Most Significant Relationship: As the Fourth Circuit has held, in litigation involving multistate or nationwide misconduct, the significant relationship test may be more appropriate. *New England Leather v. Feuer Leather Corp.*, 942 F.2d 253 (4th Cir. 1991); *Edmondson v. Am. Motorcycle Ass'n*, 7 F. App'x 136 (4th Cir. 2001); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1224, 1228 (M.D. N.C. 1996). North Carolina courts have likewise applied the significant relationship test in evaluating UDTPA claims. *Andrew Jackson Sales v. Bi-Lo Stores, Inc.*, 68 N.C. App. 222 (1984); *Michael v. Greene*, 63 N.C. App. 713 (1983). Under the significant relationship test, this Court looks to factors such as where "the relationship between the parties was created and is centered," including where "discussions between the parties concerning" the disputed matter took place. *Michael v. Greene*, 63 N.C. App. at 715. The "principal advantage of this [significant relationship] test is that it enables a court to assess the strength of a state's relationship to a transaction before its laws are applied. In contrast, [the *lex loci* test] may often dictate that the laws of a state with only a minor connection to a transaction should govern." *New England Leather*, 942 F.2d at 255-56. Given the substantial ties GSK and the facts of this dispute has to North Carolina, application of the significant relationship test leads this Court to apply North Carolina law to GSK's UDTPA claim.

7

GSK's HIV business is and for the relevant time period always has been located in Research Triangle Park, North Carolina. At the prior trial, John Keller, GSK's chief negotiator in connection with the Norvir/Lexiva license, testified that his team met with John Poulos, Abbott's chief negotiator, at the Diamond View office in North Carolina in October 2002. Tr. 989 (Dkt. No. 542). That meeting continued over two days. Tr. 990. Poulos also testified about the North Carolina meeting and negotiations. Tr. 1120 (Dkt. No. 543). These negotiations were held in North Carolina precisely because that is where GSK's HIV business was and is located. As North Carolina is home to GSK's HIV business, North Carolina was the site for the license negotiations between GSK and Abbott, GSK was deceived in North Carolina, GSK suffered losses in North Carolina, and Abbott's unfair and deceptive conduct was directed to North Carolina. Thus, North Carolina law should apply to GSK's UDTPA claim. *Am. Rockwool Inc. v. Owens Corning Fiberglass Corp.*, 640 F. Supp. 1411 (E.D.N.C. 1986) ("In the frequent cases where there have been substantial concurrent impacts in many, and sometimes all, states, . . . where a substantial number of impacts have occurred within the forum, and where it is also the main place of business of either the plaintiff or the defendant, its law should govern.").

Abbott's Contractual Choice of Law Argument Fails: Finally, Abbott argues that GSK's UDTPA claim is barred under the parties' license agreement, which contains a New York choice of law clause. However, the Fourth Circuit has held that North Carolina UDTPA claims may proceed in North Carolina courts notwithstanding a contractual choice-of-law clause that selects the law of a different state. In *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42 (4th Cir. 1983), the court held that a contractual choice of law clause designating New York law as governing is inapplicable to a claim for damages arising under North Carolina's Unfair and Deceptive Trade Practices Act. *See also Republic Indus, Inc. v. Atl. Veneer Corp.*, 166 F.3d 1210 (4th Cir. 1999). Because

8

"[t]he nature of the liability ... imposed by the statute is *ex delicto*, not *ex contractu*, . . . [n]o issue of contractual construction, interpretation, or enforceability is raised," and therefore, "North Carolina's courts would apply [UDTPA] to the facts presented ... without regard to the presence of the contractual choice of law provision." *ITCO*, 722 F.2d at 49 n.11. That is because under North Carolina law, the choice of law analysis is unaffected by the inclusion of a New York choice-of-law provision in the parties' license agreement. *See Robinson v. Ladd Furniture, Inc.*, 995 F.2d 1064 (4th Cir. 1993) (contract's choice-of-law provision does not govern claims where "the nature of the liability was not contractual"); *Simms Inv. Co. v. E.F. Hutton & Co.*, 688 F. Supp. 193, 198 (M.D.N.C. 1988) (contractual provisions "only apply to actions involving the construction, interpretation, or enforceability of the contract containing the choice of law provision"); *United Virginia Bank v. Air Lift Assocs. Inc*, 79 N.C. App. 315, 321 (1986) ("G.S. 75-1.1 is separate and distinct from any contractual relationship between plaintiff and defendants.").[3]

