IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SMITHKLINE BEECHAM CORPORATION, )
d/b/a GLAXOSMITHKLINE,             )
                                   )
            Plaintiff,             )
                                   )
      v.                           )           1:15CV360
                                   )
ABBOTT LABORATORIES,               )
                                   )
            Defendant.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

This case was transferred to the Middle District of North Carolina following lengthy proceedings in the Northern District of California. The case involves a dispute between Plaintiff SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK" or "Plaintiff") and Defendant Abbott Laboratories ("Abbott" or "Defendant"). Just prior to the scheduled trial in California,[1] GSK filed a Second Amended Complaint. (Second Amended Complaint ("Second Am. Compl.") (Doc. 632).) A change in the scope of the Second Amended Complaint led to a question of the Northern District of California's personal jurisdiction over the case,

---

[1] While there was a trial in 2011, on appeal, the Ninth Circuit remanded the case for a new trial due to a jury selection issue. See SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 474 (9th Cir. 2014). The scheduled trial referenced here refers to the second trial, scheduled to occur after the Ninth Circuit remand.

and the parties thereafter stipulated to a transfer of this case to the Middle District of North Carolina. (See Doc. 681.) Following a status conference held in this district on May 20, 2015, Abbott filed an Answer to the Second Amended Complaint. (Def.'s Answer (Doc. 707).)

Presently before this court is Defendant's Motion for Judgment on the Pleadings based on Changed Choice-of-law Principles and its supporting memorandum. (Docs. 710, 711.) Plaintiff filed a response in opposition. (GSK's Mem. in Opp'n to Abbott's Rule 12(c) Mot. for J. on the Pleadings ("Pl.'s 12(c) Resp.") (Doc. 720).) Defendant filed a reply. (Abbott's Reply in Supp. of Rule 12(c) Mot. for J. ("Def.'s 12(c) Reply") (Doc. 725).)

Defendant also filed an alternative motion to dismiss GSK's unfair and deceptive claim, with supporting memorandum, in the event this court finds that North Carolina law applies to the claim under North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). (Docs. 721, 722.) Plaintiff filed a response in opposition. (Pl.'s Resp. to Dismiss (Doc. 726).) Defendant filed a reply. (Def.'s Dismiss Reply (Doc. 730).)

These matters are now ripe for adjudication and, for the reasons stated below, this court will deny Defendant's motions.

## I.  **PROCEDURAL HISTORY**

The procedural history of this case is complex. The case involves a dispute over a 2003 price increase for an HIV drug sold by Abbott called Norvir. (See Doc. 708 at 3-4.)[2] Abbott began to sell market licenses for Norvir to its competitors, including one negotiated in 2002 with GSK that allowed GSK to market its own HIV drugs to be co-administered with Norvir. (Id.) After signing this agreement with GSK, at some point in 2003, Abbott increased the price of Norvir from $1.71 per day to $8.57 per day, an increase of over 400%. (Id. at 4.)

In 2007, GSK brought suit against Abbott in the Northern District of California. Its 2009 Amended Complaint alleged violations of federal and state antitrust claims, a claim for breach of the implied covenant of good faith and fair dealing in the licensing agreement, and a claim under North Carolina's UDTPA, codified at N.C. Gen. Stat. § 75-1.1. (See First Amended Complaint ("First Am. Compl.") (Doc. 170).) In 2011, the case was tried on all four claims, with the jury finding in favor of GSK only as to the breach of implied covenant claim. See SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 475 (9th

---

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

Cir. 2014). GSK appealed and the Ninth Circuit vacated the verdict and remanded on the basis that a juror was improperly excluded on the basis of sexual orientation. Id. at 475-76.

On remand, Abbott moved for a Rule 50(a) judgment as a matter of law on the antitrust and UDTPA claims, and the District Court for the Northern District of California denied that motion, holding that GSK had presented sufficient evidence on its antitrust claims and that its UDTPA claim could survive because antitrust liability was sufficient to establish unfair trade practice liability. (See Doc. 591 at 14, 15 n.5, 16.) Trial was set for May 2015, but on March 10, 2015, GSK was granted leave to amend its complaint a second time. (See Doc. 631.) The Second Amended Complaint was changed from the first only in that it dropped GSK's causes of action for both federal and state antitrust violations. (See generally Second Am. Compl. (Doc. 632).) As a result of this change, the parties and the court were concerned that the Northern District of California no longer had personal jurisdiction over the case, absent the Sherman Act claims.[3] The court entered an order resolving all pending motions in limine, (Doc. 679), and the parties entered

---

[3] The Sherman Act grants nationwide jurisdiction, which is how the parties were able to litigate in the Northern District of California to begin with. See 15 U.S.C. §§ 15, 22, 26; (see also First Am. Compl. (Doc. 170).)

- 4 -

into a stipulation, adopted by the court, that transferred the case to this district. (Doc. 681.)

Currently at issue is a dispute between the parties on whether North Carolina, Pennsylvania, or New York law governs the UDTPA claim. (See Doc. 710; Def.'s 12(c) Br. (Doc. 711) at 8 (arguing specifically that North Carolina's unfair competition law does not apply).) Abbott contends that the choice-of-law analysis as to the UDTPA claim has been altered by the change in venue, (see Doc. 708) at 10; Abbott's 12(c) Br. (Doc. 711) at 7-22), and that if Pennsylvania or New York law is found to apply, judgment on the pleadings in its favor will be warranted on the UDTPA claim. (Abbott's 12(c) Br. (Doc. 711) at 19.)

## II.  **FACTUAL BACKGROUND**

The following facts are presented in the light most favorable to Plaintiff. See Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014).[4]

GSK was a Pennsylvania corporation with its principal office in Pennsylvania and with headquarters in both Durham, North Carolina, and Philadelphia, Pennsylvania. (Second Am. Compl. (Doc. 632) ¶ 5; Abbott's 12(c) Br., Ex. A ("Agreement")

---

[4] This court excluded matters not properly considered on the motion pursuant to Rule 12(c). See A.S. Abell Co. v. Baltimore Typographical Union No. 12, 338 F.2d 190, 193 (4th Cir. 1964).