As is clear from the above, the choice-of-law analysis Abbott urges results in sustaining GSK's UDTPA claim regardless of which construction this Court applies. Further, to the extent Abbott believes it has a meritorious defense on choice-of-law (which Abbott does not), that defense could, as this Court stated at the prior status conference, be addressed at trial once GSK has presented its case on the UDTPA claim and the evidence shows North Carolina's strong connections to GSK's injuries and to this

---

[3] Indeed, even New York law permits a party to a contract to state an unfair and deceptive trade practices claim under the law of a different state notwithstanding a contractual choice-of-law provision. *Maltz v. Union Carbide Chemicals & Plastics Co.*, 999 F. Supp. 286, 315 (S.D.N.Y. 1998) (citing *Valley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604, 612 (2d Cir. 1996)) ("The Second Circuit has explicitly rejected the argument urged here by defendants—that a choice of law provision in a [contract] precludes statutory claims arising under the laws of states other than the state chosen by the parties to govern their contract disputes.").

9

claim. May 20, 2015 Hr'g Tr. at 33-34 (Court noting that choice-of-law analysis may be "very fact specific").

### B. Abbott's Proposed "Alternative" Motion

While simultaneously asking the Court for permission to relitigate settled disputes and to disregard Judge Wilken's final order regarding motions in limine, Abbott latches on to selected excerpts from Judge Wilken's equivocal comments at the April pretrial conference to make a bold and unsupported allegation that Judge Wilken was "inclined to dismiss the UDTPA claim." Judge Wilken said no such thing and certainly made no such order. Instead, Abbott in effect asks this court for yet another attempt to attack GSK's UDTPA claims, which the California Court sustained on numerous occasions and which the California Court previously (and correctly) submitted to the jury. As with Abbott's other motion, this Court need not entertain yet another motion to dismiss GSK's UDTPA claim at this stage. After GSK presents its evidence, Abbott can (as it has previously, without success) file a motion for judgment as a matter of law if GSK does not present sufficient evidence to support its UDTPA claim.

As a brief recap, Abbott has filed with the district court no fewer than six unsuccessful motions or briefs seeking to dispose of or significantly curtail GSK's UDTPA claims. Dkt. Nos. 42, 174, 224, 355, 574, 601; *see also* Chart 1, below. This includes two post-remand motions wherein Abbott brought a renewed motion for JMOL on the UDTPA claims (Dkt. No. 574, *denied in* Dkt. No. 591) as well as submitted revised jury instructions on GSK's UDTPA claim in connection with the January 2015 pretrial conference (Dkt. No. 601, *denied in* Dkt. No. 620).

| Chart 1: Abbott's Previous Failed Attempts to Dismiss or Substantially Narrow the UDTPA Claims ||||
|---|---|---|---|
| Date | Dkt No. | Motion | Decision |
| 1/24/2008 | 42 | *Motion to Dismiss:* Abbott claimed allegations of inequitable assertions of power, among other acts, were insufficient to state a UDTPA claim. | *Denied* (Dkt No. 82): GSK alleged conduct that "could be considered 'unfair' or 'deceptive' under the Act" |
| 9/1/2009 | 174 | *Motion for Leave to File Early Summary Judgment Motion:* Abbott claimed that "GSK merely seeks to repackage its failed antitrust and contract claims as violations of the UDTPA" | *Denied* (Dkt. No. 179) |
| 7/30/2010 | 224 | *Motion for Summary Judgment:* Abbott claimed "dismissal of GSK's Sherman Act claim also would dispose of GSK's UDTPA claim to the extent it is based on the same allegations." | *Denied* (Dkt. No. 325): "The evidence supporting an award . . . for GSK's breach of implied covenant claim under NY law could also support liability under the UDTPA based on Abbott's alleged breach. . . . Here, . . . there is evidence that Abbott knew that it was taking steps that would undermine the license's value. If the evidence is construed as described above, Abbott's conduct could be found 'unethical, oppressive, unscrupulous' and 'substantially injurious to consumers.' Thus, summary judgment is not warranted on GSK's UDTPA claim to the extent it is based on Abbott's alleged breach of the implied covenant of good faith and fair dealing. . . . [T]he Court summarily adjudicates that GSK cannot base its UDTPA claim on Abbott's alleged deception of consumers. In **all other respects**, Abbott's motion concerning GSK's UDTPA claim is denied." |
| 1/28/2011 | 355 | *Joint Jury Instructions Brief:* Abbott sought to eliminate the UDTPA questions, arguing that "GSK should not be allowed to include [the first UDTPA question] in an effort to prejudice the jury into believing that merely studying certain options concerning Norvir can be unlawful." | *Denied* (Dkt Nos. 425, 485, and 486): Court presented UDTPA questions to the jury largely as GSK proposed. |
| 8/5/2014 | 574 | *Renewed Motion for JMOL:* Abbott argued JMOL warranted on UDTPA claims to the extent based on a breach of contract. | *Denied* (Dkt No. 591): "To the extent GSK's UDTPA claim is based on a breach of contract, it is based, at least in part, on unfair conduct rather than misrepresentations or deceptive conduct. Accordingly, the Court denies Abbott's motion for JMOL on GSK's UDTPA claim." |
| 12/31/2014 | 601 | *January Pretrial Conference Statement:* Abbott sought modifications to the UDTPA instructions. | *Denied* (Dkt. No. 620): Court reaffirmed UDTPA instructions and verdict form questions were proper. |