- 5 -

(Doc. 711-1) at 3.) North Carolina is the site for "various sales and marketing, administrative, and corporate functions" of GSK. (Second Am. Compl. (Doc. 632) ¶ 5.) North Carolina is also the center for GSK's "research and development facilities and commercial operations in the HIV/AIDS area." (Id.) GSK's brand director for its HIV drug Lexiva conducted his business in GSK's North Carolina facilities. (Trial Tr., vol. 5, Mar. 4, 2011 (Doc. 542) at 9, 11.)[5]

Abbott is an Illinois corporation with its principal place of business in Illinois. Abbott develops, manufactures, and sells health care products and services. (Second Am. Compl. (Doc. 632) ¶ 6.) Abbott has operations in numerous states and sells its products throughout the United States. (Id.)

GSK and Abbott manufacture and sell protease inhibitors (PIs), which are drugs used to treat HIV infection. (Id. ¶ 13.) In 1996, Abbott introduced ritonavir, a drug product it had developed under the brand name Norvir, for use as a stand-alone PI. (Id. ¶ 14.) Abbott was the sole manufacturer of Norvir. (Id.

_____

[5] "[I]n disposing of a Rule 12(c) motion, 'courts may consider relevant facts obtained from the public record, so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint.'" Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) (finding the district court's consideration of a trial transcript did not run afoul of Rule 12(d)). Additionally, Abbott did not object to the transcript and cited to transcripts in the record as well.

- 6 -

¶ 22.) It was later discovered that a small dose of Norvir could "boost" the effectiveness of other PIs paired with it, thus reducing dosage amounts of the paired PI and slowing the rate at which HIV developed a resistance to a given PI treatment. (Id. ¶ 15.) Norvir began to be co-prescribe and co-administer with other PIs, and GSK relied on the reasonable availability of Norvir as a boosting agent when developing its own PIs. (Id. ¶ 16).

In 2000, Abbott introduced Kaletra, a drug that combined both Norvir, as a booster, and another PI into a single pill. (Id. ¶ 19.)

In 2001, Abbott approached GSK requiring GSK to secure a license to allow GSK to promote Norvir with GSK's existing PIs and its PIs in development. (Id. ¶ 20.) The parties' lead negotiators met in North Carolina for a face-to-face meeting to negotiate the terms of the Agreement. (Trial Tr., vol. 5, Mar. 4, 2011 (Doc. 542) at 170; Trial Tr., vol. 6, Mar. 7, 2011 (Doc. 543) at 77.) GSK alleges that in the license negotiations with Abbott, Abbott did not disclose that it had begun internal discussions regarding ways to protect the market share of its PI Kaletra by damaging competitors' access to Norvir. (Second Am. Compl. (Doc. 632) ¶ 25.) For instance, during negotiations in 2002, Abbott began to consider a "supply constraint program" to

- 7 -

remove Norvir from the U.S. market. (Id. ¶ 28.) Abbott was also considering options for a "mega price increase." (Id. ¶¶ 29-30.)

On December 13, 2002, GSK and Abbott executed a Non-Exclusive License Agreement, under which GSK paid money to Abbott and for which Abbott granted GSK a license to "recommend, label, market, use, sell, have sold and offer to sell one or more of the GSK Products, but no other product, in co-prescription and/or co-administration with Ritonavir." (Agreement (Doc. 711-1) ¶ 2.1.; Second Am. Compl. (Doc. 632) ¶ 21.) The Agreement also contained a provision that "[t]his Agreement shall be governed exclusively by the laws of the State of New York." (Agreement (Doc. 711-1) ¶ 11.4.)

Abbott also licensed other competitors the right to market PIs to be co-administered with Norvir and was able to sell Norvir at a profit. (Second Am. Compl. ¶¶ 17, 23-24.)

In 2003, GSK introduced its PI Lexiva into the market specifically for boosting with Norvir. (Id. ¶¶ 2, 32-33.) Two weeks after GSK began selling Lexiva, Abbott raised the price it charged for a 100 mg capsule of Norvir from $1.71 to $8.57, amounting to a 400-percent increase. (Id.; Def.'s Answer (Doc. 707) ¶ 34.) This price hike commensurately increased the cost of a boosted Lexiva therapy to some consumers, with the escalated wholesale acquisition cost of GSK's boosted Lexiva treatment

- 8 -

from $19.43 to $33.15. (Second Am. Compl. (Doc. 632) ¶ 34.) The
wholesale acquisition cost of Abbott's Kaletra remained
unchanged at $18.76. (Id.; Answer (Doc. 707) ¶ 34.) Shortly
after the price hike, a senior Abbott executive congratulated
the virology team on "giving a lump of coal to BMS [Bristol
Myers Squibb] and GSK for the holidays." (Second Am. Compl.
¶ 32.)

GSK alleges that the price increase and the timing of the
increase following the release of Lexiva disrupted its ability
to promote Lexiva, causing a loss to its anticipated market
share. (Id. ¶¶ 35, 39.) GSK alleges that the price increase
immediately following the release of Lexiva prevented GSK from
promoting Lexiva at prices competitive with Kaletra (and other
PIs), thus causing lost market share and lost profits that it
expected to receive under the Agreement. (Id. ¶¶ 41-42, 47, 50.)
GSK alleges Abbott's conduct harmed GSK in North Carolina and
effected commerce within California, North Carolina, and
elsewhere. (Id. ¶ 5, 52.)

### III. **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(c), a party may
move for judgment on the pleadings "[a]fter the pleadings are
closed — but early enough not to delay trial . . . ." Fed. R.
Civ. P. 12(c). Such motions are "designed to dispose of cases

- 9 -

when the material facts are not in dispute and the court can judge the case on its merits by considering the pleadings." Preston v. Leake, 629 F. Supp. 2d 517, 521 (E.D.N.C. 2009).