Judge Wilken repeatedly denied Abbott's motions, entering orders in which she rejected Abbott's attacks as to the viability of the UDTPA claims and, as recently as February 20, 2015, reiterated that the same three factual questions regarding Abbott's unfair and deceptive conduct would be submitted to the jury as part of the verdict form at retrial. (Dkt. No. 620). Following that Order, the Court granted GSK leave to file the Second Amended Complaint, and in so doing, ordered the parties to "file updated Preliminary Jury Instructions, Final Jury Instructions and Verdict form . . . [with edits] limited to those necessary to reflect the Second Amended Complaint." Dkt. No. 631.

Abbott's proposed alternative filing willfully misconstrues the significance of GSK's decision to file a second amended complaint. Abbott's sole basis for requesting another opportunity to dismiss the UDTPA claim is an out-of-context summary of "what transpired before Judge Wilken" at the April pretrial conference.[4]

In truth, as this Court noted during the May 20 Status Conference, GSK's Second Amended Complaint did not create the "sea change" Abbott ascribes to it. Rather, GSK simply elected not to pursue two of its four causes of action, without altering the factual allegations against Abbott. Abbott's argument that the decision to drop federal and state antitrust claims has profound effect on the legal viability of GSK's UDTPA claim is belied by the fact that the California Court time and again rejected Abbott's attempts to consolidate or dismiss the UDTPA claim. In the 2011 trial of this case, the jury verdict form contained separate and independent sections dedicated to GSK's theories of

---

[4] Abbott places great weight on certain of Judge Wilken's comments at the April pretrial conference, notwithstanding its suggestion elsewhere in its status report that everything Judge Wilken said or did after GSK filed its Second Amended Complaint is a legal nullity. Notwithstanding the sharp disagreement between the parties regarding the California Court's jurisdiction over Abbott, the parties filed a stipulation and the Court entered an order transferring the case under 28 U.S.C. § 1631 on April 14, 2015. The California Court's comments at a pretrial conference that were never reduced to an order were never actually decided and do not constitute law of the case.

12

antitrust, breach of implied covenant, and UDTPA liability. The deletion of one is of no significance to the legal viability of the others. *See ITCO Corp. v. Michelin*, 722 F.2d 42, 52 (4th Cir. 1983) (plaintiff was not barred "from advancing, under the guise of [UDTPA], what in essence is the Sherman Act claim already dismissed voluntarily"). To be sure, in a different context, the California Court previously addressed the issue Abbott now raises (*i.e.*, that GSK's decision to voluntarily dismiss its antitrust cause of action somehow means GSK's UDTPA claim may not proceed). The California Court denied Abbott's motion to dismiss the UDTPA claims, holding that irrespective of GSK's antitrust theories, "GSK has alleged conduct that could be considered 'unfair' or 'deceptive' under the" UDTPA. Dkt. No. 82 at 24.

C. **Abbott's Proposal Regarding Jury Instructions and Verdict Form**

As the Court recognized during the previous status conference, jury instructions are often more appropriately fashioned during trial based on the presented evidence. This case presents no exception. There is no reason to delay trial for the sake of jury instructions. The elements of a UDTPA cause of action are well established both generally and as law of the case. *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 301 (1993) (plaintiff must show: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business"); Summary Judgment Order, Dkt. No. 325, at 44 (quoting and adopting *Miller* formulation); Order Denying Renewed Mot. for JMOL, Dkt. No. 591, at 14-15 (rejecting detrimental reliance as an element applicable to GSK's claim).