Rule 12(c) motions are judged by the same standards as Rule 12(b)(6) motions. Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014). Accordingly,

> [A] motion for judgment on the pleadings "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."

Id. (citations omitted). However, Rule 12(c) motions are limited in scope and courts must be "mindful that '[a] Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact.'" Massey v. Ojaniit, 759 F.3d 343, 353 (4th Cir. 2014) (quoting Drager, 741 F.3d at 474).

When assessing a Rule 12(c) motion, the complaint, "the answer and any documents incorporated by reference in the pleadings may be considered. The 'factual allegations of the answer are taken as true, to the extent "they have not been denied or do not conflict with the complaint."'" Blue Rhino Glob. Sourcing, Inc. v. Well Traveled Imps., Inc., 888 F. Supp. 2d 718, 721 (M.D.N.C. 2012) (quoting Farmer v. Wilson Hous.

- 10 -

Auth., 393 F. Supp. 2d 384, 386 (E.D.N.C. 2004)) (internal citation omitted). However, courts "are not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" Massey, 759 F.3d at 353 (citations omitted) (quoting Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible provided the plaintiff provides enough factual content to enable the court to reasonably infer that the defendant is liable for the misconduct alleged. Id. The pleading setting forth the claim must be "liberally construed" in the light most favorable to the nonmoving party, and allegations made therein are taken as true. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). However, "the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege any facts [that] set forth a claim." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004).

Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. Under Iqbal, the court performs a two-step analysis. First, it separates factual allegations from allegations not entitled to the assumption of truth (i.e., conclusory allegations, bare assertions amounting to nothing more than a "formulaic recitation of the elements"). Iqbal, 556 U.S. at 681. Second, it determines whether the factual allegations, which are accepted as true, "plausibly suggest an entitlement to relief." Id. "At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor." Estate of Williams-Moore, 335 F. Supp. 2d at 646.

## IV.    SUMMARY OF THE ARGUMENTS

### A.    Parties' Arguments on Abbott's Motion for Judgment on the Pleadings on GSK's UDTPA Claim Based on Changed Choice of Law

Abbott argues that under the applicable North Carolina choice-of-law rules, the UDTPA claim is governed by the law of Pennsylvania or New York, neither of which recognize GSK's

- 12 -

unfair competition claim as alleged. Specifically, Abbott argues
that the lex loci test, not the most significant relationship
test, applies to GSK's UDTPA claim. Under the lex loci test,
Abbott argues Pennsylvania law applies because GSK's lost
profits injury was felt in Pennsylvania, where its principal
place of business is located. Abbott also argues in a footnote
that if this court were to use the most significant relationship
test, Pennsylvania law would still apply because Pennsylvania
had the most significant relationship to the claim (and if not
Pennsylvania, then Illinois where its principal place of
business is located).

Alternatively, Abbott argues that the New York choice-of-
law clause in the Agreement governs GSK's UDTPA claim because
the claim relates to the validity and enforceability of the
parties' Agreement. Because neither Pennsylvania nor New York
recognizes GSK's UDTPA claim as alleged, Abbott argues judgment
pursuant to Rule 12(c) should be entered in its favor.

GSK argues that Abbott waived any objection to the
application of North Carolina law because Abbott acquiesced to
and relied upon North Carolina law for over seven years, first
arguing North Carolina law did not apply only two months before
the second trial. GSK also disagrees with the use of the lex
loci test, arguing that the appropriate test is the most

- 13 -

significant relationship test. Under the most significant
relationship test, GSK argues North Carolina law applies because
North Carolina has the most significant relationship to the
claim. GSK further argues that even under the lex loci test,
North Carolina law governs because GSK suffered the injury in
North Carolina, where its HIV headquarters are located. Finally,
GSK argues that the UDTPA claim is not contractual, consequently
the New York choice-of-law clause in the Agreement is not
applicable to that claim. Because North Carolina law governs the
UDTPA claim, GSK argues Abbott's motion should be denied.

> **B.** **Parties' Arguments on Abbott's Motion to Dismiss GSK's
> UDTPA Claim Based on North Carolina Law**

Abbott argues that even if North Carolina law applies to
the UDTPA claim, the claim should be dismissed because without
the antitrust claims, it is a breach of implied covenant with no
aggravating factors to support a UDTPA claim. Abbott also argues
that GSK should not be permitted to pursue an antitrust-based
UDTPA theory after dismissing its antitrust claims.

GSK argues that the removal of the antitrust causes of
action do not affect the viability of the UDTPA claim because
such a claim goes beyond antitrust liability. GSK argues it has
alleged facts sufficient to support unfair conduct or practices
actionable under the UDTPA as well as aggravating factors of

- 14 -

unscrupulous behavior sufficient to support liability under the
UDTPA.

## V.    **ANALYSIS**

As a threshold issue, the parties do not dispute that North
Carolina choice-of-law rules apply following the transfer of
this case to this court pursuant to 28 U.S.C. § 1631. <u>See</u>
(Abbott's 12(c) Br. (Doc. 711) at 3, 9; Pl.'s 12 (c) Resp. (Doc.
720) at 14).) This court agrees and will analyze the issues
under North Carolina choice-of-law rules.