Judge Wilken issued jury instructions on the UDTPA claim based on North Carolina law, and those instructions were given to the jury. Dkt. No. 485. The parties fully briefed and argued those instructions and the California Court reaffirmed them on

13

multiple occasions, including as recently as February 20, 2015. Dkt. No. 620. To the extent the jury instructions should be revisited, that can be done at trial.

D.  **Abbott's Proposed *Daubert* Motion**

Abbott also seeks to relitigate the qualifications of GSK's damages expert, Dr. Stephen Prowse, in an effort to delay retrial. Dr. Prowse was qualified to and in fact testified at the first trial, based on his calculations that compared Lexiva's actual market performance with the market share projections calculated by GSK, Abbott, and two outside consulting firms prior to Abbott's Norvir price hike. Although Dr. Prowse's supplemental expert reports served earlier this year employ the same methodology as was used in his testimony at the 2011 trial, Abbott sought to exclude Dr. Prowse from the retrial. Judge Wilken, however, reviewed full briefing, heard oral argument on the matter, and ultimately denied Abbott's motion. Abbott now asks the Court to entirely disregard Judge Wilken's decision and reconsider whether Dr. Prowse is qualified to testify under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Abbott offers no compelling reason for this Court to reconsider Dr. Prowse's qualifications when Judge Wilken, who had the most familiarity with Dr. Prowse's opinions and methodology, has already held that he is permitted to testify at the retrial.

Abbott's putative motion would fundamentally misconceive the ruling of *Daubert*, which is designed to make a preliminary determination as to whether the a proffered expert witness's testimony relies on recognized scientific methodology and standards. *See TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) ("In applying *Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses to reach his conclusion; the court does not evaluate the conclusion itself."). Here, Dr. Prowse employed the economically sound and accepted methodology of calculating damages estimates by comparing projected market share calculated before the defendant's alleged misconduct with real world market share. Abbott's own damages

expert, Joel Hay, has testified that reliance on prelaunch forecasts of future market share is a generally accepted practice in calculating damages in cases such as this. Tr. 2485-86 (Dkt. No. 550).

In an effort to entice the Court's indulgence in relitigating this matter, Abbott alleges a "brewing dispute" in which GSK is accused of "construing the required discovery obligation so narrowly as to render it meaningless." Abbott Status Report at 15 & n.4. In truth, it is Abbott who is misconstruing the California Court's order and engaging in stalling tactics to create controversy where there needn't be any. Counsel for GSK informed counsel for Abbott that GSK was gathering documents in accordance with Judge Wilken's order which explicitly "reopen[ed] discovery *to permit Abbott to request* expedited production of *documents related to the [Lexiva HC4] pilot program.*" Dkt. No. 679 at 2-3 (emphases added). GSK informed Abbott that although Abbott has made no such "request," GSK nonetheless has begun the document collection process so as to comply fully with Judge Wilken's order. GSK expects to be prepared to make a production to Abbott in short order.

Even if the Court were inclined to reconsider Judge Wilken's order denying Abbott's putative *Daubert* motion as to Dr. Prowse, there is no reason to delay the commencement of retrial to do so.

E. **Abbott's Proposed Motion *in Limine* Regarding One of GSK's Contract Theories**

GSK's breach of implied covenant claim remains unaffected by both the filing of the Second Amended Complaint and the subsequent transfer to this Court. That same claim has been litigated and tried to a jury. The jury previously ruled in favor of GSK on that claim. Abbott challenged that verdict on appeal to the Ninth Circuit but was unsuccessful. Yet, Abbott now mischaracterizes GSK's theory of Abbott's breach as one of "simply raising the price of Norvir too much in GSK's view." (Report at 16). Instead,

15

GSK's theory of breach is consistent with the law's requirement that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (Summary Judgment Order (Dkt. No. 325) at 36-37 (quoting *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008)). By intentionally enacting an unprecedented 400% price increase on Norvir that was specifically timed to interfere with GSK's launch of Lexiva, Abbott breached the implied covenant and severely injured if not utterly destroyed GSK's ability to receive the anticipated fruits of the contract.