### A.    **Abbott Has Not Waived Its Objection to North Carolina Law**

GSK argues that Abbott waived any objection to the
application of North Carolina law because Abbott acquiesced to
and relied upon North Carolina law for over seven years, first
arguing North Carolina law did not apply only two months before
the second trial. Circuit courts recognize that a party's
litigation conduct can constitute a waiver of choice-of-law
issues. <u>Williams v. BASF Catalysts LLC</u>, 765 F.3d 306, 316 n.2
(3d Cir. 2014), <u>reh'g denied</u> (Dec. 1, 2014) (collecting cases).
The Fourth Circuit has recognized this principle, <u>Bilancia v.
Gen. Motors Corp.</u>, 538 F.2d 621, 623 (4th Cir. 1976), and has
recognized that choice-of-law provisions can be waived when
parties rely on other law throughout the litigation. <u>Grecon
Dimter, Inc. v. Horner Flooring Co.</u>, 114 F. App'x 64, 66 (4th

- 15 -

Cir. 2004). However, a waiver is an "'intentional relinquishment of a known right'" and "'must indicate an intention or election to dispense with something of value or to forego some advantage which the party waiving it might at his option have insisted upon.'" Citibank, S.D., N.A. v. Palma, 184 N.C. App. 504, 509, 646 S.E.2d 635, 639 (2007) (quoting Guerry v. Trust Co., 234 N.C. 644, 648, 68 S.E.2d 272, 275 (1951)).

Here, although Abbott relied on North Carolina law in its briefs and arguments as early as 2008, GSK's removal of the antitrust claims caused the transfer of this case to this court, which led to the application of North Carolina choice-of-law rules to the UDTPA claim. In light of GSK's amended complaint and the subsequent transfer to this district, this court will not preclude Abbott from making an argument about the effect of the changed choice-of-law analysis on the UDTPA claim.

## B. Application of the Lex Loci Test and the Significant Relationship Test to GSK's UDTPA Claim

In ascertaining whether North Carolina law governs GSK's UDTPA claim, this court must first establish which rule to apply according to North Carolina choice-of-law. "[I]n determining state law[,] a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications." Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998). If no North Carolina Supreme

- 16 -

Court case is dispositive of the issue, this court must seek guidance from the state's appellate court. Id.

The Supreme Court of North Carolina has yet to address the proper test for UDTPA claims, and there is a split of authority in the North Carolina Court of Appeals on the appropriate rule to be applied. Stetser v. TAP Pharm. Prods., Inc., 165 N.C. App. 1, 15, 598 S.E.2d 570, 580 (2004); Associated Packaging, Inc. v. Jackson Paper Mfg. Co., No. 10 CVS 745, 2012 WL 707038, at *5 (N.C. Super. Ct. Mar. 1, 2012). Two different methods have been used by the appellate courts to assess which state's law governs an unfair and deceptive trade practice claim. Stetser, 165 N.C. App. at 15, 598 S.E.2d at 580. One approach is the lex loci test, which applies "the law of the state where the injuries" were sustained. E.g., United Va. Bank v. Air-Lift Assocs., Inc., 79 N.C. App. 315, 321, 339 S.E.2d 90, 93 (1986). The other approach is the most significant relationship test, which applies "the law of the state having the most significant relationship to the occurrence giving rise to the action." E.g., Andrew Jackson Sales v. Bi-Lo Stores, Inc., 68 N.C. App. 222, 225, 314 S.E.2d 797, 799 (1984).

Here, Abbott argues that the lex loci rule is favored by North Carolina courts and urges this court to adopt the lex loci rule as the better rule. (Abbott's 12(c) Br. (Doc. 711) at 10-

- 17 -

12.) GSK argues that the most significant relationship test is more appropriate because this is a complex UDTPA claim that touches many states. (Pl.'s 12(c) Resp. (Doc. 720) at 15-17.) Faced with conflicting appellate decisions, and "absent definitive authority from North Carolina's highest court, this court must 'attempt to divine what that court would do were it faced with this [case].'" Martinez v. Nat'l Union Fire Ins. Co., 911 F. Supp. 2d 331, 338 (E.D.N.C. 2012) (quoting Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994)).

While some North Carolina courts have used the most significant relationship test, federal courts generally appear to favor the lex loci rule. As one North Carolina court reasoned, earlier use of the significant relationship test was done when "there was a nationwide trend to apply the significant relationship test to torts in general, and that the North Carolina Supreme Court's subsequent rejection of this trend in Boudreau [v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988),] indicates that North Carolina court's would not be inclined to apply the significant relationship test to UDTPA claims." Associated Packaging, 2012 WL 707038, at *5 (citing United Dominion Indus., Inc. v. Overhead Door Corp., 762 F. Supp. 126, 128 n.2 (W.D.N.C. 1991)).

The district court in Martinez, also citing the district court decision in United Dominion, agreed in concluding that the North Carolina Supreme Court would use the lex loci test. In United Dominion, the district court placed "particular importance on the [North Carolina Court of Appeals] decision in United Virginia, which rejected the most significant relationship test in favor of the traditional [lex loci] test." United Dominion, 762 F. Supp. at 129.

Noting the conflict of authority, and relying on the reasoning in these decisions, several other North Carolina district courts have applied the lex loci test. M-Tek Kiosk, Inc. v. Clayton, 1:15CV886, 2016 WL 2997505, at *12 (M.D.N.C. May 23, 2016), appeal dismissed (July 19, 2016); Best v. Time Warner Inc., No. 5:11-CV-00104-RLV-DSC, 2013 WL 66265, at *3 (W.D.N.C. Jan. 4, 2013). However, the United Virginia case (on which these courts partially relied), in finding the lex loci rule to be "the better rule," did not discuss the use of the significant relationship test in complex injury cases and acknowledged that applying either test in that case would have brought about the same result. 79 N.C. App. at 322, 339 S.E.2d at 94.

Similarly, many of the district court cases applying the lex loci test did not involve an unclear place of injury, nor

- 19 -

did the courts discuss consideration of the most significant relationship test in such cases. In M-tek Kiosk, the court stated "there is no other location alleged where MTEK would have suffered damages except in Oregon." 2016 WL 2997505, at *16. In Best, the court cited Martinez and United Dominion in a footnote for its decision to apply the lex loci test and found, without much discussion, that California was the place of injury. 2013 WL 66265, at *3 n.4. Likewise, Martinez was not a complex injury case where the place of harm was unclear or highly open to date. 911 F. Supp. 2d at 336-38. The United Dominion case involved a single commercial transaction with the injury taking place either in North Carolina, where one party had corporate headquarters, or in Texas, where the transaction closed. 762 F. Supp. at 129-30. As that court noted, there was a "single clear alternative" to North Carolina. Id.