By the time this case was transferred to this Court, the deadline for filing dispositive motions had long passed. Abbott's belatedly proposed MIL rests on a distortion and downplaying of its misconduct—misconduct the prior jury found actionable and warranting damages. There is no justification for the Court to entertain Abbott's request to modify the pretrial schedule to allow an untimely and meritless motion. Once again, to the extent Abbott contends that GSK has not offered sufficient evidence at retrial to sustain its breach of implied covenant claim, Abbott can file a JMOL (as it has previously, and as has been rejected previously).

### III. GSK'S PROPOSED MOTIONS

GSK believes this case should be set for trial, and any issues it needs the Court to address can be raised in the ordinary course of trial.

### IV. STATUS OF ADDITIONAL EXPERT DISCOVERY REGARDING GSK'S DAMAGES

As GSK stated during the May 20, 2015 status conference, GSK is collecting and reviewing documents to be produced in connection with the California Court's order "reopen[ing] discovery to permit Abbott to request expedited production of documents related to the [Lexiva HC4] pilot program." Dkt. No. 679 at 2-3. Although Abbott has not propounded any discovery request as contemplated by that Order, GSK is in the

process of expediently gathering and reviewing documents responsive to the California Court's April 10, 2015 Order.

This the 3rd day of June, 2015.

      **WOMBLE CARLYLE SANDRIDGE & RICE, LLP**
      /s/ Pressly M. Millen
      Pressly M. Millen, N.C.S.B. No., 16178
      150 Fayetteville Street, Suite 2100
      Raleigh, NC 27601
      Telephone: (919) 755-2135
      Facsimile: (919) 755-6067
      Email: pmillen@wcsr.com

      *Attorneys for Plaintiff GlaxoSmithKline*

*Of Counsel*

HUESTON HENNIGAN LLP
Brian Hennigan
Moez M. Kaba
Padraic W. Foran
C. Mitchell Hendy
523 W. Sixth St., Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
bhennigan@hueston.com;
mkaba@hueston.com;
pforan@hueston.com;
mhendy@hueston.com

THE LANIER LAW FIRM P.C.
W. Mark Lanier
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
wml@lanierlawfirm.com

THE LANIER LAW FIRM P.C.
Lee A. Cirsch
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Telephone: (310) 277-5100
Facsimile: (310) 277-5103
lee.cirsch@lanierlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITH KLINE'S STATUS REPORT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Caroline Cunningham, caroline.cunningham@mto.com, Charles Klein, cklein@winston.com, James Hurst, james.hurst@kirkland.com, Jeffrey Weinberger, weinbergerji@mto.com, Krista Ennis, kenns@winston.com, Nichole Norris, nnorris@coltwallerstein.com, Samuel Spark, spark@winiston.com, Seth Weisburst, sweisburst@winston.com, Steffen Johnson, sjohnson@winston.com, Stuart Senator, stuart.senator@mto.com and I hereby certify that I have served the following non-CM/ECF participants a copy of the same:

| | | |
|---|---|---|
| David J. Doyle<br>Winston & Strawn LLP<br>35 W. Wacker Dr.<br>Chicago, IL 60601 | Kathryn Ann Eidmann<br>Munger, Tolles & Olson, LLP<br>560 Mission St., 27th Floor<br>San Francisco, CA 94105 | Keith Rhoderic Dhu Hamilton, II<br>Munger Tolles & Olson LLP<br>355 S. Grand Ave., Suite 3500<br>Los Angeles, CA 90071-1560 |
| Michelle Friendland<br>Munger Tolles & Olson LLP<br>560 Mission St., 27th Floor<br>San Francisco, CA 94105 | Stephanie Suzanne McCallum<br>Winston & Strawn LLP<br>35 W. Wacker Dr.<br>Chicago, IL 60601 | |

This the 3rd day of June, 2015.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Pressly M. Millen
Pressly M. Millen, N.C.S.B. No., 16178
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 755-2135
Facsimile: (919) 755-6067
Email: pmillen@wcsr.com

*Attorneys for Plaintiff GlaxoSmithKline*

*Of Counsel*

HUESTON HENNIGAN LLP
Brian Hennigan
Moez M. Kaba
Padraic W. Foran
C. Mitchell Hendy
523 W. Sixth St., Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
bhennigan@hueston.com;
mkaba@hueston.com;
pforan@hueston.com;
mhendy@hueston.com

THE LANIER LAW FIRM P.C.
W. Mark Lanier
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
wml@lanierlawfirm.com

THE LANIER LAW FIRM P.C.
Lee A. Cirsch
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Telephone: (310) 277-5100
Facsimile: (310) 277-5103
lee.cirsch@lanierlawfirm.com