In applying the lex loci test, these courts also relied on the North Carolina Supreme Court's Boudreau decision. See, e.g., United Dominion, 762 F. Supp. at 129 ("This Court relies heavily upon the Boudreau decision . . . in concluding that a North Carolina court would apply the lex loci test to this issue."). The Boudreau court stated that North Carolina's Supreme Court "has consistently adhered to the lex loci rule in tort actions." Boudreau, 322 N.C. at 335, 368 S.E.2d at 854. This court does

not dispute that for causes of action generally considered to be torts, "the state where the injury occurred is considered the situs of the claim." Id. However, an UDTPA claim is "'neither wholly tortious nor wholly contractual in nature.'" Stetser, 165 N.C. App. at 15, 598 S.E.2d at 580 (quoting Bernard v. Cent. Carolina Truck Sales, Inc., 68 N.C. App. 228, 230, 314 S.E.2d 582, 584 (1984)); but see Caper Corp. v. Wells Fargo Bank, N.A., 578 F. App'x 276, 280 (4th Cir. 2014) (characterizing an UDTPA claim in violation of N.C. Gen. Stat. § 75-1.1 as a tort claim).

Additionally, there is Fourth Circuit precedence that states "when the place of injury is open to debate in regard to an unfair trade practices claim, North Carolina choice of law rules require a court to apply the law of the state with the most significant relationship to the transaction." Edmondson v. Am. Motorcycle Ass'n, Inc., No. 99-1290, 2001 WL 91104, at *12 (4th Cir. 2001); see New England Leather Co. v. Feuer Leather Corp., 942 F.2d 253, 255 (4th Cir. 1991). This court cannot ignore the Fourth Circuit decisions in analyzing this issue. See Spirax Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 419 (E.D.N.C. 2015) ("[I]f the Fourth Circuit has predicted how the North Carolina Supreme Court would rule, then this court should follow that decision in the absence of a later state court decision that renders the Fourth Circuit's decision clearly no

- 21 -

longer persuasive regarding North Carolina law."); cf. Derflinger v. Ford Motor Co., 866 F.2d 107, 110 (4th Cir. 1989).

Given that context, this court will apply the lex loci test unless its application does not yield a clear answer and the place of injury is so open to debate that application of the significant relationship test is more appropriate. See Food Lion, Inc. v. Capital Cities/ABC, Inc., 951 F. Supp. 1224, 1228 (M.D.N.C. 1996); see also McElmurry v. Alex Fergusson, Inc., No. 1:04CV389, 2006 WL 572330, at *10 n.8 (M.D.N.C. Mar. 8, 2006) ("This court has interpreted the conflicting North Carolina court of appeals opinions to hold that where the place of injury is uncertain the significant relationships test should apply.").

### C. **North Carolina Law Governs GSK's UDTPA Claim**

Under the lex loci rule, the "the state where the injury occurred is considered the situs of the claim." Stetser, 165 N.C. App. at 14, 598 S.E.2d at 580 (quoting Boudreau, 322 N.C. at 335, 368 S.E.2d at 853–54). For an UDTPA claim, the injury is considered "sustained in the state 'where the last act occurred giving rise to [the] injury.'" Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 694, 698 S.E.2d 719, 724 (2010) (quoting United Virginia, 79 N.C. App. at 321, 339 S.E.2d at 94). North Carolina requires that a plaintiff "suffer damages as a prerequisite for a cause of action under [the] unfair and

- 22 -

deceptive trade practice act[]. Thus, the suffering of damages . . . would be the last event necessary to make [a party] liable under the [North Carolina] unfair and deceptive trade practices act[]." Synovus Bank v. Parks, No. 10 CVS 5819, 2013 WL 3965424, at *5 (N.C. Super. Ct. July 30, 2013). Accordingly, this court must determine where GSK allegedly suffered its injury or damages.

Here, GSK alleged that it suffered injury in the form of lost market share and lost profits on sales of Lexiva throughout the United States and that Abbott's conduct injured consumers and commerce in "California, North Carolina and elsewhere." (Second Am. Compl. (Doc. 632) ¶¶ 43-52.) "In determining where the injury occurred in a case involving commercial or financial injury . . . , courts often look at the location where the economic loss was felt." Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sept. 21, 2005) (collecting cases); see Harco, 206 N.C. App. at 697, 698 S.E.2d at 726. Abbott argues that GSK suffered damages in many states, therefore, the location of the economic loss could only be felt at GSK's principal place of business, which it argues is in Pennsylvania. (Abbott's 12(c) Br. (Doc. 711) at 15.) Specifically, Abbott argues that GSK is a Pennsylvania corporation with its sole headquarters in Pennsylvania. Abbott

- 23 -

contends that GSK can have only one headquarters, which is in Pennsylvania, not North Carolina. Therefore, Abbott argues that because the injury is nationwide and GSK is a Pennsylvania corporation with its headquarters in Pennsylvania, the site of the injury must be at its headquarters in Pennsylvania. Alternatively, Abbott makes the argument that any focus on its conduct relating to the UDTPA claim would implicate Illinois, where its principal place of business is located. (Abbott's 12(c) Br. (Doc. 711) at 15 n.4.)

On the other hand, GSK argues that it has headquarters in both Pennsylvania and North Carolina. GSK claims its North Carolina offices are where its HIV business is centered, where it conducts HIV research and development, and where it carries out various marketing, administrative, and corporate functions. GSK asserts the center of economic impact was at its North Carolina headquarters where its center for "research and development facilities and commercial operations in the HIV/AIDS area" is located because that is where it felt the damages associated with the loss in market share and lost profits related to the HIV market and Lexiva. (Second Am. Compl. (Doc. 632) ¶ 5.) GSK further argues that even if its headquarters were legally only in Pennsylvania, North Carolina was still the site of the injury because that is where the center of the economic

- 24 -

impact was felt. Based on the foregoing, the location of GSK's injury appears to be either in Pennsylvania or North Carolina.

As Abbott argued, courts do often find that financial harm occurs where a business' principal place of business is located. However, courts have rejected a bright line rule that in all cases an injury is sustained where corporate headquarters are located. Harco, 206 N.C. App. at 697, 698 S.E.2d at 725-26 (finding persuasive United Dominion's reasoning that such a rule "would allow a corporation to conduct an entire transaction in a foreign jurisdiction and urge the law of the corporation's state of residency in subsequent litigation," 762 F. Supp. at 130); see Synovus Bank, 2013 WL 3965424, at *5 ("place of residence is not dispositive"); cf. Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 273 (4th Cir. 1982). As the Harco court stated,

> We . . . reject[] [the] proposed bright line rule. The location of a plaintiff's residence or place of business may be useful for determining the place of a plaintiff's injury in those rare cases where, even after a rigorous analysis, the place of injury is difficult or impossible to discern. However, . . . a significant number of cases exist where a plaintiff has clearly suffered its pecuniary loss in a particular state, irrespective of that plaintiff's residence or principal place of business.

Harco, 206 N.C. App. at 697, 698 S.E.2d at 725-26.

Abbott's alleged conduct caused GSK to lose revenue from many states, and consumers and competition were affected in many states. Thus, turning to where the economic loss was felt, GSK

- 25 -

may have been a Pennsylvania corporation with corporate headquarters in Pennsylvania, however, GSK also claims it had headquarters in North Carolina. (Second Am. Compl. (Doc. 632) ¶ 5.) Although GSK may have suffered injury in Pennsylvania as Abbott asserts, GSK alleges the center of economic impact was in North Carolina where the heart for "research and development facilities and commercial operations in the HIV/AIDS area" was located – this is where it felt the damages associated with the loss in market share and lost profits related to the HIV market and Lexiva. See Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d 554, 555 (M.D.N.C. 1999) (applying lex loci in fraud claim, plaintiff suffered injury at its headquarters in both North Carolina and France, but in finding North Carolina "more appropriate," the court noted that plaintiff's North Carolina corporation was more involved, plaintiff's principal negotiator was in North Carolina, and neither party asserted that North Carolina law applied until eve of trial).

Rule 12(c) motions are "designed to dispose of cases when the material facts are not in dispute." Preston, 629 F. Supp. 2d at 521. Here, Abbott disputes the location of GSK's headquarters. However, in applying the lex loci test, GSK has plausibly pled that it felt the economic injury in North Carolina. Therefore, North Carolina law governs.

Even if this court were to apply the most significant relationship test because of the alleged nationwide impact, the place of injury still appears to be North Carolina. Courts analyzing North Carolina UDTPA claims under the most significant relationship test focus on "where the relationship between the parties was created and where it was centered." Jacobs v. Cent. Transp., Inc., 891 F. Supp. 1088, 1111 (E.D.N.C. 1995), rev'd on other grounds, Nos. 95-2395, 95-2396, 95-2397, 1996 WL 223688 (4th Cir. May 3, 1996); see also New England Leather, 942 F.2d at 256; Edmondson, 2001 WL 91104, at *12. Federal courts and North Carolina courts applying the most significant relationship test to UDTPA claims engage in fact-specific inquiries under that guidance. Id. See, e.g., Andrew Jackson Sales, 68 N.C. App. at 225, 314 S.E.2d at 799; Michael v. Greene, 63 N.C. App. 713, 715, 306 S.E.2d 144, 145 (1983). However, it may also be appropriate to consider the factors listed in the Restatement (Second) of Conflict of Laws, which include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) of Conflict of Laws § 145 (Am. Law Inst. 1971).

- 27 -

The first factor, in effect, is the lex loci test. As already discussed, the application of the first factor favors North Carolina. For the second factor, GSK offers the conclusory statement that "conduct giving rise to Abbott's liability occurred in North Carolina." (Pl.'s 12(c) Resp. (Doc. 720) at 19.) Abbott argues that the UDTPA claim focuses on Abbott's conduct "relating to the pricing of Norvir and statements Abbott allegedly made about that pricing" which occurred at its principal place of business in Illinois. (Def.'s 12(c) Reply (Doc. 725) at 8.)

The third factor does not favor any one state. Abbott is an Illinois corporation with its principal place of business in Illinois. GSK was a Pennsylvania corporation with its principal office in Pennsylvania and with headquarters in both Durham, North Carolina, and Philadelphia, Pennsylvania.

The fourth factor is essentially the factor that courts focus on when analyzing North Carolina UDTPA claims under the most significant relationship test. Abbott argues that the center of the parties' relationship is reflected in the Agreement, which "does not contain a single reference to North Carolina." (Id. at 10.) Abbott asserts that the Agreement describes GSK as a Pennsylvania corporation, requires notice to be sent to GSK in Pennsylvania and Abbott in Illinois, and

- 28 -

grants GSK a worldwide license. (Id.) Abbott suggests it is unimportant that the parties had meetings in North Carolina or that GSK had key employees and its HIV operations in North Carolina. (Id. at 11.) Abbott further asserts that it contracted with GSK, not GSK's HIV business. (Id.) Abbott, in support of its claim that if North Carolina "had mattered . . . it would have appeared in the Agreement," cites a quote from Edmondson stating that the "joint venture agreement provides it was entered into in Ohio." (Id.) However, the Edmondson court found that "North Carolina had a more significant relationship to this case than Ohio" even though the agreement provided it was entered into in Ohio and even though the defendant asserted all of plaintiff's claims arose out of the parties' joint venture relationship. Edmondson, 2001 WL 91104, at *12.

GSK asserts that negotiations between the parties regarding the Agreement took place in North Carolina. Abbott makes the argument that its conduct relating to the UDTPA claim occurred in Illinois, where its principal place of business is located. However, GSK asserts that Abbott did not disclose certain material information during the negotiations in North Carolina. It is not disputed that Abbott is an Illinois corporation with its principal offices in that state. GSK was a Pennsylvania corporation with headquarters there. However, GSK asserts that

it also had headquarters in North Carolina, specifically, its HIV headquarters. The parties' Agreement states that "GSK is interested in obtaining a license from Abbott to promote and market certain of GSK's HIV products." (Agreement (Doc. 711-1) at 3.) GSK asserts North Carolina is where its HIV business is centered, where it conducts HIV research and development, where its Lexiva brand director conducted his business, and where it carries out other marketing, administrative, and corporate functions.

While Pennsylvania and Illinois are not without connection to the parties and the subject matter of the suit, application of the factors point to North Carolina as the state with the most significant relationship and thus this court finds that the law of North Carolina governs.

### D. <u>The New York Choice-of-Law Clause in the Agreement Does Not Govern GSK's UDTPA Claim</u>

The Agreement contains a choice-of-law clause providing that "[t]his Agreement shall be governed exclusively by the laws of the State of New York." (Agreement (Doc. 711-1) ¶ 11.4.) As a general matter, in North Carolina, parties to a contract can agree in advance as to the choice of law that will govern certain disputes that arise between them. <u>See</u> <u>Tanglewood Land Co. v. Byrd</u>, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). However, a contractual choice-of-law provision does not

- 30 -

necessarily apply to a claim for damages arising under North Carolina's Unfair and Deceptive Trade Practices act. United Dominion, 762 F. Supp. at 127–28; ITCO Corp. v. Michelin Tire Corp., Commercial Div., 722 F.2d 42, 49 n.11 (4th Cir. 1983).

Similar to the United Dominion court's conclusion, "[t]he contractual provision here may govern the choice of laws as to the interpretation and construction of the contract; however, it does not provide the applicable law for a claim based on unfair and deceptive acts." United Dominion, 762 F. Supp. at 128. As explained in ITCO, North Carolina courts would apply N.C. Gen. Stat. § 75-1.1 to an UDTPA claim, without regard to the contractual choice-of-law clause, because "the nature of the liability allegedly to be imposed by the statute is ex delicto, not ex contractu." ITCO, 722 F.2d at 49 n.11. "No issue of contractual construction, interpretation, or enforceability" was raised. Id.

Here, GSK's UDTPA claims do not rely on the validity or enforceability of any contractual provision in the Agreement. United Dominion, 762 F. Supp. at 128; see United Virginia, 79 N.C. App. at 320-21, 339 S.E.2d at 93 (referring to the ITCO decision as "persuasive"). Even if GSK's alleged UDTPA claims are directly relevant to the Agreement, this court will still decline to apply the contractual choice-of-law provision in

determining whether North Carolina's UDTPA applies. See Robinson
v. Ladd Furniture, Inc., No. 92-2286, 1993 WL 211309, at *5 (4th
Cir. June 14, 1993) (stating "[t]he argument could have been
made in [the] ITCO [case] that the terms of the . . . agreements
would be directly relevant to the wrongful termination claims,
but we still declined to apply the contractual choice of law
provisions in these actions").

### E. GSK Has Alleged Sufficient Facts to Support Its UDTPA Claim

Abbott moves to dismiss GSK's N.C. Gen. Stat. § 75-1.1
claim for unfair and deceptive trade practices. North Carolina's
UDTPA prohibits "[u]nfair methods of competition in or affecting
commerce, and unfair or deceptive acts or practices in or
affecting commerce." N.C. Gen. Stat. § 75-1.1(a). To state a
claim for unfair and deceptive trade practices, a plaintiff must
show that (1) the defendant committed an unfair or deceptive act
or practice; (2) the act in question was in or affecting
commerce; and (3) the act proximately caused injury to the
plaintiff. Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704,
711 (2001).

The UDTPA language generally covers five categories: (1)
unfair conduct; (2) deceptive misrepresentations; (3) certain
per se violations of § 75-1.1; (4) breaches of contract
occurring under aggravating circumstances; and (5)

- 32 -

anti-competitive conduct. <u>Sparks v. Oxy-Health, LLC</u>, 134 F. Supp. 3d 961, 997-98 (E.D.N.C. 2015) (collecting cases); <u>Exclaim Mktg., LLC v. DirecTV, LLC</u>, 134 F. Supp. 3d 1011, 1022 (E.D.N.C. 2015), <u>aff'd in part</u>, No. 15-2339, 2016 WL 7479315 (4th Cir. Dec. 29, 2016). The conduct sufficient to constitute an unfair or deceptive trade practice is a "somewhat nebulous concept," and depends on the circumstances of the particular case. <u>ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 472 F.3d 99, 122-23 (4th Cir. 2006). Whether a particular commercial act or practice constitutes an unfair or deceptive practice is a question of law for the court. <u>Norman Owen Trucking, Inc. v. Morkoski</u>, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998).

In this case, the dispute arises over the first prong of whether Abbott committed an unfair or deceptive act or practice sufficient to support an UDTPA claim. Abbott argues that GSK's two UDTPA theories, unfairness and antitrust, fail because GSK dismissed its antitrust claims. (Def.'s Dismiss Br. (Doc. 722) at 6-7.) Abbott contends that because GSK chose to dismiss its antitrust claims, GSK "should not be permitted to pursue an antitrust-based UDTPA theory." (<u>Id.</u> at 10-12.) Specifically, Abbott contends that "dismissal of antitrust claims requires

- 33 -

dismissal of a UDTPA claim based on the same allegations." (Id. at 12.)

It may be correct that when a Sherman Act claim is dismissed by a court as legally deficient, and the UDTPA claim is premised on the same factual allegations, dismissal of the UDTPA claim may be appropriate. See, e.g., R. J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002); Sea-Roy Corp. v. Parts R Parts, Inc., No. 1:94CV00059, 1997 WL 1046282, at *19 n.25 (M.D.N.C. Dec. 2, 1997). However, that is not the posture of this case. Here, in various stages of litigation, it has been found that GSK adequately pled antitrust violations. (See, e.g., Docs. 82, 195, 325, 591.) The court did not dismiss the antitrust claims. GSK chose to dismiss them and proceed on an alternate theory. See Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1160 (9th Cir. 2002). Although GSK dismissed its antitrust claims, all of the factual allegations regarding Abbott's alleged anti-competitive conduct remain in the operative complaint.

Courts have held that "[c]onduct is 'anti-competitive' where it amounts to an unfair use of market power to harm the competitive process and thereby harm consumers." Exclaim Mktg., 134 F. Supp. 3d at 1022 (citing Dickson v. Microsoft Corp., 309 F.3d 193, 206 (4th Cir. 2002); and ITCO, 722 F.2d at 48)). The

- 34 -

Fourth Circuit has held that "proof of conduct violative of the Sherman Act is proof sufficient to establish" liability under North Carolina's UDTPA. ITCO, 722 F.2d at 48. Although "anti-competitive conduct is similar in nature to that conduct which could give rise to a violation of the Sherman Act . . . [and a] violation of the Sherman Act is sufficient to give rise to a UD[T]PA claim, it is not necessary." Exclaim Mktg., 134 F. Supp. 3d at 1025 (citing ITCO, 722 F.2d at 48; and citing Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 71, 529 S.E.2d 676 (2000) for the proposition that "plaintiff need not prove a technical violation of a statute regulating trade to give rise to UD[T]PA claim, where defendant's conduct substantially violates statute")). That GSK voluntarily dismissed its antitrust claims does not itself preclude GSK from proceeding on an alternative anti-competitive UDTPA claim, and this court will not dismiss GSK's UDTPA claim on those grounds. See ITCO, 722 F.2d at 48-52.

Abbott further argues that without the antitrust claims, GSK can allege no aggravating factors sufficient to support a UDTPA violation, making GSK's unfairness theory a mere breach of contract claim. (Def.'s Dismiss Br. (Doc. 722) at 7-10.) Unfair conduct is that which a court of equity would find unfair. South Atl. Ltd. P'ship of Tennessee, L.P. v. Riese, 284 F.3d 518, 535 (4th Cir. 2002). An act or practice is unfair if it

- 35 -

"offends established public policy"; if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers"; or if it "amounts to an inequitable assertion of [a party's] power or position." Carcano v. JBSS, LLC, 200 N.C. App. 162, 172, 684 S.E.2d 41, 50 (2009) (emphasis omitted); see Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). "[T]he fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others." South Atlantic, 284 F.3d at 535.

North Carolina courts have construed the UDTPA liberally, but there are some limits on its application. Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, 80 F.3d 895, 903 (4th Cir. 1996). Whether GSK's allegations demonstrate unfair conduct, anti-competitive conduct or a breach of contract by Abbott, GSK must prove that such conduct or breach was surrounded by substantial aggravating circumstances. Dalton, 353 N.C. at 657, 548 S.E.2d at 711; Griffith v. Glen Wood Co., 184 N.C. App. 206, 217, 646 S.E.2d 550, 558–59 (2007).

To satisfy a showing of substantial aggravating circumstances, courts have opined that unfairness or "deception

either in the formation of the contract or in the circumstances of its breach" may be adequate. Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989); United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981). Courts have also found that aggravating factors can "include an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other." Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 700 (M.D.N.C. 2011). Obtaining a contract without intending to adhere to the contract or abandoning and frustrating its performance can give rise to an action for unfair and deceptive trade practices as well. Swan Racing Co., LLC v. XXXtreme Motorsport, LLC, Civil Action No. 5:14CV155-RLV, 2015 WL 4430257, at *3 (W.D.N.C. July 20, 2015) (taking assets without paying, stripping contract of value, and frustrating agreed payment method could "plausibly give rise to an action for unfair and deceptive trade practices").

GSK alleges the following unfair conduct: (1) Abbott deliberately withheld its plans to use Norvir as a weapon to destroy competition while negotiating with GSK for substantial compensation in the Norvir Agreement (Second Am. Compl. (Doc. 632) ¶¶ 28-32; Pl.'s Resp. to Dismiss (Doc. 726) at 7, 9); (2) Abbott inequitably asserted its power or position by

manipulating GSK into the Agreement that Abbott sought to undermine (Id. ¶ 60; Id. at 8-9); and (3) Abbott deliberately timed the Norvir price increase to disrupt the launch of Lexiva in the market and harm GSK (Id. ¶¶ 35, 41, 45-48; Id. at 8-9). These actions, if proved, could reasonably give rise to an UDTPA claim within the meaning of section 75.1-1.

"The obligations imposed by the UD[T]PA 'create a cause of action broader than traditional common law actions.'" South Atlantic, 284 F.3d at 537 (quoting Marshall, 302 N.C. at 547, 276 S.E.2d at 402). In South Atlantic, the Fourth Circuit, applying North Carolina law, found that a party who "deliberately withheld information" knowing it would harm the other party to an agreement, even if not necessarily legally obligated to convey such information, was "the essence of unscrupulous behavior . . . sufficiently egregious to constitute an unfair trade practice." Id. at 538. The South Atlantic court also found that when one party "manipulated and exploited" the timing of its conduct to ensure that the other party received no compensation for its work was "the kind of inequitable assertions of power that North Carolina deems to be unfair trade practices." Id. at 539-40 (internal quotations omitted). Based on the foregoing, GSK's allegations that Abbott, after negotiating with GSK for the Agreement, knowingly took steps to

undermine the value of the Agreement, if proved, is sufficiently egregious to support an UDTPA claim.

## VI.   CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Judgment on the Pleadings Based on Changed Choice-of-Law Principles (Doc. 710) and Alternative Motion to Dismiss GSK's Unfair and Deceptive Acts Claim under North Carolina Law (Doc. 721) are **DENIED.**

This the 20th day of March, 2017.

_____
United States District Judge

– 39 –